# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

STATE OF ALABAMA     )
Alabama State Capitol     )
600 Dexter Avenue, Suite NB-05 )
Montgomery, Alabama 36130-3024, )
            )
  Plaintiff,       )
            )
vs.           )
            )
U.S. ARMY CORPS OF ENGINEERS )
441 G Street NW      )
Washington, DC 20314-1000;  )
            )
JOHN M. MCHUGH,    )
in his official capacity as   )
Secretary of U.S. Army,   )
101 Army Pentagon    )
Washington, DC 20310-0101;  ) **CIVIL ACTION NO. 1:15-cv-00696**
            )
JO-ELLEN DARCY,    )
in her official capacity as   )
Assistant Secretary of U.S. Army )
for Civil Works,     )
108 Army Pentagon    )
Washington, DC 20310-0108;  )
            )
THOMAS P. BOSTICK,   )
in his official capacity as   )
Commander and Chief of Engineers for )
U.S. Army Corps of Engineers,  )
U.S. Army Corps of Engineers  )
441 G Street NW      )
Washington, DC 20314-1000  )
            )
C. DAVID TURNER,    )
in his official capacity as   )
Division Commander for   )

South Atlantic Division of                )
U.S. Army Corps of Engineers,             )
U.S. Army Corps of Engineers              )
South Atlantic Division                   )
60 Forsyth Street SW, Room 10M15          )
Atlanta, Georgia 30303-8801;              )
                                          )
JON J. CHYTKA,                            )
in his official capacity as               )
District Commander for Mobile District    )
of U.S. Army Corps of Engineers,          )
U.S. Army Corps of Engineers              )
Mobile District                           )
P.O. Box 2288                             )
Mobile, Alabama 36628-0001,               )
                                          )
         Defendants.                      )


# COMPLAINT OF STATE OF ALABAMA

The State of Alabama brings this action under the Administrative Procedure Act, 5 U.S.C. §701 *et seq.*, to set aside the U.S. Army Corps of Engineers' final adoption in 2015 of the Revised Water Control Manual for the Alabama-Coosa-Tallapoosa River Basin, including but not limited to its manual relating to the Allatoona Project.

## PARTIES

1.      Plaintiff State of Alabama ("Alabama") is a sovereign State of the United States. Alabama Governor Robert Bentley has authorized the undersigned attorneys under Section 36-13-2 of the Alabama Code to bring this action.

2.      Defendant United States Army Corps of Engineers ("Corps") is an agency of the United States. The Corps' headquarters are in Washington, D.C. Critically for present purposes, the Corps' functions include operating a reservoir project at Lake Allatoona in Georgia (the "Allatoona Project") and other projects within the Alabama-Coosa-Tallapoosa River Basin (the "ACT River Basin").

3.      Defendant John McHugh, Secretary of the United States Army ("Secretary"), is the official who directs and supervises the Corps. The Secretary maintains his office in Washington, D.C.

4.      Defendant Jo-Ellen Darcy, Assistant Secretary of the United States Army for Civil Works ("Assistant Secretary"), is the official responsible for certain actions taken by the Corps that are the subject of this complaint. The Assistant Secretary maintains her office in Washington, D.C.

5.      Defendant Lieutenant General Thomas P. Bostick, Commander and Chief of Engineers, U.S. Army Corps of Engineers ("Commander"), is the official responsible for certain actions taken by the Corps relating to this complaint. The Commander maintains his office in Washington, D.C.

6.     Defendant Brigadier General C. David Turner, Division Commander for the South Atlantic Division of the Corps ("Division Commander"), is the official responsible for certain actions taken by the Corps relating to this complaint. The Division Commander maintains his office in Atlanta, Georgia.

7.     Defendant Colonel Jon J. Chytka, District Commander for the Mobile District of the Corps ("District Commander"), is the official responsible for certain actions taken by the Corps relating to this complaint. The District Commander maintains his office in Mobile, Alabama.

8.     In addition to being responsible for and approving the acts and omissions of the Corps relating to this complaint, the Secretary, Assistant Secretary, Commander, Division Commander, and District Commander are responsible for the Corps' compliance with any judgment or decree of this Court.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this complaint to set aside the Corps' final agency action under 28 U.S.C. §§1331 and 1361 and 5 U.S.C. §§701-706.

10.     Venue is proper in this Court under 28 U.S.C. §1391(e) because the Corps' headquarters are in this District and the Secretary, Assistant Secretary, and Chief of Engineers maintain their offices here.

## FACTUAL AND LEGAL BACKGROUND

### *Geographic background*

11.     This case arises from the Corps' operations of reservoirs within the Alabama-Coosa-Tallapoosa River Basin.

12.     The Allatoona Project is on the Etowah River in Georgia.

13.     The Etowah River starts in the mountains of northeast Georgia. It flows to Rome, Georgia, where it meets another river and forms the Coosa River.

14.     The Coosa River then flows west and south into Alabama. It joins the Tallapoosa River to form the Alabama River in the middle part of Alabama. The Alabama River then flows through the southern part of Alabama.

15.     These three rivers, their tributaries (including the Etowah River), and their drainage areas form a basin known as the "ACT River Basin." ACT is an acronym for "Alabama-Coosa-Tallapoosa." The basin mostly is in Alabama, but some of the waters within it, like the Etowah River, start in Georgia.

16.     The flow of water through the ACT River Basin is critical to Alabama water users and its government. The flow directly affects Alabama's citizens, environment, and economy. The flow is a critical determinant of, among other things, navigability of the State's waterways, commerce conducted within the State, electricity production, the availability of water for drinking and commercial

purposes, the well-being of the environment, and the ability of the State and its citizens to use the State's waterways for recreational and tourism purposes.

### *The Corps' operation of the Allatoona Project*

17.    Congress authorized the Corps to build and maintain the Allatoona Project in 1941. *See* Pub. L. No. 77-228, 55 Stat. 638 (Aug. 18, 1941).

18.    The Allatoona Project has three statutory purposes: "the control of floods, regulation of stream flow for navigation, and the development of hydroelectric power." House Doc. 674, 76th Cong., 3d Session, at 2 (Mar. 18, 1940).

19.    The Corps completed the Allatoona Project in 1949.

20.    Congress authorized the Corps to operate other projects in the ACT River Basin in addition to the Allatoona Project.

### *The Corps' previous manuals governing operations at the Allatoona Project*

21.    The Corps has used several different manuals to govern its operations at the Allatoona Project and other Corps projects in the ACT River Basin.

22.    As relevant for present purposes, the Corps prepared and finalized one manual for the Allatoona Project in 1968 ("1968 Manual").

23.     While the Corps was operating the Allatoona Project under the 1968 Manual, Congress passed, and the President signed, the National Environmental Protection Act, 42 U.S.C. §4321 ("NEPA"). NEPA required the Corps to issue an environmental-impact statement concerning the continued operations of the Allatoona Project. In accordance with that obligation, the Corps prepared a final environmental-impact statement relating to the Allatoona Project's continued operations in 1974 ("1974 FEIS").

24.     The Corps prepared a draft revised Allatoona Water Control Manual in 1993 ("1993 Draft Manual"). The Corps never prepared a finalized version of the 1993 Draft Manual. The Corps also never subjected the 1993 Draft Manual to the required review and coordination under federal law, including NEPA and the Corps' own regulations.

25.     The Corps purported to operate the Allatoona Project under the 1993 Draft Manual, rather than the earlier manuals, from 1993 until the time it adopted the manual that is the subject of this complaint.

## THE CORPS' WATER CONTROL MANUAL
## AND FINAL ENVIRONMENTAL IMPACT STATEMENT

*The Corps' notice and implementation of the WCM*

26.     In March 2013, the Corps provided public notice of a draft revised water-control manual for its operations in the ACT River Basin. The manual was

to include a master water-control manual for the entire basin and individual water-control manuals for particular projects.

27.    NEPA required the Corps, in taking this action, to prepare an environmental-impact statement. Accordingly, the Corps also provided notice in March 2013 that it would issue a draft environmental-impact statement for the draft revised manual.

28.    Alabama, through its Office of Water Resources, provided timely comments objecting to various aspects of the draft revised manual and environmental-impact statement. Likewise, two additional Alabama state agencies, the Alabama Department of Environmental Management and the Alabama Department of Conservation and Natural Resources, provided timely comments objecting to various aspects of the draft revised manual and environmental-impact statement.

29.    In November 2014, the Corps provided public notice of the final revised Water Control Manual for the ACT River Basin, including both the master water-control manual and individual project water-control manuals (collectively, the "WCM") and a final environmental-impact statement for the WCM ("FEIS").

30.    The WCM and FEIS failed to adequately address valid comments and objections made by Alabama and other stakeholder commenters in response to the draft versions.

31.     Alabama and its Office of Water Resources, Department of Environmental Management, and Department of Conservation and Natural Resources timely renewed their comments and made additional comments in February 2015.

32.     Without adequately addressing the expressed concerns of Alabama and numerous other commenters, the Corps signed the Record of Decision for the WCM and FEIS on May 4, 2015.

33.     The Corps is now operating the Allatoona Project and other Corps projects in the ACT River Basin under the WCM.

34.     The Defendants' acts and omissions in adopting the WCM, the FEIS, all supporting analysis and documentation, and a final Record of Decision constitute final agency action reviewable under the Administrative Procedure Act ("APA").

35.     The WCM goes beyond the congressionally authorized purposes of the Allatoona Project and is contrary to law in numerous ways. It will cause injury to Alabama. The WCM will allow the Corps to operate the Allatoona Project and other ACT River Basin projects in an arbitrary and capricious manner that will reduce the quantity of flows into Alabama, change the timing of flows into Alabama, and reduce the quality of water that flows into Alabama. As a direct result, Alabama will suffer injury to its citizens, economy, and environment.

*The WCM's "guide curve plateau"*

36.     An important function of the reservoirs in the ACT River Basin is to store water when there is an abundance of rain and to release water when there is less rain. This helps ensure that relevant water needs and congressionally authorized purposes are met throughout the year.

37.     The late summer and fall tends to be a relatively dry time of year in the ACT River Basin.

38.     Yet the WCM implements a significant operational change through what has been described as a "modified drawdown" at the Allatoona Project in the fall months. Under prior operations, consistent with the function of reservoir operations discussed above, the Corps could release water from Lake Allatoona's conservation storage pool from October 1 through mid-November. The WCM calls for the Corps to suspend this process during that 45-day period, creating what is known as a "plateau" in the Project's "guide curve."

39.     The Corps has identified recreation as the only purpose that will benefit from the WCM's modified drawdown.

40.     Corps officials have stated at a public meeting that this action was designed to benefit recreation at Lake Allatoona.

41.     The apparent purpose of the modified drawdown is to keep water levels at the Allatoona Project sufficiently high so as to allow certain forms of

recreation on the lake during the fall months. The Corps will then release the water later in the year during the wet season.

42.     The Corps has asserted that because of the modified-drawdown plan and other factors, lake elevations at Lake Allatoona will be substantially higher under drought conditions from mid-August through December.

43.     The modified-drawdown plan will have substantial environmental and economic effects on Alabama. Flows near the Alabama border will be substantially lower in the fall. Especially during droughts, the result will be substantially poorer water quality at various points in the ACT River Basin throughout Alabama.

44.     During the time period between October 1 and November 15, downstream areas in Alabama have substantial water needs. The modified draw-down period will result in water being held at the Allatoona Project until this time period is over. Although the WCM envisions releasing the water later in the year, at that point the releases will be of diminished value to downstream areas in Alabama.

45.     The Corps' promotion of recreation through the modified drawdown, at the expense of other considerations, is contrary to the purposes for which Congress authorized the Allatoona Project.

46.     The Corps' change in policy through the modified drawdown is contrary to the settled expectations of Alabama and its citizens in water flows in

the ACT River Basin. The Corps has not provided a sufficiently substantial explanation for this change of policy.

*The WCM's "action zones"*

47.     The WCM implements a significant operational change through its creation of "action zones" at the Allatoona Project.

48.     Before the WCM, the Corps was required to generate hydropower each day when Lake Allatoona was in the upper portion of its conservation storage pool.

49.     Under the WCM, the Corps has the discretion to generate zero hydropower even when Lake Allatoona is in the upper portion of its conservation pool during the summer and fall months.

50.     The WCM creates one zone of the conservation storage pool, Zone 1, in which the Corps has the discretion to generate the most hydropower. But under the WCM, Zone 1 does not come into existence until two full months after the WCM envisions the Allatoona Project reaching full pool level within the conservation storage pool. And even then, the WCM gives the Corps discretion to generate zero hydropower in Zone 1 during this time.

51.     The WCM creates one zone of the conservation storage pool, Zone 4, in which the Corps has fully removed the option for hydropower generation.

52.     The WCM defines Zone 4 to include a majority of the conservation storage pool for most of the year.

53.     The WCM's creation of these zones substantially diminishes the importance of hydropower generation in the Corps' operation of the Allatoona Project.

54.     The Corps' change in policy through the creation of these zones is contrary to the settled expectations of Alabama and its citizens in water flows in the ACT River Basin, and the Corps has not provided a sufficiently substantial explanation for this change of policy.


*Additional reordering of the Allatoona Project's purposes*

55.     The WCM places greater importance on water supply for human consumption than did the 1968 Manual.

56.     Inflow in the Coosa River and downstream in Alabama is critical for navigation, one of the three statutory purposes for which the Allatoona Project was created. Yet the WCM abandons, without Congressional approval, navigation as an operating purpose for the Allatoona Project. It contains no specific reservoir regulation requirements to support navigation at the Allatoona Project.

*The WCM's water-quality impacts*

57.     Section 313(a) of the Clean Water Act, 33 U.S.C. §1323(a), and the Corps' implementing regulations and guidance require the Corps to implement a water-quality management program that, among other things, "[e]nsure[s] that water quality, as affected by the project and its operation, is suitable for project purposes, existing water uses, and public health and safety and is in compliance with applicable Federal and state water quality standards." *Water Quality and Environmental Management for Corps Civil Works Projects*, ER 1110-2-8154, (May 31, 1995). The Corps' regulations and guidance also require it to "[e]nsure that the project and its operation offer the lowest stress possible on the aquatic environment." *Id.*; *see also* 33 C.F.R. pt. 222.5(f).

58.     The Clean Water Act and the Corps' regulations and guidance also require it to assess whether it could take measures to alleviate these downstream environmental consequences. *See Water Quality and Environmental Management for Corps Civil Works Projects*, ER 1110-2-8154, at pages 2-4 (May 31, 1995).

59.     The Alabama Department of Environmental Management noted in its comments on the WCM and FEIS that the WCM's reduced flows will result in water-quality violations and other adverse environmental impacts in Alabama.

60.    The FEIS acknowledges that the reduced flows will result in detrimental downstream impacts, including an adverse effect on downstream levels of dissolved oxygen, phosphorous, nitrogen, and chlorophyll.

61.    Rather than assess whether the Corps could take steps to alleviate these detrimental downstream impacts, the FEIS simply identifies those impacts and suggests that downstream parties will have to deal with them.

62.    In particular, the FEIS suggests that state agencies should take action to address these issues.

63.    The Clean Water Act and the Corps' regulations and guidance do not allow it to simply place and transfer the burdens of maintaining water quality on Alabama or Alabama entities.

64.    In comments submitted on February 17, 2015, the Environmental Protection Agency ("EPA") confirmed, contrary to the Corps' assertion, that the Corps cannot simply place the burdens of maintaining water quality on Alabama or Alabama entities. EPA wrote that "compliance with water quality standards" on the part of the Corps "means that the existing instream water uses and the water quality necessary to protect them will be maintained." EPA also wrote that "the [Corps] cannot, through its operational decisions, create conditions (e.g., decreased flow) that cause permittees to fall out of compliance."

65.    The Corps' regulations and guidance require it to maintain the existing instream water uses and the water quality necessary to protect them.

66.    The Corps has acted arbitrarily and capriciously in failing to follow the Clean Water Act and the Corps' own regulations and guidance.

67.    The Corps' change in policy in requiring downstream parties to deal with detrimental downstream impacts is contrary to the settled expectations of Alabama and its citizens in water quality in the ACT River Basin, and the Corps has not provided a sufficiently substantial explanation for this change of policy.

*The FEIS's erroneous analysis of No-Action and Proposed-Action Alternatives*

68.    NEPA required the Corps, when it prepared the FEIS, to determine a "No-Action Alternative." Under NEPA, the No-Action Alternative represents the effect on the environment if an agency does not adopt a proposed administrative action. NEPA required the Corps to evaluate the environmental impact of the WCM ("Proposed-Action Alternative") against the No-Action Alternative.

69.    In the FEIS, the Corps determined the No-Action Alternative by incorporating effects on the environment that were created by practices and operations associated with the 1993 Draft Manual.

70.    NEPA did not allow the Corps to use practices and operations implemented by the 1993 Draft Manual to determine the No-Action Alternative

because the 1993 Draft Manual was not subject to the appropriate review and coordination required by NEPA and federal law.

71.     NEPA required the Corps to use, in determining the No-Action Alternative, the operations that existed at the time of the last final environmental-impact statement prepared for the Corps' operations in the ACT River Basin, including the Allatoona Project. That environmental-impact statement was the 1974 FEIS.

72.     Even if NEPA allowed the Corps to determine the No-Action Alternative by using practices and operations implemented by the 1993 Draft Manual, the Corps' determinations of the No-Action Alternative and the Proposed-Action Alternative are inaccurate in several respects.

73.     The Corps used inconsistent and erroneous assumptions when calculating water-supply withdrawals related to the storage contract of the Cobb County-Marietta Water Authority ("CCMWA"). CCMWA has consistently failed to adhere to the contractual limits on its water-supply withdrawals during the driest months of the year. In determining the No-Action Alternative, the Corps incorporated the CCMWA's actual withdrawals in excess of its contractual limits. But in determining the Proposed-Action Alternative, the Corps assumed CCMWA will comply with the contract in the future. The assumption of CCMWA's compliance with the contract is not rational because the Corps and the Department

of Justice have not enforced the CCMWA's contractual limits, and there is no indication that CCMWA will comply with the storage limits in the future.

74.     The Corps' determination of the No-Action Alternative assumes that the Corps has maintained a strict and regular schedule for the generation of hydropower at the Allatoona Project, when in fact the Corps has maintained a highly variable schedule for the generation of hydropower.

75.     The Corps' determination of the No-Action Alternative does not reflect that the Corps systematically overfills Lake Allatoona during certain months of the year.

76.     The Corps' determination of the No-Action Alternative fails to reflect the Corps' actual operations at another project in the ACT River Basin, at Carters Lake, particularly during drought months.

77.     The Corps' determination of the No-Action Alternative reflects modeling that does not accurately reflect the volume of water flows at Rome, Georgia.

78.     The Corps' determination of the No-Action Alternative does not accurately reflect how Alabama Power Company has operated its projects downstream of the Allatoona Project.

79.     If the Corps had correctly determined the Proposed-Action Alternative and the No-Action Alternative, the analysis would have shown that the

environmental effects of the WCM are substantially greater than the Corps'
determination.

*The FEIS's erroneous cumulative-effects analysis*

80.     NEPA also required the Corps to assess the WCM's "cumulative
effects" in the FEIS. A cumulative-effects analysis assesses the total impact on the
environment resulting from adding the incremental impact of the proposed action
to other past, present, and reasonably foreseeable future actions.

81.     When the Corps assessed cumulative effects in the FEIS, the Corps
made critical omissions from its determination of reasonably foreseeable future
actions.

82.     The Corps failed to consider the likelihood that Georgia entities will
make substantial increases in their water-supply withdrawals from the ACT River
Basin, with or without a reallocation of storage or a new contract.

83.     The Corps failed to consider the water-supply impacts of the
operations at the already-constructed Hickory Log Creek Reservoir.

84.     The Corps failed to consider the water-supply impacts of the Richland
Creek Reservoir.

85.     The Corps failed to consider proposed annual average withdrawals by
Georgia entities at Lake Allatoona.

86.    The Corps arbitrarily refused to use up-to-date data when it assessed the potential environmental impacts of future water-supply demands by entities in Georgia. At the time of the FEIS, the Corps had access to data from 2013 addressing projected water demands through 2040. Yet in assessing the potential environmental impacts of future water-supply demands by entities in Georgia, the Corps used data from 2008 addressing projected demands for 2030. The data used by the Corps understates foreseeable water-supply demands and thus the cumulative environmental impact of the Proposed-Action Alternative.

87.    The Corps failed to conduct a proper analysis of the environmental effects of diminution in river flow if the Corps operates Lake Allatoona to produce the minimum hydropower generation authorized under the WCM.

88.    An accurate cumulative-effects analysis would have shown that the harmful effects of the WCM are substantially greater than the Corps' assessment in the FEIS.

*The FEIS's other modeling and data errors*

89.    The Corps' modeling in the FEIS wrongly assumes more hydropower generation at the Allatoona Project than is required by the WCM. The Corps' modeling in the FEIS failed to use an approach that considered the environmental impacts of a scenario in which the Corps generates the minimum amount of

hydropower authorized by the WCM within each "action zone" at the Allatoona Project. As a result, during critical times of the year, the Corps' modeling assumes more downstream flows than will actually occur. That assumption, in turn, substantially understates the environmental effects of the Proposed-Action Alternative.

90.    The Corps' modeling used erroneous model inputs with certain data. Although the Corps acknowledged the error, it did not correct it in the FEIS.

91.    In the FEIS, the Corps evaluated its model outputs by looking to effects based on long-term averages under prior operations as opposed to the use of historic flows.

92.    The Corps' use of long-term averages virtually guarantees that any adverse environmental impact will be masked. Instead of using these types of long-term averages to evaluate environmental impacts, the Corps should have looked at effects during more limited periods, especially during critical dry periods.

93.    On February 17, 2015, EPA provided comments to the Corps on its new manuals and FEIS. EPA stated that it "believes that water quality impacts that will result from the [Corps'] proposed actions for water management in the ACT have not been adequately disclosed in the FEIS in part because the results from the models used lack the temporal, spatial and mechanistic precision to quantify the impacts on the water quality standards applicable under the Clean Water Act."

Therefore, EPA recommended "that the [Corps] use a more precise modeling framework in determining impacts to water quality within the Upper Coosa watershed." EPA further noted that EPA, ADEM, and the Corps had developed more appropriate models for use in the ACT River Basin, and that it was unclear why the Corps did not use those models in conducting its NEPA review in this instance. EPA also requested that the Corps provide it with a draft copy of the Record of Decision for its review before issuing a final Record of Decision, but the Corps did not publicly issue a draft Record of Decision.

94.     These modeling and data errors make the FEIS invalid, unreliable, and unlawful.

## COUNT ONE
**(Unlawful abandonment and reordering of authorized project purposes)**

95.     Alabama adopts and incorporates by reference the previous paragraphs of this complaint.

96.     The Corps cannot undertake substantial shifts in the relative sizes and scope of project purposes at the Allatoona Project without congressional approval.

97.     The Corps cannot abandon one of the Allatoona Project's congressionally mandated operating purposes without congressional approval.

98.    The Corps cannot subordinate one of the Allatoona Project's congressionally mandated operating purposes to an unauthorized purpose without congressional approval.

99.    The WCM unlawfully abandons the congressionally authorized purposes of navigation at the Allatoona project.

100.    The WCM unlawfully abandons the congressionally authorized purpose of hydropower for the majority of the storage pool at the Allatoona project.

101.    The WCM unlawfully reallocates storage to other, non-authorized purposes, including recreation and water supply.

102.    The Corps' projects in the ACT River Basin, including the Allatoona Project, were authorized for certain project purposes specifically identified and authorized by Congress. The Defendants have a duty to operate and manage these reservoirs according to those authorized purposes. They do not have authority to abandon, re-order, or significantly impair those authorized purposes.

103.    The Defendants' WCM constitutes a breach of these duties. In taking this action the Defendants have acted arbitrarily and capriciously, have abused their discretion, and have acted in a manner that is contrary to law.

WHEREFORE, Alabama respectfully requests that this Court enter an order in favor of Alabama consistent with its prayer for relief below.

## COUNT TWO
### (Violation of Clean Water Act and the Corps' implementing regulations)

104.   Alabama adopts and incorporates by reference the previous paragraphs of this complaint.

105.   The Clean Water Act, 33 U.S.C. §1323(a), and the Corps' implementing regulations and guidance require it to implement a water-quality management program that, among other things, "[e]nsure[s] that water quality, as affected by the project and its operation, is suitable for project purposes, existing water uses, and public health and safety and is in compliance with applicable Federal and state water quality standards." *Water Quality and Environmental Management for Corps Civil Works Projects*, ER 1110-2-8154, (May 31, 1995). The Corps' regulations and guidance also require it to "[e]nsure that the project and its operation offer the lowest stress possible on the aquatic environment." *Id.*

106.   The WCM is contrary to these regulations and guidance.

107.   The Defendants' violation of the Corps' regulations and guidance is arbitrary and capricious.

108.   These failures by the Defendants infringe on Alabama's rights and legal obligations.

WHEREFORE, Alabama respectfully requests that this Court enter an order in favor of Alabama consistent with its prayer for relief below.

24

## COUNT THREE
### (Violation of NEPA)

109.   Alabama adopts and incorporates by reference the previous paragraphs of this complaint.

110.   NEPA and its implementing regulations required the Defendants to conduct a proper environmental-impact analysis of the WCM.

111.   The FEIS for the WCM is unlawful in light of the considerations discussed above.

112.   Alabama has direct and substantial interests in the Defendants' compliance with the provisions of NEPA and is within the zone of interests protected by NEPA.

WHEREFORE, Alabama respectfully requests that this Court enter an order in favor of Alabama consistent with the prayer for relief below.

## COUNT FOUR
### (Violation of the Administrative Procedure Act)

113.   Alabama adopts and incorporates by reference the preceding paragraphs of this complaint.

114.   The Corps' final agency action issuing the Record of Decision, Water Control Manuals, and Final Environmental Impact Statement is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in

violation of the Administrative Procedure Act, 5 U.S.C. §706(2)(A), for at least the following reasons:

a.   It is contrary to the requirements of Pub. L. No. 77-228, 55 Stat. 638 (Aug. 18, 1941); House Doc. 674, 76th Cong., 3d Session; the Clean Water Act; and the National Environmental Policy Act;

b.   It is contrary to the Corps' own regulations governing the Corps' operation of the Allatoona Project;

c.   It is contrary to the Corps' own regulations defining its responsibilities under the Clean Water Act;

d.   It is an unexplained and unjustified departure from precedent;

e.   It fails to provide a substantial justification for upsetting reliance interests of affected parties;

f.   It fails to adequately justify the proposed changes to the operation of the Allatoona Project;

g.   It fails to respond meaningfully to objections provided by commenters;

h.   It is based on irrelevant, impermissible, or arbitrary factors;

i.   It fails to consider alternatives that would have been superior to the Corps' preferred approach to the operation of the Allatoona Project;

    j.      It fails to provide a reasoned basis for the Corps' decisions based on the record evidence; and

    k.      It is not supported by substantial evidence.

## PRAYER FOR RELIEF

Alabama respectfully requests the Court to issue the following relief against the Defendants under the APA, the Declaratory Judgment Act, and any other applicable federal law:

1.      Issue an order under 5 U.S.C. §706 holding unlawful and setting aside the WCM, including but not limited to the individual water-control manual for the Allatoona Project;

2.      Issue an order under 5 U.S.C. §706 holding unlawful and setting aside the FEIS;

3.      Issue an order under 5 U.S.C. §706 or 28 U.S.C. §1361 directing the Defendants either to revise the WCM or to prepare new manuals for the ACT River Basin consistent with the congressionally authorized purposes of the ACT River Basin, including but not limited to the Allatoona Project, and to ensure that downstream flow conditions in Alabama are consistent with historic flows;

4.      Issue an order under 5 U.S.C. §706 or 28 U.S.C. §1361 directing the Defendants to modify, as necessary, the WCM or any part thereof to ensure that

the Corps' operations will protect and maintain Alabama state water quality standards;

5.      Issue an order under 5 U.S.C. §706 or 28 U.S.C. §1361 directing the Defendants either to revise its FEIS or to prepare a new FEIS for any revised or new manuals for the ACT River Basin consistent with federal law;

6.      Award Alabama attorneys' fees and costs; and

7.      Award other relief as the Court may deem just and proper to protect Alabama's interests.

Respectfully submitted this 7th day of May, 2015.

s/     John C. Neiman, Jr.
One of the Attorneys for the State of Alabama

**OF COUNSEL:**

John C. Neiman, Jr.
John A. Earnhardt (application for admission pending)
Kasdin M. Mitchell (application for admission pending)
MAYNARD COOPER & GALE P.C.
1819 Fifth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203
(205) 254-1228
jneiman@maynardcooper.com
jearnhardt@maynardcooper.com
kmitchell@maynardcooper.com

Andrew L. Brasher (appearing under LCvR 83.2(f))
OFFICE OF THE ALABAMA ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36104
334-242-7300
abrasher@ago.state.al.us

**PLEASE SERVE THE DEFENDANTS BY CERTIFIED MAIL AT THE FOLLOWING ADDRESSES:**

U.S. Army Corps of Engineers
Headquarters
441 G Street NW
Washington, DC 20314-1000

John M. McHugh
Secretary of the Army
101 Army Pentagon
Washington, DC 20310-0101

Jo-Ellen Darcy
Assistant Secretary of the Army (Civil Works)
108 Army Pentagon
Washington, DC 20310-0108

Lieutenant General Thomas P. Bostick
Commander and Chief of Engineers
Headquarters
U.S. Army Corps of Engineers
441 G Street NW
Washington, DC 20314-1000

Brigadier General C. David Turner
Division Commander
South Atlantic Division
U.S. Army Corps of Engineers
60 Forsyth Street SW, Room 10M15
Atlanta, Georgia 30303-8801

Colonel Jon J. Chytka
District Commander, Mobile District
U.S. Army Corps of Engineers
P.O. Box 2288
Mobile, Alabama 36628-0001