## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CIVIL ACTION NO. 1:15-cv-696 (EGS) |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| ALABAMA POWER COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CIVIL ACTION NO. 1:15-cv-699 (EGS) |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS ALABAMA AND ALABAMA POWER'S JOINT MOTION FOR SUMMARY JUDGMENT

John C. Neiman, Jr.
John A. Earnhardt
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue N, Suite 2400
Birmingham AL 35203
jneiman@maynardcooper.com
jearnhardt@maynardcooper.com

Andrew L. Brasher, Solicitor General
(*Appearing Under LCvR 83.2(f)*)
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery AL 36104
abrasher@ago.state.al.us

*Attorneys for Plaintiff*
*State of Alabama*

James A. Byram, Jr.
Thomas L. Casey, III (*Admitted Pro Hac Vice*)
Balch & Bingham LLP
105 Tallapoosa Street, Suite 200
Montgomery AL 36104
jbyram@balch.com
tcasey@balch.com

C. Fredrick Beckner III
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
rbeckner@sidley.com

*Attorneys for Plaintiff*
*Alabama Power Company*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF EXHIBITS ............................................................................................... viii

TABLE OF ABBREVIATIONS ................................................................................... ix

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

I.     The ACT Basin ................................................................................... 2

II.    Authorization and Historical Operation of the Corps' ACT Projects. ................... 4

    A.    Congress Authorizes the Corps to Build and Operate Allatoona. .............. 4

    B.    Releases from Allatoona Positively Impact Downstream Hydropower, Water Quality, and Navigation. ................................................................... 6

        1.    Allatoona releases facilitate hydropower production. .................... 6

        2.    Allatoona releases facilitate navigation. ......................................... 7

        3.    Allatoona releases enhance water quality. ...................................... 7

        4.    Allatoona flood storage operations manage flood risk ................... 8

    C.    Support of Water Supply and Recreation Requires Retaining Water in Allatoona. ................................................................................................... 8

        1.    Local water-supply uses can inhibit Allatoona releases. ................ 9

        2.    Local recreational uses can inhibit Allatoona releases. .................. 9

    D.    The Corps Adopts Water-Control Manuals to Facilitate Allatoona's Originally Authorized Purposes. ............................................................. 10

        1.    Early manuals require a "drawdown" in late fall and winter. ....... 10

        2.    The 1968 Allatoona Manual continues the fall and winter drawdown and is subject to NEPA review. ................................... 12

        3.    The 1993 draft Allatoona Manual, though never finalized, is implemented and continues the fall and winter drawdown. .......... 13

III.    The Corps Adopts a New Master ACT Manual. ................................................. 16

    A.    The New Manual Raises Lake Levels to Benefit Recreation While Reducing Hydropower Generation, Navigation Support, and Flood Control. .................................................................................................... 17

1. The Manual adopts new "action zones" reducing the storage the Corps can use to generate power. ........................................... 18

2. The Manual adopts a new phased guide curve reducing downstream flows in fall. ............................................... 18

3. The Manual adopts operational changes giving the Corps discretion to further reduce hydropower generation.................... 19

4. The new Manual eliminates navigation support........................... 19

5. The new Manual reduces flood storage. ...................................... 19

B. The Corps' NEPA analysis........................................................ 20

C. The Corps' Clean Water Act Analysis. ..................................... 21

D. The Manual's Effects on the Alabama Plaintiffs....................... 23

STANDARD OF REVIEW............................................................................. 24

ARGUMENT ................................................................................................. 25

I. The New Manual Violates The APA.................................................... 26

A. Under the Manual, the Corps is Operating Allatoona Contrary to the Direction of Congress in the Flood Control Act of 1941. ........................ 26

1. The Manual substantially deemphasizes the congressionally authorized purpose of hydropower generation. ........................... 27

2. The Manual substantially deemphasizes the congressionally authorized purpose of navigation. ................................................. 30

3. The Manual deemphasizes congressionally authorized purposes for the sake of recreation. ............................................... 32

B. The Manual is an Unexplained and Arbitrary Departure From Established Operations. ......................................................... 33

II. The Manual and FEIS Do Not Adequately Assure the Corps' Compliance with the Clean Water Act and Water-Quality Standards........................................ 38

A. The Clean Water Act and Corps Regulations Require the Corps to Comply With Water-Quality Standards and to Protect Existing Downstream Uses. ....................................................................... 38

B. The Manual Unlawfully Shifts Mitigation Responsibility to States and Downstream Users.............................................................. 40

III. The Manual and FEIS Violate NEPA. ................................................ 42

A.      The FEIS Improperly Assumes Baseline Operations Under the 1993
        Draft Manual That Have Never Been Subject to NEPA Review. ............ 43

B.      The FEIS Fails to Disclose the Impacts Associated with New
        Operations in the Proposed Action Alternative. ........................................ 46

        1.      The FEIS fails to disclose the impact of the Corps' discretion
                not to generate hydropower. .......................................................... 47

        2.      The FEIS fails to disclose the impact of CCMWA's water-
                supply withdrawals. ...................................................................... 48

C.      NEPA Required the FEIS to Consider Alternatives Requiring the
        Corps to Generate Hydropower. ............................................................... 49

CONCLUSION AND REQUEST FOR RELIEF ........................................................ 50

# TABLE OF AUTHORITIES

## CASES

*Ala. v. U.S. Army Corps of Eng'rs*,
  No. 1:90-cv-01331-KOB (N.D. Ala.) ...................................................16

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*,
  462 U.S. 87 (1983) .................................................................................42

*Bangor Hydro-Electric Co. v. FERC*,
  78 F. 3d 659 (D.C. Cir. 1996) ...............................................................36

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...............................................................................45

*BNSF Ry. Co. v. Surface Transp. Bd.*,
  741 F.3d 163 (D.C. Cir. 2014) ...............................................................37

*Business Roundtable v. SEC*,
  647 F.3d 1144 (D.C. Cir. 2011) ............................................................37

*Califano v. Sanders*,
  430 U.S. 99 (1977) .................................................................................25

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ...............................................................................25

*City of Grapevine v. Dep't of Transp.*,
  17 F.3d 1502 (D.C. Cir. 1994) ...............................................................42

*Custer Cnty. Action Assoc. v. Garvey*,
  256 F.3d 1024 (10th Cir. 2001) .............................................................45

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,
  785 F.3d 1 (D.C. Cir. 2015) ...................................................................37

*Encino Motorcar, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ...........................................................................35

*Envtl. Def. Fund v. Alexander*,
  467 F. Supp. 885 (N.D. Miss. 1979) ..................................................27, 33

*FCC v. Fox Television Station, Inc.*,
  556 U.S. 502 (2009) ...............................................................................36

*Friends of Yosemite Valley v. Kempthorne*,
  520 F.3d 1024 (9th Cir. 2008) ...............................................................44

*Fund for Animals v. Norton*,
  281 F. Supp. 2d 209 (D.D.C. 2003) .......................................................43

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006) ...............................................................35

*Humane Soc. v. Johanns,*
   520 F. Supp. 2d 8 (D.D.C. 2007)............................................................44

*In re Operation of the Mo. River Sys. Litig.,*
   421 F.3d. 618 (8th Cir. 2005) ...............................................................31

*In re Tri-State Water Rights Litig.,*
   639 F. Supp. 2d 1308 (M.D. Fla. 2009),
   *rev'd on jurisdictional grounds,*
   644 F. 3d 1160 (11th Cir. 2011) ...........................................................29

*Kern v. U.S. Bureau of Land Mgmt.,*
   284 F.3d 1062 (9th Cir. 2002) ..............................................................45

*Lujan v. Nat'l Wildlife Fed.,*
   497 U.S. 871 (1990) .............................................................................26

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) .............................................................................26

*Metcalf v. Daley,*
   214 F.3d 1135 (9th Cir. 2000) ..............................................................43

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
   463 U.S. 29 (1983) .........................................................................25, 37

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
   668 F.3d 1067 (9th Cir. 2011) ..............................................................49

*N.C. Wildlife Fed. v. N.C. Dep't of Transp.,*
   677 F. 3d 596 (4th Cir. 2012) .........................................................44, 49

*Nat. Res. Def. Council, Inc. v. Morton,*
   458 F.2d 827 (D.C. Cir. 1972) ..............................................................49

*Nat'l Cable & Telecomm. Ass'n v. FCC,*
   567 F.3d 659 (D.C. Cir. 2009) ..............................................................34

*Nat'l Wildlife Fed. v. Andrus,*
   440 F. Supp. 1245 (D.D.C. 1977) .........................................................44

*Nat'l Wildlife Fed. v. Gorsuch,*
   693 F.2d 156 (D.C. Cir. 1982) ..............................................................39

*Nat'l Wildlife Fed. v. U.S. Army Corps of Eng'rs,*
   132 F. Supp. 2d 876 (D. Ore. 2001) .....................................................41

*Nat'l Wildlife Fed. v. U.S. Army Corps of Eng'rs,*
   384 F.3d 1163 (9th Cir. 2004) .........................................................38, 39

*North Carolina v. EPA,*
   531 F.3d 896 (D.C. Cir. 2008) ..............................................................26

*Northcoast Envtl. Ctr. v. Glickman,*
   136 F.3d 660 (9th Cir. 1998) ................................................................45

*Powder River Basin Res. Council v. U.S. Bureau of Land Mgmt.,*
    37 F. Supp. 3d 59 (D.D.C. 2014).................................................46

*Pub. Employees for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.,*
    177 F. Supp. 3d 146 (D.D.C. 2016)..........................................49

*S.D. Warren Co. v. Me. Bd. of Envtl. Protection,*
    547 U.S. 370 (2006) ....................................................................39

*Se. Fed. Power Customers v. Geren,*
    514 F. 3d 1316 (D.C. Cir. 2008)...............................................33

*Sierra Club v. Mainella,*
    459 F. Supp. 2d 76 (D.D.C. 2006)............................................42

*Simmons v. U.S. Army Corps of Eng'rs,*
    120 F.3d 664 (7th Cir. 1997) ....................................................49

*South Dakota v. Ubbelohde,*
    330 F.3d 1014 (8th Cir. 2003) ..................................................31

*Young v. Gen. Servs. Admin.,*
    99 F. Supp. 2d 59 (D.D.C. 2000)..............................................42

## STATUTES

33 U.S.C. § 1251 ..................................................................................1

33 U.S.C. § 1313 ................................................................................40

33 U.S.C. § 1323 ................................................................................38

33 U.S.C. § 709 ..................................................................................10

33 U.S.C. §1311 .................................................................................22

33 U.S.C. §1342 .................................................................................22

42 U.S.C. § 4321 ..................................................................................2

42 U.S.C. § 4332 ..................................................................13, 42, 49

43 U.S.C.§ 390b ..................................................................................9

5 U.S.C. § 551 ......................................................................................1

5 U.S.C. § 706 .................................................................24, 25, 26, 33

Alabama-Coosa-Tallapoosa River Basin Compact,
    Pub. L. No. 105-105 (1997),
    111 Stat. 2223 ...........................................................................29

Flood Control Act of 1941,
    Pub. L. No. 77-228,
    55 Stat. 638 ................................................................................5

Flood Control Act of 1944,
  Pub. L. No. 78-534,
  58 Stat. 889 .................................................................................................. 10, 32, 33

House Doc. 414,
  77th Congress ............................................................................................................ 5

House Doc. 66,
  74th Congress, 1st Session ....................................................................................... 4

House Doc. 674,
  76th Congress, 3d Session .................................................................................... 5, 27

Rivers and Harbors Act of 1945,
  79 Pub. L. No. 14,
  59 Stat. 10, 17 (1945) .............................................................................................. 6

## REGULATIONS

33 C.F.R. § 222.5 ................................................................................................. 10, 27, 38

40 C.F.R. § 131 .............................................................................................................. 40

40 C.F.R. § 131.10 ......................................................................................................... 40

40 C.F.R. § 1502.14 ....................................................................................................... 42

Ala. Admin. Code r. 335-6-10.01 ................................................................................. 40

Council on Environmental Quality,
  *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*,
  46 Fed. Reg. 18026 (1981) ....................................................................................... 46

EPA Office of Federal Activities,
  *Consideration of Cumulative Impacts in EPA Review of NEPA Documents* (1999) ............. 46

EPA, NPDES Permit Writers' Manual (Sept. 2010) ............................................... 41

ER 1110-2-3600 ........................................................................................................... 33

ER 1110-2-8154 ........................................................................................................... 39

ER 1165-2-1 ................................................................................................................. 32

ER 1165-2-119 ............................................................................................................. 32

**TABLE OF EXHIBITS**

*Exhibit Number*                *Description*

1                               Declaration of Onis "Trey" Glenn, III

2                               Declaration of Brian Atkins (Division Chief, Office of Water Resources, State of Alabama Department of Economic and Community Affairs)

3                               Declaration of Alan L. Peeples (Manager-Reservoir Management, Southern Company Services, Inc.)

4                               Declaration of Rod Lumpkins

5                               Corps of Engineers' Engineer Regulation 1110-2-8154

6                               Ala. 6th Am. Compl., *Ala. v. U.S. Army Corps of Eng'rs*, No. 1:90-cv-01331-KOB (N.D. Ala. Oct. 16, 2007 (Doc. 598)

7                               Tr. of Hearing at 89, *Ala. v. U.S. Army Corps of Eng'rs*, No. 1:90-cv-01331-KOB (July 17, 2012) (Doc. 774)

## TABLE OF ABBREVIATIONS

| *Abbreviation* | *Longer Form* |
|---|---|
| ACT | Alabama-Coosa-Tallapoosa River Basin |
| ADEM | Alabama Department of Environmental Management |
| Alabama Plaintiffs | State of Alabama and Alabama Power Company |
| APA | Administrative Procedure Act |
| CCMWA | Cobb County-Marietta Water Authority |
| Corps | United States Army Corps of Engineers |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FEIS | United States Army Corps of Engineers' Final Environmental Impact Statement for the Master Water Control Manual for the Alabama-Coosa-Tallapoosa River Basin |
| Manual | United States Army Corps of Engineers' Master Water Control Manual for the Alabama-Coosa-Tallapoosa River Basin, including individual project manuals |
| NPDES | National Pollutant Discharge Elimination System |
| NEPA | National Environmental Policy Act of 1969 |
| EPA | United States Environmental Protection Agency |

## INTRODUCTION

Plaintiffs State of Alabama and Alabama Power Company (collectively the "Alabama Plaintiffs") move the Court to enter judgment in their favor on all their claims. Through its new Master Water Control Manual for the Alabama-Coosa-Tallapoosa River Basin (hereinafter "Manual"), the Corps is fundamentally altering an important interstate river system. The Manual will reduce flows out of Lake Allatoona in Georgia, a federal dam-and-reservoir project upstream of Alabama. The reduced flows will impair water quality in Alabama, negatively impact hydropower generation at Alabama Power's projects, reduce the capacity of the reservoir that can provide flood control, and impede if not eliminate navigation on the Alabama River. The Manual is unlawful for three independent reasons.

*First*, the Manual violates the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* It departs from the Allatoona Project's authorizing legislation and arbitrarily alters its operations. Congress authorized the Corps to build and administer the Allatoona Project so that it could release water to facilitate hydropower generation, navigation, and flood control. The Manual's stated goal is to cut back on releases and hold as much water in the lake as possible so the Corps can promote local recreational uses of the lake. The reduced releases and diminishment of hydropower generation, flood control, and downstream navigation will violate the congressional authorization for the project. At the very least, the Corps has acted arbitrarily by reducing releases in this way and for this purpose.

*Second*, the Manual departs from the Clean Water Act, 33 U.S.C. § 1251 *et seq.* The Corps concedes that the Manual's provisions cutting back on releases will impair water quality in downstream locations. Yet the Corps disclaims any responsibility to address water-quality issues. Instead, the Corps has asserted that State permitting authorities and other downstream entities

will have the responsibility to make adjustments that cure the environmental problems the Corps' operations will cause. As the Environmental Protection Agency ("EPA") noted during the comment process, the Corps' approach is contrary to its obligations under the Clean Water Act and other federal and state laws.

*Third,* the Manual's environmental impact statement violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* The Corps has understated the impact of its new operations by using, as the baseline for comparison, operations under a 1993 draft manual the Corps illegally implemented and never subjected to NEPA review. The Corps avoided judicial review of that draft manual by claiming that it was not "final agency action" in a previous NEPA case brought by the Alabama Plaintiffs. Now the Corps is seeking to forever insulate those changes from review by claiming that they serve as the baseline for the current NEPA analysis. The Corps also understates the impact by assuming that the Corps will make releases that the new Manual does not require and that are inconsistent with historical operations.

For each of these reasons, the Court should vacate the Manual, should direct the Corps to operate its dams and reservoirs in a way that is consistent with their statutory purposes and the Clean Water Act, and should direct the Corps to conduct a proper environmental analysis when developing a new, lawful manual.

## STATEMENT OF FACTS

The following statement sets forth geographical and historical context, important to the Alabama Plaintiffs' claims, concerning (i) the ACT Basin; (ii) Congress' authorization and the Corps' historical operation of projects in the basin; and (iii) the new Manual challenged here.

## I.    The ACT Basin.

The ACT Basin comprises the Alabama, Coosa, and Tallapoosa Rivers, along with their tributaries and drainage areas, as the following map from the administrative record shows:



ACT Basin

Figure 2.0-1

D-00043909.[1] The rivers flow some 330 miles from north Georgia to south Alabama and the Gulf of Mexico, and are regulated by a series of dams owned and operated by either the Corps or Alabama Power. D-00044720. The Corps' Allatoona and Carters projects are at the "top of the chain," upstream of the other dams.

Allatoona is a "storage" project, meaning that the Corps varies the reservoir level depending on whether the season typically is "wet" or "dry." About 40% of the rain in the Basin falls between December and March, while only about 27% occurs between August and November. D-00013496.0026. Usually the Corps lowers the lake's level during the late-summer and fall dry periods to generate power, to provide flows to downstream projects, and to support water quality. The Corps holds the reservoir at its lowest level during the winter period to maximize flood control. The Corps then refills the lake during the spring wet period to store water it can release during the following summer and fall. *See* D-00043910-11.

## II.   Authorization and Historical Operation of the Corps' ACT Projects.

### A.   Congress Authorizes the Corps to Build and Operate Allatoona.

Congress authorized the Corps to build Allatoona and other ACT projects by approving a series of Corps reports emphasizing Allatoona's three originally authorized purposes: hydropower, navigation, and flood control. In 1934, the Corps prepared a comprehensive report "concerning existing and prospective developments in the basin for navigation, power development, and flood control." House Doc. 66, 74th Congress, 1st Session (D-00053515, 00053524). Building a dam and reservoir at the top of the basin at Allatoona, the report stated, would provide "regulated flow . . . for power development at the dam . . . and at other

---

[1] The index to the administrative record is Doc. 61. Citations to the record will use the format of Doc. 61, Attachment B, Parts 1-6, and are pinpoint citations to pages of documents in the record.

constructed and proposed sites on the lower Etowah and Coosa Rivers," including Alabama Power's downstream projects. D-00053573.

Congress later asked the Corps to review the 1934 report, which ultimately led to House Document 674, 76th Congress, 3d Session. D-00013497. In that document, the Board of Engineers for Rivers and Harbors recommended that the Corps build Allatoona "for the control of floods, regulation of stream flow for navigation, and the development of hydroelectric power." D-00013497.0002. Like the 1934 report, House Document 674 stressed the project's importance to existing and future downstream hydropower developments, including Alabama Power's projects. D-00013497.0004; *see also* D-00013497.0005, D-00013497.0017, D-00013497.0020. Congress then passed the Flood Control Act of 1941, providing that the plan set forth for Allatoona in House Document Number 674 was "approved" and "shall be prosecuted" "in accordance" with that document. Pub. L. No. 77-228, 55 Stat. 638. D-00053805, D-00053808.

As the Corps developed its ACT Basin projects, the agency continued to focus on the congressionally authorized navigation, hydropower, and flood-control purposes. The Corps issued a Definite Project Report for Allatoona in 1941, emphasizing that "it is anticipated that this plant would be used primarily as a peaking [hydroelectric] plant or for intermittent operation and" that "regulated flow from Allatoona would increase the minimum flow at the downstream plants . . . and would increase their firm [electric generating] capacity." SUPPAR027115; SUPPAR027131, SUPPAR027187. The Corps likewise issued a report on the overall development of the Basin "for navigation, power generation, and flood control," printed as House Document 414, 77th Congress. D-00053819; D-00053821 ¶ 5. Congress approved that report in the Rivers and Harbors Act of March 2, 1945, providing for the "[i]nitial and ultimate development of the Alabama-Coosa River and tributaries for navigation, flood control, power

development, and other purposes, as outlined in House Document Numbered 414 . . . with such modifications thereof from time to time as . . . may be advisable for the purpose of increasing the development of hydroelectric power." 79 Pub. L. No. 14, 59 Stat. 10, 17 (1945). D-00053852-00053853.

The Corps finished building Allatoona in 1949, and by 1972 had completed three additional ACT lock-and-dam projects in Alabama. D-00044759. Those made it possible for commercial barges to navigate the Alabama River from Mobile to Montgomery. D-00044801. Meanwhile, Alabama Power built new additional projects on the Coosa and Tallapoosa Rivers, and the Corps later built the Carters project in northwest Georgia. D-00045784l; D-00044718.

**B.    Releases from Allatoona Positively Impact Downstream Hydropower, Water Quality, and Navigation.**

To understand how the Corps has operated the ACT system in the past and how the Corps is now proposing to operate it in the future, it is important to consider how releases of water from Allatoona facilitate the project's authorized purposes downstream.

*1.    Allatoona releases facilitate hydropower production.*

The Corps facilitates one of its originally authorized purposes, hydropower generation, by releasing water through the turbines at the Allatoona Dam itself. Moreover, for every kilowatt hour of energy the Corps generates in that way, downstream plants use the same release to generate three additional kilowatt hours. D-00013496.0060. The timing of hydropower generation is important. *See generally* SUPPAR022714–22725 (Corps' Power Point presentation on hydropower principles). Allatoona and the downstream Alabama Power plants typically operate as "peaking" projects, meaning that water is released through the turbines and power is generated at times of peak demand. D-00043931. According to the Corps, currently there are 6

daily peaking hours during the summer, in the afternoon, and 11 daily peaking hours in winter, in the early morning and evening. D-00044449.

### 2.      *Allatoona releases facilitate navigation.*

When the Corps releases water that generates hydropower, it also facilitates Allatoona's authorized navigation purpose. A certain amount of water is needed to support commercial navigation of the Alabama River, south of Montgomery. D-00044801. It is particularly important for the Corps to release water from ACT projects, including Allatoona, to aid navigation during the fall low-flow months when precipitation and basin inflows are at their lowest. D-00013496.0016, D-00013496.0060, D-00013496.0061. Between 1971 and 2001, commercial traffic on the Alabama-Coosa river system averaged approximately 1.8 million tons per year. D-00049524. But commercial traffic has declined more recently because of the Corps' decision to curtail dredging and other maintenance activities for budgetary reasons. D-00044801. Nevertheless, the Corps continues to recognize that "[n]avigation is an important use of water resources in the ACT Basin" and that "[t]he Alabama River, from Montgomery downstream to the Mobile area, provides an important navigation route for commercial barge traffic, serving as a valuable regional economic resource."*Id.*

### 3.      *Allatoona releases enhance water quality.*

The Corps always has recognized that facilitating "water quality" in the ACT Basin, through releases from Allatoona, is one of Allatoona's "principal purposes." D-00013496.0016. "[I]ncreas[ing] flow downstream" dilutes downstream discharges and therefore facilitates "pollution abatement." D-00011308.0018. So when the Corps releases more water from Allatoona, water quality downstream improves. Releases are important because the EPA has determined that the Coosa River, including Weiss Lake, has impaired water quality because of discharges originating mostly in Georgia. D-00027183. To that end, EPA has issued a specific

Total Maximum Daily Load for the lake, providing limits on pollutants causing a nutrient problem in the lake. D-00027171-73.

Reduced flows from the Allatoona Project also impact Alabama Power's environmental obligations under its license, issued by the Federal Energy Regulatory Commission, for the company's Coosa Project, which includes Weiss Dam and Lake. Decreased flows from Allatoona result in depleted dissolved oxygen at Weiss, making it more burdensome for Alabama Power to ensure compliance with the license's dissolved-oxygen requirements. D-00028230; D-00066503-06. Reduced flows from Allatoona also reduce the minimum flow the license requires Alabama Power to release for the sake of protecting the downstream environment. D-00028226; D-00028140; D-00066507.

### 4.     *Allatoona flood storage operations manage flood risk.*

The Corps long has recognized flood control, or "flood risk management," as one of the principal purposes of its upstream projects in the ACT Basin. D-00043778. The flood-control portion of the reservoir is the empty space at the top that is reserved to hold flood waters during high-flow events. D-00043931. Flood-control operations at Allatoona are intended to primarily benefit Rome, Georgia and to reduce inflows to Weiss Lake that otherwise might cause floods there. D-00013496.0016. Ordinarily, the Corps must evacuate water from the flood pool at a reasonable rate to return the lake to the top of its normal level, leaving the empty flood-storage space available once again to hold flood waters if necessary. D-00043978; D-00044796.

### C.     Support of Water Supply and Recreation Requires Retaining Water in Allatoona.

Whereas the Corps serves Allatoona's originally authorized purposes by releasing water from the dam, it can use Allatoona for water supply or recreation only by holding water in storage.

### 1.   *Local water-supply uses can inhibit Allatoona releases.*

The less water the Corps releases from Allatoona, the more that could be available for local water supply. The authority the Corps relies on to use Allatoona for local water supply derives from the Water Supply Act of 1958. D-00013496.0022; D-00044960. That Act allows the Corps to use some storage space in its reservoirs for water supply purposes. 43 U.S.C. § 390b. But it simultaneously prohibits the Corps from reallocating project storage for water supply without prior approval of Congress when the reallocation would "seriously affect the purposes for which the project was authorized, surveyed, planned, or constructed," or "would involve major structural or operational changes." 43 U.S.C. § 390b(e). The Corps has used this authority to reallocate approximately 7% of Allatoona's storage capacity for normal operations from power to municipal water supply, based on contracts with Cobb County-Marietta Water Authority ("CCMWA") in 1963, and with the City of Cartersville in 1966 and 1991. *See* 5813.

CCMWA's exceedances of its contract with the Corps have been a recurring problem. As a general matter, water supply usage increased over time, peaking in 2006. D-00043790. The Corps has recognized that "the available storage under existing water supply agreements at USACE reservoirs may not be sufficient to accommodate the 2006 level of water supply withdrawals under all conditions." D-00043824. In fact, according to the Corps, CCMWA in 2007 "substantially exceeded the storage allocation provided in the water supply storage contract." SUPPAR012820.

### 2.   *Local recreational uses can inhibit Allatoona releases.*

The Corps also facilitates local recreational uses of Allatoona—such as water skiing and motorboating—by withholding releases and keeping lake levels high. The Corps' authority to promote recreation at Allatoona is found in Section 4 of the Flood Control Act of 1944, which allows the Chief of Engineers "to construct, maintain, and operate public park and recreational

9

facilities at water resource development projects under the control of the Department of the Army." Pub. L. No. 78-534, 58 Stat. 889 (D-00006416.000, D-00006416.005, D-00006416.009; D-00006416.010). The Corps defines the "peak recreation season" at Allatoona as "generally Memorial Day through Labor Day." D-00013496.0045. The Corps' regulations, like the Water Supply Act, prohibit reallocations of storage "to provide more stable recreation levels" without prior Congressional approval, if "more stable recreation levels" would "have a significant effect on other authorized purposes," or would involve "major structural or operational change." ER 1165-2-1 ¶ 17-3(e).[2] Unlike the Water Supply Act, however, the Flood Control Act of 1944 does not give the Corps any express authority to reallocate any amount of storage to benefit recreation.

### D. The Corps Adopts Water-Control Manuals to Facilitate Allatoona's Originally Authorized Purposes.

Federal law requires the Corps to promulgate manuals to govern its dam-and-reservoir operations. *See* 33 U.S.C. § 709; 33 C.F.R. § 222.5. The Corps first prepared a master manual for the ACT Basin in 1951, and prepared individual water-control manuals for Allatoona in 1951, 1962, 1968, and 1993. As explained below, in each of these prior manuals the Corps recognized that operations for the authorized flood control, hydropower, and navigation purposes required the Corps to draw down the reservoir level during the summer and fall period, to use the water to generate power, and to support downstream needs.

#### 1. Early manuals require a "drawdown" in late fall and winter.

The 1951 ACT master manual, and the accompanying 1951 Allatoona manual, emphasized hydropower purposes. The master manual provided that Allatoona would be

---

[2] The Corps' engineer regulations, cited here as "ER [regulation number]," are available at http://www.publications.usace.army.mil/USACE-Publications/Engineer-Regulations/.

operated as part of "an integrated and mutual interrelated system" to improve downstream conditions, including flow regulation and hydropower production. D-00013495.0041. The Allatoona manual provided that "the Allatoona project will be operated as a peaking plant for the production of hydroelectric power and during off-peak periods will maintain a flow of about 200 cfs [cubic feet per second] through the service unit." D-00011308.0018. Of particular importance, the manual provided that "[d]uring low-water periods such regulation will provide *increased* flow downstream for navigation, water supply, pollution abatement, and other purposes." *Id.* (emphasis supplied).

This manual included the following "rule" or "guide" curve for "power operations," set forth in a photocopy in the administrative record:



D-00011308. 0043. "Rule" or "guide" curves provide engineers with targets for reservoir elevations throughout the year. These targets show administrators when they should fill a reservoir, when they should maintain it at a particular level, and when they should release, or "draw down," the water. The rule curve in the 1951 Allatoona manual showed filling in the spring, maintenance through the summer, and a "normal annual drawdown" of over 20 feet of reservoir elevation between September and January to facilitate the release of water for hydropower and downstream support. D-00011308.0019, D-00011308.0021, D-00011308.0043.

Likewise, when the Corps issued a new manual for Allatoona in 1962, it determined that it should store even more water during the wet season to release during the summer and fall period. D-00013501. The Corps found this approach would "result in considerable increase in power revenue with no reduction in flood-control benefits." D-13501.0014. Under this plan, the Corps would decrease the lake level by 20 feet "during September through December." *Id.*

## 2.   *The 1968 Allatoona Manual continues the fall and winter drawdown and is subject to NEPA review.*

In 1968 the Corps revised the Allatoona manual again, to further facilitate power generation. D-00011371. It adopted a guide curve chart, shown on the page that follows, that refers to the upper "top of power" pool" guide curve and a lower "power guide curve." D-00013501.0067. The "top of power pool" concept refers to the maximum elevation at which the Corps could maintain the reservoir "whenever flow conditions are favorable." D-00013501.0015. Even during wet conditions, that curve mandated the "drawdown" during the October to December period of nearly 20 feet. The lower "power guide curve" showed more normal operations, including the drawdown to generate power and support downstream purposes as early as July. The 1968 manual portrayed those curves in the following chart:

12



Lake levels between the upper and lower curves meant that "excess energy" was available to generate more power. D-00013501.0028.

The 1968 Allatoona manual was the last Allatoona manual, prior to the Manual at issue in this case, that the Corps reviewed for environmental impact under NEPA. Congress passed NEPA in 1969, mandating that before an agency can implement "major Federal actions significantly affecting the quality of the human environment," the agency must produce "a detailed" EIS describing "the environmental impact" of the proposed actions. 42 U.S.C. § 4332(2)(C)(i). In 1974, the Corps conducted that review for its then-existing Allatoona operations and memorialized them in a final environmental statement. D-00004143.

> ### 3. The 1993 draft Allatoona Manual, though never finalized, is implemented and continues the fall and winter drawdown.

The Corps in 1993 drafted a new manual that made substantial changes to its Allatoona operations. D-00013496. The Corps never finalized that manual or subjected it to the appropriate environmental review mandated by NEPA. D-00010026.0001-0012. Nevertheless, the Corps purported to operate Allatoona under that manual until its adoption of the new manual that the

Alabama Plaintiffs are now challenging in this case. D-00044187; D-00043793; D-00044227. Notwithstanding the Corps' failure to comply with NEPA or to otherwise finalize the 1993 draft manual, that manual made several significant changes to Allatoona's operations.

*Action Zones.* The 1993 draft manual divided the part of the lake that could be used to generate hydropower into two "action zones," as shown by Chart 1-11, reproduced below:



D-00044250; D-00013496.0041, D-00013496.0072. The pool was in Zone 1 during "normal to wetter than normal" conditions. D-00013496.0041. When the lake was in that zone, the manual required the Corps to allow "between two and six hours of full powerhouse generation." D-00013496.0072. The pool was in Zone 2 during "dry or impending drought conditions." D-00013496.0041. The manual provided that during that time "objective will be to protect *downstream* water supply and water quality values," by providing a minimum of "two hours peak power generation each weekday," in addition to "the continuous release of about 240 cfs."

D-00013496.0072. The practical effect of these actions zones was to reduce hydropower production. D-00049525; D-00049646–49649.

*Reduced Storage Available for Authorized Project Purposes:* The 1993 draft also suggested that the bottom 20 feet of the storage pool not be used for project purposes because "public expectations and awareness about low pool elevations are inconsistent with the minimum authorized levels." D-00013496.0050. This decision eliminated over 34% of the storage authorized for hydropower use. D-00013496.0064.

*Decreased Navigation Support.* The draft manual acknowledged that navigation was an authorized purpose of Allatoona, but claimed it was not an "operating" purpose because the dam "is located distant from the navigation channel and any releases for that purpose would be captured and re-regulated by the Alabama Power Co. reservoirs located downstream." D-00013496.0022.

*Flood Storage Zone.* In another change from the 1968 manual, the 1993 draft manual designated a portion of the flood control storage pool as zone A, and allows water to be stored in that zone "indefinitely . . . as a precaution for possible impending drought." D-00013496.0073. In other words, the Corps reduced the amount of the reservoir available for flood control to achieve higher lake levels.

*Recreation.* The 1993 draft manual also adopted new "recreation impact levels" for the Corps to consider when making water-management decisions at Allatoona. These levels applied only "[d]uring peak recreation season, generally Memorial Day through Labor Day." D-00013496.0045,-.0046.

The Corps began operating under the 1993 draft manual while Alabama and Alabama Power were in litigation over the Corps' operations. Alabama and Alabama Power claimed in

that case that the Corps could not implement that manual because, among other things, the Corps had not issued an EIS or otherwise conducted the environmental review NEPA requires. *See* Ala. 6th Am. Compl. ¶ 90, at 46, *Ala. v. U.S. Army Corps of Eng'rs*, No. 1:90-cv-01331-KOB (N.D. Ala. Oct. 16, 2007) (Doc. 598) (attached as Exh. 6). The Corps persuaded the district court to dismiss the Alabama Plaintiffs' NEPA claims in 2012 on the theory that the Corps had not finalized the draft manual and that it therefore was not "final agency action." *See* Order at 2, *Ala. v. U.S. Army Corps of Eng'rs*, No. 1:90-cv-01331-KOB July 3, 2012) (Doc. 771) (D-00049315). At oral argument on that motion to dismiss, the Corps explained that the 1993 draft manual "ha[d] not been form[al]ly adopted or finalized," and assured the court that the Corps was "in the process in both basins of curing that and getting those manuals fully updated with the appropriate NEPA compliance." Tr. of Hearing at 89, *Ala. v. U.S. Army Corps of Eng'rs*, No. 1:90-cv-01331-KOB (July 17, 2012) (Doc. 774) (attached as Exh. 7).

## III.    The Corps Adopts a New Master ACT Manual.

The "process" the Corps promised during that litigation in 2012 culminated in 2015, when the Corps finalized the final ACT master Manual under review now, which included individual manuals for each Corps project in the basin. The Corps gave public notice and accepted comments on a draft and final Manual, and issued the NEPA-required draft and final environmental impact statement. Both Alabama and Alabama Power submitted comments on the draft and final Manual and EIS. *See* D-00043396; D-00043408; D-00046601; D-00049511; D-00066475; D-00066493. The Corps signed its Record of Decision on May 4, 2015, finalizing the Manual and commencing operations under it. D-00053477–53487.

A.    **The New Manual Raises Lake Levels to Benefit Recreation While Reducing Hydropower Generation, Navigation Support, and Flood Control.**

The Corps has stated that a goal of the new Manual is to have "substantially higher lake elevations" than historical averages. D-00044278; *see* D-00044272 (Figure 6.1-4); D-00044273 (Figure 6.1-5). The Corps can achieve this goal only by substantially reducing hydropower generation and decreasing the downstream flows that would promote downstream water quality, power generation, and navigation, especially during the August-to-November low-flow period. The following chart shows changes the new Manual adopts to achieve these higher lake levels:



Figure 5.4-1. Operations under the Proposed Action Alternative at Allatoona Lake.

D-00044258. The Corps summarizes these changes as "(1) the revised action zones, (2) the fall phased drawdown (or phased) guide curve, and (3) reduced fall hydropower generation." D-00044278.

**1.      The Manual adopts new "action zones" reducing the storage the Corps can use to generate power.**

The new Manual divides the conservation pool—*i.e.*, the water available for hydropower generation—into four zones. The FEIS provides that the Corps will use these zones "to manage the lake at the highest level possible for recreation and other" unspecified "purposes" to the detriment of hydropower generation releases, navigation, and environmental support. D-00044402 (discussing Alternative D); *see also* D-00044406 (discussing similar approach to Proposed Action Alternative). During the summer, Zones 1 and 2 combined are only 12% of conservation storage. That is a reduction of 43% of the conservation storage available for normal hydropower releases as compared to Zone 1 of the 1993 draft manual. D-00049516; D-00049593–49595. As of October 1, Zones 1 and 2 combined are only 15% of conservation storage. That is a reduction of 67% of the conservation storage available for normal releases for hydropower, as compared to Zone 1 of the 1993 draft manual. *Id.*. During the critical July-August period, when peak generation is needed most, 45% to 55% of the total conservation storage is in Zone 4, which is off-limits to normal hydropower generation. D-00043419–43420; D-00045583–45585. The Corps typically may use the water in Zone 4 only to provide for public water supply, for recreation, and for a 240 cfs minimum flow out of the dam. D-00044793.

**2.      The Manual adopts a new phased guide curve reducing downstream flows in fall.**

The new Manual also marks a substantial break from previous guide curves. It eschews the Corps' previous approach of steadily drawing down the lake in the fall, *see supra* at pp. 10-14, in favor of a "phased drawdown." Under this new approach, the guide curve remains flat, providing for no drawdown at all, from October 1 through mid-November. D-00044241. The requirement of higher lake levels in that dry period prevents releases that would have supported hydropower generation, navigation, and environmental benefits.

### 3.     The Manual adopts operational changes giving the Corps discretion to further reduce hydropower generation.

The new Manual mandates reduced power generation in all action zones, as compared with the 1993 draft manual. In new Zone 1, the highest elevation zone, the minimum hydropower generation schedule is reduced from 2 hours to 0, and the maximum is reduced from 6 hours to 4. In new Zone 2, the hydropower generation schedule is only 0 to 3 hours. In new Zone 3, the Corps provides for only 0 to 2 hours of hydropower generation, and new Zone 4 has no hydropower generation at all. *See supra* at 17 (Figure 5.4-1). Moreover, to achieve higher lake levels during the driest period, the new Manual provides that "hydropower production at the project would be reduced during September through November to facilitate implementation of the fall phased down guide curve." D-00044244. Indeed, the new manual even goes so far as to grant the Corps discretion to eliminate hydropower generation *completely* at any time in any of the proposed action zones. *See supra* at 17 (Figure 5.4-1).

### 4.     The new Manual eliminates navigation support.

Under the new Manual, the Corps refuses to support navigation, especially during the low flow season. Its proffered rationale is that the Allatoona Project is "distant from the navigation channel," and any navigation releases "would be captured and reregulated by APC projects downstream." D-00043980. Navigation requires "flow augmentation" from "ACT Basin reservoir storage," D-00044801, especially during the dry August-November period. Yet the new Manual disclaims any obligation to reduce Allatoona's lake level during the October 1-November 15 rule curve "plateau."

### 5.     The new Manual reduces flood storage.

The Manual also allows the Corps to keep Lake Allatoona's level higher than the full pool "top of conservation" level, shown by Figure 5.4-1 above, by storing water in a portion of

the flood control pool described by the Manual as "Zone A." D-00045085–45086. By using this discretion, the Corps can even avoid taking the initial step of releasing water under the phased guide curve in September, which will further reduce downstream flows. The Manual provides that "[d]uring the fall step down period the pool may be held at the top of Zone A *indefinitely* if all project purposes are being met." D-00045086 (emphasis added). The "top of zone A" elevation can be as much as seven feet higher than the conservation pool guide curve level during the "fall step down" period. *Compare* D-00045085 *with* D-00044954. Ordinarily, the Corps must evacuate water from the flood pool to return the lake to the top of its conservation level, but that is no longer required by the new Manual. D-00043978; D-00044796.

### B.     The Corps' NEPA analysis.

Whereas the Corps had not conducted any NEPA analysis for the 1993 draft manual, *see supra* at pp. 15-16, it purported to undertake the NEPA process for the new 2015 Manual. It issued a Final Environmental Impact Statement ("FEIS") considering 12 different management alternatives, including a Plan G, which became the "Proposed Action" Alternative and the operations embodied by the new Manual. D-00044228. To describe the Manual's environmental impact, the Corps compared the "Proposed Action" Alternative to a baseline, "No Action" Alternative. D-00044246.

The Corps did not use, as its "No Action" Alternative baseline for comparison, its "last major evaluations of the environmental consequences of the individual USACE reservoirs in the ACT Basin," which the Corps acknowledged occurred "in the 1970s." D-00044248; *see supra* at p. 13. The Corps instead used, as the baseline for comparison, "[o]perations consistent with," among other documents, the 1993 draft manual that had not been subject to NEPA review. D-00044246.

The Corps' modeling of the Proposed Action Alternative made two assumptions that are important for present purposes. First, even though the new Manual gave the Corps discretion to not generate hydropower at all, the FEIS assumed that the Corps would make sufficient releases to generate the maximum amount of hydropower each day when Allatoona was in Zone 1 or 2 during 9 months of the year, and 50% of the maximum during the rest of the year. D-00043433. Second, whereas the "No Action" baseline reflected the reality that the Cobb-County Marietta Authority had routinely and substantially exceeded the limits its contract set on its water-supply withdrawals from Lake Allatoona, *see supra* at p. 9, the Corps' modeling of the "Proposed Action" Alternative assumed that CCMWA would withdraw only the contractually allocated amounts, *see* D-00053482–53483.

The Alabama Plaintiffs submitted comments during the NEPA process explaining the inadequacies in the Corps' descriptions of both the No Action Alternative baseline and the Proposed Action Alternative. *See* D-00043396–43405; D-00043408–43415; D-00049525–49527; D-00066500–66519. The Alabama Plaintiffs maintained that as a result of these inadequacies, the FEIS failed to accurately convey the true impact of lower flows into Alabama and lower lake levels at Weiss Lake.

## C.    The Corps' Clean Water Act Analysis.

Regarding the Corps' obligations under the Clean Water Act, the FEIS acknowledged that the Manual's reduced flows would cause water-quality problems downstream. Those problems would include "increase[d] algal growth in the headwaters of Weiss Lake." D-00043827. They also would include increased temperatures in the Coosa River and in the Alabama River, which is important because increased water temperature can have negative impacts on aquatic plants and animals. D-00044389. Likewise, the Corps acknowledged the Proposed Action Alternative would adversely impact downstream levels of dissolved oxygen,

phosphorous, nitrogen, and chlorophyll *a*, which all affect marine habitat. D-0004390-D-00044393.

But the Corps responded that the downstream water-quality impacts were not its concern, but rather the concerns of States and downstream parties. Under the framework put into place by the Clean Water Act, States can issue permits allowing entities, such as municipalities and businesses, to discharge certain pollutants under the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. §§1311(a), 1342(b). With respect to the water-quality issues the Corps projected its diminished releases to cause, the Corps stated that it would be "the responsibility of the respective states that manage the NPDES program" to address the problem through "reevaluation of NPDES permits." D-00043827; D-00043860; D-00046505. The Corps predicted that the Manual's overall effect on water quality would be "negligible" because "State agencies [will] continue to apply adaptive management techniques to more precisely define the ACT system's assimilative capacity." D-00043827; D-00044388. As to the adverse effects on dissolved oxygen downstream in particular, the Corps reasoned that "permit conditions may be temporarily changed"—again, by the States—"during extreme low-flow conditions." D-00044390.

The Corps' approach drew sharp criticism from EPA. D-00049703. EPA noted that the Corps had "acknowledge[d] that its operational decisions will have water quality impacts but, citing constraints in the district's or agency's authority, refutes the responsibility to comply with that aspect of the CWA," instead "recommend[ing] that States and other stakeholders address the consequences of the USACE's operational decisions." D-00049709. EPA stated that it "disagree[d] with" the Corps' "statements" on that issue. D-00049710. EPA explained that that the Manual "should provide for operations that comply with state water quality standards, which

includes not creating conditions that impair water quality standards, including downstream uses and adequate flows to protect the designated use, consistent with the authorized purposes of the projects." D-00049705. EPA elaborated that the Corps has an obligation not to "create conditions (e.g., decreased flow) that cause permittees to fall out of compliance" in light of the "CWA, Executive Orders, promulgated regulations, and the USACE's own guidance." D-00049704; D-00049710. "[C]ompliance with water quality standards," on the part of the Corps, "means that the existing instream water uses and the water quality necessary to protect them will be maintained." D-00049704. The Alabama Department of Environmental Management echoed these comments and raised additional concerns about the environmental consequences of the Corps' proposal. D-00046601–46616; D-00043396–43405.

### D. The Manual's Effects on the Alabama Plaintiffs.

Modeling at the time the Corps adopted the Manual showed that the new operations would substantially decrease flows into Alabama during low-flow and drought periods. The percentage of days when flow would be less than the average 10-year drought were projected to increase by 33% each August, 100% each September, 67% each October, and 25% each November as compared to the Corps' No Action Alternative. *See* D-00044316; D-00044330 (Table 6.1-2); D-00066498. These reduced flows were projected to result in reduced hydropower generation, reduced lake levels at Alabama Power's Coosa and Tallapoosa River projects, and impaired water quality, especially in the Coosa River and at Alabama Power's Weiss Lake. *See* D-00049516-49524; D-00066499; D-00049607; D-00049627-49630; D-00049636-49645; D-00066501-66502; D-00066505-66506. Even on the Corps' flawed assumptions that it would generate hydropower in circumstances when it was not required to do so, the operations were projected to cause drought conditions 16% more frequently at the Alabama-Georgia state line. *See* D-00044210 (Table 4.2-5); D-00044342. If the Corps were to use the full range of its

discretion to keep Allatoona full, as it did in 2016, Alabama would frequently receive minimum flows only from Allatoona during the late summer months.   D-00049518 (minimum flows projected in 48% of years, based on 1980-2012 operations); D-00049596; D-00049608. On the other hand, flows into Alabama were projected to greatly increase each year when the Corps made the releases associated with the delayed "phased drawdown" after November 15. But this late-season flow would occur under cooler and wetter conditions, when releases are generally not needed for navigation and hydropower. D-00049604.

U.S. Geological Service data since the Corps implemented the Manual confirm the new operations' effects. During summer 2015 and 2016, flows into Allatoona were not at record low levels. *See* Exh. 1 ¶ 9 (Glenn Decl.). Yet in furtherance of Manual's stated goal to keep Allatoona's elevation as high as possible, the Corps released so little water that downstream flows at the state line were among the lowest in recent history. *See id.* ¶ 8. At the same time, while the FEIS's modeling assumed that the Corps would make sufficient releases to generate three hours of hydropower during the 132 summertime days when Allatoona was in Zone 2 or above, *see supra* at pp. 20-21, the Corps met or exceeded that goal on only 14 of those days, *see* Exh. 1 ¶ 10. Correspondingly, Allatoona has remained relatively full, while Lake Weiss's elevation has been relatively low. *See* Exh. 3 (Peeples Decl.) ¶ 16.

## STANDARD OF REVIEW

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of [the agency's] statutory jurisdiction" or "authority." 5 U.S.C. §§ 706(2)(A), (C).

The APA requires the Court to undertake "a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 104–05 (1977). First, this Court must determine whether the Corps acted within its scope of authority. *See id.*; 5 U.S.C. § 706(2)(C). Second, if this Court concludes that the Corps acted within its statutory authority, it must independently ensure that the Corps engaged in reasonable decision-making—*i.e.,* the Corps' decision must reveal a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). In particular, this Court must examine whether the Corps "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation" either contrary "to the evidence before the agency" or "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## ARGUMENT

The Corps' adoption and implementation of the Manual will result, and already has resulted, in substantial harm to the downstream environment and economy. Even before the Corps adopted the Manual, modeling showed that its new operational provisions, designed to keep Allatoona's elevation as high as possible for recreational purposes, would substantially reduce flows into Alabama during dry times, would impair water quality on Alabama rivers, and would decrease hydropower generation by Alabama Power. *See supra* at pp. 23-24. The parties' experience in the two years since the Corps implemented the new Manual, documented in Exhibits 1 through 3, confirms that the Alabama Plaintiffs have standing to seek redress for these harms. That is particularly so since one of the Alabama Plaintiffs has the "special position and interest" of a "sovereign State," *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007), and Congress

authorized the Allatoona Project specifically to benefit hydropower generation at Alabama Power's downstream projects, *see supra* at pp. 4-6. The Corps has withheld releases from Allatoona and kept the lake's elevation high even during times that saw record low flows at the state line. So both Alabama and Alabama Power are suffering "injury," "fairly traceable" to the Manual, that the Court can "redress[]" by setting the Manual aside and requiring the Corps to adhere to the law. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990).

The Court should take that step now. As explained below, in adopting and implementing a Manual that substantially reduces flows out of Allatoona and into Alabama during critical times, the Corps is violating the APA, the Clean Water Act, and NEPA.

## I.       The New Manual Violates The APA.

The Corps violated two foundational requirements of the APA in adopting the Manual. *First*, the Corps' actions were "in excess of [the agency's] statutory . . . authority." 5 U.S.C. § 706(2)(C). *Second*, adoption of the new Manual was "arbitrary and capricious" because the Corps departed from its prior operational precedents without a reasoned basis for doing so and failed to respond meaningfully to comments demonstrating the significant harms that would flow from the Manual. *Id.* § 706(2)(A).

### A.       Under the Manual, the Corps is Operating Allatoona Contrary to the Direction of Congress in the Flood Control Act of 1941.

The Corps, like all federal agencies, is "a creature of statute" and has "only those authorities conferred upon it by Congress; if there is no statute conferring authority, [it] has none." *North Carolina v. EPA*, 531 F.3d 896, 922 (D.C. Cir. 2008) (internal quotation marks omitted). Thus, the Corps must operate its reservoirs as authorized by Congress and may only modify its operations for other purposes as specifically permitted by Congress.

As explained above, *see supra* at p. 5, the Flood Control Act of 1941 unambiguously provides that the Allatoona project "shall be prosecuted . . . in accordance with the recommendation of the Chief of Engineers in House Document Numbered 674." D-00053805; D-00053808. House Document 674 in turn unambiguously provides that Allatoona was authorized only "for the control of floods, regulation of stream flow for navigation, and the development of hydroelectric power." D-00013497.0002.

The Corps has recognized these limitations. The Corps issued the new Manual under 33 C.F.R. § 222.5 (ER 1110-2-240), which provides that all water control plans must "conform with *objectives and specific provisions of authorizing legislation* and applicable Corps of Engineers reports." 33 C.F.R. § 222.5(a), (d)(1), (f)(1) (emphasis added). The Corps' General Counsel has likewise opined that "[i]t is the view of this office that the discretionary authority given the Chief of Engineers to make post-authorization changes in projects . . . is *not* considered to include matters *which materially alter the nature of the project*, such as the deletion or addition of project purposes where not otherwise authorized by law, or substantial changes in the relative sizes of project purposes." SUPPAR 022996-97 (emphasis added). As one district court has explained, these principles mean that it is "necessary" for the Corps "to bring a project change to the attention of Congress and secure its approval for the modification, if," among other things "the purpose or function of the project, *i.e.*, navigation, flood control, etc., would be materially changed." *Envtl. Def. Fund v. Alexander*, 467 F. Supp. 885, 908-09 (N.D. Miss. 1979). The new Manual "materially change[s]" the nature of the Allatoona Project in three respects.

> ### 1.   *The Manual substantially deemphasizes the congressionally authorized purpose of hydropower generation.*

For the last 60 years, the Corps' Allatoona manuals, as well as the actual operations of Allatoona, have shown that the lake level must be drawn down over the summer and fall period

to comply with the Congressional mandate that Allatoona is a flood control, hydropower, and navigation project. *See supra* at pp. 10-15. Now, the Corps intends "to manage the lake at the highest level possible for recreation and other purposes." *See supra* at p. 18. This can only be accomplished by substantially reducing hydropower generation, including the discretion not to generate at all. *See supra* at pp. 17-19. The reduction is across the board—in all seasons of the year and at all levels in the reservoir—and is especially acute during the August to November period, when peak hydropower and downstream flow support are needed most. *See id.* While the full potential impact at Allatoona of this reduction is (tellingly) not disclosed in the FEIS, *see infra* at pp. 46-47, the hydropower analysis prepared for the Corps in conjunction with the Manual conceded that the changes at Allatoona will result in reduced hydropower and reduced flows downstream during critical low-flow periods in the fall. *See* D-00048480 (Figure 6); D-00048498 (Tbl.13); D-00048499 (Tbl.15); D-00048500 (Tbl. 17). Even these impacts are a lower bound, because they do not reflect the fact that the Corps could reduce generation to zero in its sole discretion.

This concern is not hypothetical. During the drought year of 2016, the first full year of operation under the New Allatoona Manual, Allatoona was essentially full or even above full pool elevations, with historic low discharges compared with prior droughts, while Alabama Power's downstream Weiss project was well below full pool. *See* Exh. 1 & 3; Doc. 54-1 (filed Oct. 24, 2016).

The "action zones" adopted by the new Manual provide another stark illustration of how the Corps has disregarded Congress' direction that power generation was one of Allatoona's primary purposes. *See In re Tri-State Water Rights Litig.*, 639 F. Supp. 2d 1308, 1333 (M.D. Fla. 2009) (finding that "action zones" in draft manual for Corps project in nearby river basin

"highlight[ed] the shift in operations . . . from hydropower, flood control, and navigation to water supply and recreation"), *rev'd on jurisdictional grounds*, 644 F. 3d 1160 (11th Cir. 2011). The 1968 Allatoona manual contained no action zones. *See supra* at pp. 12-13. Instead, it provided that a full lake meant that "excess energy is available" for "power generation." *See id.* The 1993 draft manual introduced action zones but still required minimum levels of hydropower generation. *See supra* at pp. 13-15.

The new Manual eliminates all such minimum hydropower requirements and substantially reduces the volume of water available for hydropower. Comparing the new Manual with the 1993 draft manual, during the summer May 1 to September 1 period, the amount of storage in zones 1 and 2 combined is reduced by 43% from zone 1 storage under the 1993 draft manual. As of October 1, the driest month of the year, the combined storage in zones 1 and 2 is reduced by 67% compared to zone 1 of the 1993 draft manual. And, during the critical July-August period, when peak generation is needed most, zone 4 puts fully half of the storage off-limits to normal hydropower generation. *See supra* at p. 18.

A federal commissioner for a previous multistate compact involving the ACT between Alabama, Georgia, and the United States made clear that such a reallocation in the use of Allatoona's storage away from power generation constitutes a "material alteration" in its operation. *See generally* Pub. L. No. 105-105 (1997), 111 Stat. 2223 (establishing the ACT Basin Compact) (available at SUPPAR007126). In fact, he advised the Corps, Alabama, and Georgia that "the specification of reservoir operational procedures that limit or constrain the amount or timing of hydropower production" would have "an adverse impact on the presently authorized hydropower and flood control purposes" at Allatoona and Carters, and "[a]ny restriction which does not allow the project purposes to utilize freely the entire conservation pool must be

accompanied by a Congressional re-authorization." SUPPAR026151; *see also* D-00005962.004-.005.

### 2.   *The Manual substantially deemphasizes the congressionally authorized purpose of navigation.*

The new Manual also effectively deletes navigation as an Allatoona project purpose. Even though Congress authorized Allatoona for navigation, *see supra* at pp. 4-6, the Corps disclaims any obligation to operate Allatoona for the express purpose of navigation support. D-00043980 ("Allatoona Lake . . . while originally authorized to support downstream navigation, [is] not regulated for navigation[.]"). Even if, as the Corps asserts, Allatoona could be considered "distant from the navigation channel," *id.,* that was just as true in the 1940s when Congress authorized the Allatoona Project for the express purpose of supporting navigation.

The Corps, apparently recognizing that it has no authority to abandon this project purpose, claims that navigation is indirectly supported as a byproduct of hydropower generation. D-00044961. That can be true—hydropower releases can support downstream navigation by providing some additional flow. But the Corps also concedes that navigation support is needed most in the fall low-flow season, D-00043977, the exact season when the new Manual proposes to reduce or eliminate hydropower releases in the interest of higher lake levels for recreation. *See supra* at pp. 17-18. In contrast, the Corps still expects Alabama Power to make releases from storage to support navigation flows, recognizing that hydropower generation at Alabama Power's projects is not always enough to maintain a navigable channel on the Alabama River. D-00044803 ("[A]nother critical component in the water control plan for navigation involves using an amount of storage from APC storage projects . . . . The plan does not include flow requirements from Allatoona and Carters Lakes because . . . they are not regulated specifically for navigation."). The Corps cannot simply offload its navigation responsibilities to Alabama

Power. Allatoona was specifically authorized for navigation support and its storage must be used for that purpose.

While the Corps has *some* authority to balance different project purposes, that authority is limited. The Corps is constrained by Congress to operate its projects for certain purposes and is precluded, at the very least, from *abandoning* those project purposes in either a de facto or de jure manner. For example, in a case involving the Missouri River system, the Eighth Circuit refused to uphold injunctions requiring the Corps to favor the secondary use of recreation at upstream lakes over the dominant purpose of downstream navigation support. *See South Dakota v. Ubbelohde*, 330 F.3d 1014, 1032 (8th Cir. 2003). In a later appeal, the Eighth Circuit acknowledged the Corps' authority to balance project purposes but warned that the Corps could not functionally abandon project purposes like flood control or navigation in favor of secondary purposes like recreation. *See In re Operation of the Mo. River Sys. Litig.*, 421 F.3d 618, 629 n.7 (8th Cir. 2005). The court explained that if "faced in the future with the unhappy choice of abandoning flood control or navigation on the one hand or recreation, fish and wildlife on the other, the priorities established by the [Flood Control Act] would forbid the abandonment of flood control or navigation." *Id.* The court likewise emphasized that "some more limited degree of support for flood control or navigation in the future could be held to constitute 'abandonment' of these dominant functions." *Id.* In other words, only Congress can deauthorize a primary project purpose, and even the Corps has acknowledged that "[n]avigation is an authorized purpose of the ACT projects and as such cannot be abandoned." D-00046940. Indeed, recreation is due even less weight in the ACT system than in the Missouri system, where the original congressional authorization contemplated a specific secondary purpose of recreation, unlike the limited authorization "to construct, maintain, and operate public park and recreational facilities"

31

the Flood Control Act of 1944 allows at projects in the ACT. *See* Flood Control Act of 1944 § 9;

House Doc. 475 (1944); Senate Doc. 191 (1944); Senate Doc. 247 (1944).

### 3.   *The Manual deemphasizes congressionally authorized purposes for the sake of recreation.*

Ultimately, the reason that the Corps decided to scale back generation and eliminate

navigation as a project purpose was to increase lake levels in Allatoona to benefit recreational

activities.  According  to  the  Corps,  the  complained-of  changes  in  the  Manual  achieve

"substantially  higher  lake  elevations"  that  benefit  recreation  in  the  September  to  December

period. D-00044245; *see also id.* (reduced "hydropower production for September through

November to facilitate implementing the phased fall guide curve drawdown would likely provide

additional  improvement  to  fall  lake  levels").  The  Corps,  however,  has  no  such  authority  to

advance recreational interests over hydropower generation and navigation.

Recreation was not an originally authorized purpose of Allatoona. The Corps relies on the

Flood Control Act of 1944, Pub. L. No. 78-534, 58 Stat. 889, as authority to consider recreation

as  an  authorized  project  purpose.  D-00004143.0016.  But  the  Flood  Control  Act  of  1944  only

gives  the  Corps  the  authority  to  "construct,  maintain,  and  operate  public  park  and  recreational

facilities." Flood Control Act of 1944 § 4. Whatever general authority the Corps possesses to add

recreation  facilities  to  projects  like  Allatoona,  it  does  not  authorize  the  Corps  to  change  the

project's original congressionally authorized purposes by shifting reservoir storage to recreation

at  the  expense  of  navigation  and  hydropower  generation. *See* ER 1165-2-119 ¶ 8f. Indeed, the

Corps'  engineers  regulations  specifically  provide  that  recreation  "is  secondary,  as  far  as  storage

operation is concerned, to project functions for which the storage was formulated." ER 1165-2-1

¶ 17-3(e). Accordingly, "[a]ny reallocation of reservoir storage to provide more stable recreation

levels that would have a significant effect on other authorized purposes, or that would involve

major structural or operational change, requires Congressional authorization." *Id.*; *accord* ER 1110-2-3600 at 2-29. Manipulating the reservoir's storage to benefit recreation is a material operational change that requires Congressional reauthorization. *See supra* at p. 27 (citing *Envtl. Def. Fund v. Alexander*, 467 F. Supp. 885, 908-09 (N.D. Miss. 1979)).

The D.C. Circuit's opinion in *Southeastern Federal Power Customers v. Geren*, 514 F. 3d 1316 (D.C. Cir. 2008), is instructive. In that case, the Court reversed the trial court and held under the similar terms of the Water Supply Act of 1958 "that a major operational change . . . requires prior Congressional approval," and that a reallocation of 22% or even 9% was unambiguously "a major operational change" as a matter of law, without affording the Corps *Chevron* deference. *Id.* at 1323-25. Here, the new Manual reduces conservation storage for normal hydropower operations by 43% in the summer, and 67% as of October 1, and puts fully 50% of conservation storage off limits to normal hydropower generation during the critical July-August period. *See supra* at p. 18. But, unlike the Water Supply Act, the Flood Control Act of 1944 does not give the Corps express authority to reallocate *any* storage to recreation. Whatever authority the Corps has to consider recreation under the Flood Control Act of 1944, it is necessarily less than the Corps' authority under the Water Supply Act. The Corps exceeded that authority here.

**B.    The Manual is an Unexplained and Arbitrary Departure From Established Operations.**

At the very least, the Corps' reordering of project purposes violated the APA because it was "arbitrary." 5 U.S.C. § 706(2)(A). Since the construction of the Allatoona Project, the Corps' consistent position has been that the Project should primarily be operated for hydropower, navigation, and flood control and, thus, that the reservoir must necessarily be drawn down during the fall season. It has further recognized these purposes must be given primacy over maintaining

high lake levels to benefit recreation and the supply of water. The new Manual sharply departs from that precedent without acknowledging, let alone explaining, its departure from its prior practices. *Cf. Nat'l Cable & Telecomm. Ass'n v. FCC,* 567 F.3d 659, 667 (D.C. Cir. 2009) ("Of course, 'it is axiomatic that agency action must either be consistent with prior action or offer a reasoned basis for its departure from precedent.'" (citations omitted))." In addition, even if the Corps were operating on a clean slate, it failed to engage in reasoned decision-making in choosing to preference recreational interests at the expense of hydropower, navigation, flood control, and, most critically, the environment. *See State Farm*, 463 U.S. 29 at 52.

Under the new Manual, the Corps proposes to hold the elevation of the reservoir at high levels from October 1 to mid-November—the driest period of the year—or even higher in Zone A, before drawing the reservoir down by December 31. *See supra* at pp. 17-20. As the Alabama Plaintiffs explained during the comment process, this proposal was contrary to the Corps' historical practices and could only be accomplished by reductions in hydropower generation and flows that support navigation and the environment. D-00043418-19; D-00049512-16. While the Corps purports to justify its operational changes, it fails to provide any reasoned response to commenters' concerns.

Until implementation of the new Manual, the Corps' consistent policy had been to operate Allatoona to provide downstream flows when they are needed the most, *i.e.*, the late summer and fall. *See supra* at pp. 10-16. Indeed, the FEIS itself recognizes this:

> [T]he need for water in the summer and fall often is greater than the supply of water in the river basin. An important function of the many reservoirs in the ACT Basin is to store water when there is an abundance of rain and to release water when there is less rain, ensuring that all water needs can be met throughout the year . . . . The reservoirs formed by those dams attenuate high river flows during wet periods and augment low flows during dry-weather periods.

D-00043910-43911.

While purporting to adhere to established operations, the Corps disregarded those operations in the new Manual. The Manual would substantially reduce flow support during the driest season of the year by adopting action zones intended "to manage the lake *at the highest level possible* for recreation and other purposes." D-00044402 (emphasis added). This is the paradigm of arbitrary agency action. The Corps cannot simultaneously acknowledge its established policy of providing downstream flows during the dry season and then adopt operational practices that contradict that policy. *See Encino Motorcar, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'") (citations and brackets omitted); *Goldstein v. SEC*, 451 F.3d 873, 882 (D.C. Cir. 2006) (holding SEC rule arbitrary because it had not "adequately explained" why "'client' should mean one thing when determining to whom fiduciary duties are owed . . . and something else entirely when determining whether an investment adviser must register").

Indeed, the Corps' actions are doubly arbitrary because they are contrary to the Corps' repeated, prior determinations that higher lake levels in the fall were *not* in the public interest. For example, in 1957, the Corps' District Engineer addressed complaints about impacts of "lowering of the water level at Allatoona" on "recreational facilities," explaining that the "drawdown, which is usually about 20 feet, is *necessary* in operating the project to fulfill its functions of flood-control and power generation as authorized in the Flood Control Act of 18 August 1941." Exh. 4 (Lumpkins Decl.), at Exhs. 6-7 (emphasis supplied). In 1968, the Corps made management decisions recognizing that they were *not* intended to benefit recreation. D-00011371.0004 ("There will be little, if any, benefit to recreation due to the modification of the top of power pool."). Similarly, in 1974, the Corps determined that more stable lake levels for

recreation "would result in the necessity to obtain foregone power from other sources," and that "[e]limination of power from the project would result in a project which may not be economical to operate." D-00004143.0024–4143.0025. Alabama Power raised these concerns during the comment period. D-00049513, Yet the Corps did not even acknowledge its prior decisions establishing that the Allatoona Project should not maintain high reservoir levels to benefit recreation at the expense of generation and navigation, let alone justify its departure from these prior precedents. *See FCC v. Fox Television Station, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").

Even apart from the Corps' failure to follow its own precedents, the FEIS is contrary to the APA because the Corps' justifications for "substantially higher lake elevations" at the expense of hydropower generation, navigation support, and water quality are arbitrary on their face. The Corps says the changes will benefit recreation, D-00044245, even though most of this period (September to December) is outside the normal (May through early September) recreation season at Allatoona. D-00044185. Further, the Corps undertook no evaluation or quantification of increased recreation days or economic impacts associated with the speculated increase in recreation at Allatoona. *See* D-00066499. The Corps cannot rely "only on conclusory assertions" on this front. *Bangor Hydro-Electric Co. v. FERC*, 78 F. 3d 659, 664 (D.C. Cir. 1996). As the D.C. Circuit has explained in another context, "[i]t will not do to present only a 'Field of Dreams' justification ('If you build it, they will come.')." *Id.* Regardless, the Corps' assertions of recreation benefits are contradicted by its own 1998 study concluding that only 11% of the recreational visits to Lake Allatoona occurred in the fall season and that recreational use of

Allatoona would not substantially increase from higher lake levels in the fall. *See* D-00021638 (Tbl.4-62); D-00021643–D-00021644 (Tbl.4-92).

Having failed to consider "an important aspect of the problem," *State Farm*, 463 U.S. at 43, the Corps then had no basis to reject commenters' detailed showings that any conceivable benefit in increased recreation from higher late-summer and early-fall lake levels would be far outweighed by the massive harms that retaining water in Allatoona when it is most needed would cause: reduction in hydropower releases, elimination of critical navigation flow support, and severe downstream environmental impacts. D-00066499; D-00046816; D-00049516. The Corps simply brushed these comments under the rug. But an "agency must 'engage the arguments raised before it.'" *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 11 (D.C. Cir. 2015). And an agency's decision is arbitrary if, as here, the agency fails to "'respond *meaningfully* to objections raised by a party.'" *BNSF Ry. Co. v. Surface Transp. Bd.*, 741 F.3d 163, 168 (D.C. Cir. 2014) (citations omitted) (emphasis added).

Remarkably, the Corps also attempts to justify "substantially higher lake elevations" by claiming "improved flood risk management operations at Allatoona Lake," and "improvements for hydropower generation." D-00044244. According to the Corps, the lake level will be five to six feet higher than current lake levels, based on modeling of fall-period operations, D-00044278, and the reservoir could be up to seven feet higher than full pool under the Zone A operations during the fall period. *See supra* at pp. 19-20. This justification further demonstrates the arbitrary nature of the Corps' actions. By definition, *higher* lake levels mean *less*, not more, flood control, and *less*, not more, hydropower generation. This "internally inconsistent" agency action is inherently arbitrary and necessarily violative of the APA. *Business Roundtable v. SEC*, 647 F.3d 1144, 1153 (D.C. Cir. 2011).

II.     **The Manual and FEIS Do Not Adequately Assure the Corps' Compliance with the Clean Water Act and Water-Quality Standards.**

The Court also should set aside the Manual because it violates the Corps' obligations to maintain water quality and to avoid environmental degradation throughout the ACT Basin. As EPA noted during the comment process, the Corps "acknowledge[d] that its operational decisions will have water quality impacts" during low-flow conditions. D-00049709; *see generally supra* at pp. 22-23. As EPA also observed, the Clean Water Act and federal regulations required the Corps to "select[] the" action alternative "that complies with water quality standards to the maximum extent feasible." D-00049711. But rather than taking that route, the Corps "refute[d]," as EPA put it, "the responsibility to comply with that aspect of the CWA," instead "recommend[ing] that States and other stakeholders address the consequences of the USACE's operational decisions." D-00049709. As EPA concluded, the Clean Water Act and applicable regulations do not allow the Corps to shirk its obligations in this way.

A.     **The Clean Water Act and Corps Regulations Require the Corps to Comply With Water-Quality Standards and to Protect Existing Downstream Uses.**

The Clean Water Act and implementing regulations require the Corps' operations to "comply with state water [quality] standards." *Nat'l Wildlife Fed. v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1178 (9th Cir. 2004). The Clean Water Act provides in relevant part that each federal "agency . . . (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity." 33 U.S.C. § 1323(a); *see also* 33 C.F.R. § 222.5(f)(1). (specifying that the Corps' "water control plans will be prepared giving appropriate consideration" to the "Clean Water Act of 1977."). Private dams are

subject to state water-quality standards. *See, e.g.*, *S.D. Warren Co. v. Me. Bd. of Envtl. Protection*, 547 U.S. 370, 375-83 (2006). So under the Clean Water Act, dams operated by "the Corps must comply with water quality standards promulgated by the State[s]" as well. *Nat'l Wildlife Fed.*, 384 F.3d at 1167; *accord Nat'l Wildlife Fed. v. Gorsuch*, 693 F.2d 156, 183 & n.78 (D.C. Cir. 1982).[3]

Of equal importance, the Corps' own regulations make clear that the agency's water-quality obligations extend throughout the ACT Basin. Under these regulations, the Corps must avoid creating water-quality conditions that impair "existing instream water uses" "throughout the area" its dam operations will affect. ER 1110-2-8154 ¶ 6a, at 2 & ¶ 6b, at 2 (attached as Exh. 5). The regulations thus require the Corps' operations to "protect all existing and future uses including assimilative capacity, aquatic life, water supply, recreation, industrial use, hydropower, etc." *Id.* The regulations provide that "[n]o degradation is allowed without substantial proof that the integrity of the stream will not diminish." *Id.* ¶ 6a, at 2. The Corps' divisions are therefore to "[e]nsure that water quality, as affected by the project and its operation, is suitable" not only "for project purposes," but also for "existing water uses, and public health and safety and in compliance with applicable Federal and state water quality standards." *Id.* ¶ 8a, at 3-4.

---

[3] The Corps in the past erroneously argued that the Eighth Circuit's decision in *Missouri ex rel. Ashcroft v. Department of the Army*, 672 F.2d 1297, 1304 (8th Cir. 1982), limits the Corps' Clean Water Act responsibilities to activities that result in the runoff or discharge of pollutants. But as later decisions have explained, that decision did not address language from the prong of the statute that is relevant here, 33 U.S.C. § 1323(a)(1), requiring water-quality compliance whenever an agency has "jurisdiction over the particular property or facility," without regard to whether runoff or discharge of pollutants occurs. *See In re Operation of Mo. River Sys. Litig.*, 320 F. Supp. 2d 873, 877 (D. Minn. 2004) (citing 33 U.S.C. § 1323(a)(2)), *aff'd in part*, 418 F.3d 915 (8th Cir. 2005). With respect to the dam facilities at issue here, this part of the Clean Water Act requires the Corps to comply with state water-quality standards, as EPA confirmed during the comment period and the Corps did not deny. D-00049710.

These requirements are important because the Manual makes no assurance that the decreased flows from Allatoona will not cause water-quality violations in Alabama. States that participate in water-quality regulation under the Clean Water Act must establish water-quality standards and a policy against environmental degradation. *See* 33 U.S.C. § 1313; 40 C.F.R. § 131.10 *et seq*. These States also must ensure that their water-quality standards are sufficient to protect the quality of downstream waters. 40 C.F.R. § 131.10(b). The Alabama Department of Environmental Management has done so, promulgating water-quality standards to "protect, maintain and improve the quality" of water in Alabama. ALA. ADMIN. CODE r. 335-6-10.01(1). The FEIS confirms that reduced flows under the Corps' new Manual will exacerbate nutrient concentrations in Weiss Lake, thus contributing to a violation of the limits ADEM has placed there. *See supra* at pp. 7-8, 21. The FEIS likewise acknowledges the Manual's adverse impacts on water temperature, nitrogen, phosphorus, and chlorophyll *a*. *See id*. The Manual thus on its face failed to provide assurances that the Corps was choosing an alternative that, in EPA's words, "complies with water quality standards to the maximum extent feasible, consistent with the authorized purposes of the projects." D-00049711.

> **B.    The Manual Unlawfully Shifts Mitigation Responsibility to States and Downstream Users.**

Rather than address the water-quality degradation its new operations will create, the Corps passed the buck in a manner that EPA determined to be inconsistent with the law. As to each potential water-quality issue that the Corps' reduced flows would cause, the Corps' solution was to make it "the responsibility of the respective states that manage the NPDES program" to facilitate "[a]djustment of NPDES permits" in a way that mitigates the problem. *See supra* at p. 22. At bottom, what the Corps is saying is that it expects downstream States to mitigate the Corps' reduction in flows from Allatoona by reducing the effluent concentrations that State

permits currently allow for downstream municipalities and companies. As a general matter, the less flow that is available to dilute a discharge, the less effluent a State can allow a permit holder to discharge. *See* EPA, NPDES PERMIT WRITERS' MANUAL ¶ 6.2.4.2, at 6-18 (Sept. 2010), *available at* https://www.epa.gov/npdes/npdes-permit-writers-manual. So in calling for the "[a]djustment of NPDES permits" in response to the water-quality issues its operations will cause, the Corps is calling for State authorities to rectify the conditions the Corps has created by setting more stringent standards on the effluent that permit holders can discharge.

The Corps points to no provision of law that would allow it to shift responsibility for the impacts of its own actions in that way. EPA has confirmed that there is none and therefore "disagree[d] with" the Corps' "statements" on these issues. D-00049710. The Corps responded by claiming that EPA was trying to foist a duty on it to "ensure that *other* entities meet *their* federal clean water compliance requirements," but that was not what the EPA was saying. D-00043784 (emphasis added). EPA was instead saying that the Corps had its *own* obligations not to "create conditions (e.g., decreased flow) that cause permittees to fall out of compliance." D-00049704. Those obligations, EPA noted, arise from the "CWA, Executive Orders, promulgated regulations, and the USACE's own guidance" discussed above. D-00049710.

The Court thus should set aside the Manual. Rather than making clear that it selected the action alternative that complies with water quality standards to the maximum extent feasible, the Corps denied that it had such an obligation. When "the administrative record does not establish that the Corps has complied with its legal obligations under the Clean Water Act," the final agency action is "arbitrary and capricious." *Nat'l Wildlife Fed. v. U.S. Army Corps of Eng'rs*, 132 F. Supp. 2d 876, 895 (D. Ore. 2001).

**III.    The Manual and FEIS Violate NEPA.**

Finally, the Court also should set aside the Manual because the Corps has deprived the public of its right to review the environmental impacts of the Corps' operations under NEPA, 42 U.S.C. § 4332(2)(C)(i). NEPA's EIS requirement forces agencies to take a "hard look" at environmental consequences before taking action, and to disclose the relevant environmental information "to the public" so it may "offer its insight to assist the agency's decision-making." *Young v. Gen. Servs. Admin.*, 99 F. Supp. 2d 59, 67 (D.D.C. 2000) (internal quotation marks omitted), *aff'd*, 11 Fed. Appx. 3 (D.C. Cir. 2000). The APA makes the public's right to this information judicially enforceable, requiring courts to set aside "final agency actions" when the accompanying EIS does not "adequately consider[] and disclose[] the environmental impact." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97–98 (1983). That step is required here, for the FEIS does not adequately communicate, and in some respects affirmatively conceals, important environmental impacts associated with the Manual.

Critically for present purposes, NEPA requires an EIS to take "'comparative form.'" *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (quoting 40 C.F.R. § 1502.14). An EIS describes the impact of an agency's "proposed action" by comparing it to the impact under the "No Action" alternative, which serves as the "baseline." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 83–84 (D.D.C. 2006). The Corps' FEIS thus was required to evaluate the impact of the Corps' proposed operations on various environmental conditions "as compared to" a set of conditions it deemed to be "the No-Action Alternative." D-00044309 (lake levels); D-00044330 (flows); D-00044330 (water quality).

That comparison was fundamentally flawed, both in the way the Corps defined the baseline and in the way it defined the Proposed Action Alternative. As explained below, the Corps' no-action alternative assumes operations at the Allatoona Project under the 1993 draft

42

manual, which the Corps never legally adopted or subjected to NEPA review. The FEIS also fails to properly analyze and disclose impacts associated with the Proposed Action Alternative in two critical respects. As a result, the Corps has not communicated the environmental information that NEPA demands. By comparing unrealistic operations scenarios to a false-floor baseline, the Corps did not accurately portray the impact of the Manual.

A.     **The FEIS Improperly Assumes Baseline Operations Under the 1993 Draft Manual That Have Never Been Subject to NEPA Review.**

The Corps' proffered "No Action" baseline wrongly incorporates operations from the 1993 draft manual and other "incremental changes in project operations" that were never legally implemented or subjected to NEPA review. *See supra* at p. 20. That draft manual proposed major changes to Allatoona operations, chief among them the regulation of hydropower generation based on "action zones." *See supra* at pp. 13-15. The Corps began implementing the draft manual in the early 1990s. The Corps did not conduct the required NEPA analysis either then or in the years since. The Corps fought off Alabama and Alabama Power's earlier NEPA claims concerning the 1993 draft manual only by persuading the court that the manual was not "final agency action" and that the NEPA claims therefore were not ripe for APA review. *See supra* at pp. 15-16.

Having failed to comply with NEPA regarding the 1993 draft manual in the past, the Corps cannot now grandfather the 1993 draft manual's operations into an extrapolated NEPA baseline now. NEPA requires an agency to disclose environmental impacts *before* it makes an "'irreversible' and irretrievable commitment of resources" to major federal actions. *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 229 (D.D.C. 2003) (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000)). Because the Corps never undertook any NEPA review of the 1993 draft manual, its implementation of that manual was not lawful. *See Humane Soc. v. Johanns*,

520 F. Supp. 2d 8, 37 (D.D.C. 2007) (vacating interim final rule promulgated in violation of NEPA). As the Ninth Circuit has explained, it is "logically untenable" for an agency to "assume[] . . . as the baseline, the existence" of operations that previously have been found to be "illegal" or "invalid." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1037-38 (9th Cir. 2008). Because the new Manual would incorporate several elements of the non-NEPA-reviewed 1993 draft manual that were not present in the 1968 NEPA-reviewed manual—including, critically, the very concept of action zones—allowing the 1993 draft manual to serve as the baseline would wrongly "assume[] the existence of [the] proposed project," rendering the baseline meaningless. *N.C. Wildlife Fed. v. N.C. Dep't of Transp.*, 677 F. 3d 596, 603 (4th Cir. 2012) (citing *Friends of Yosemite Valley*, 520 F.3d at 1037-38).

If the Corps can do so in the case at hand, the result would create incentives for federal agencies to evade their NEPA obligations. They could declare newly implemented operations "non-final" and refuse to subject them to NEPA, only to later claim that those non-NEPA-analyzed operations become part of a "baseline," never to be NEPA-reviewed, against which the impact of a new, "final" action is to be compared. That cannot be the law. As a previous decision from this District reasoned in a different context, "if agencies are allowed to undertake major federal actions without complying with NEPA and then to compound their error by basing later decisions on their previous illegal actions, then NEPA's protections will be rendered worthless." *Nat'l Wildlife Fed. v. Andrus,* 440 F. Supp. 1245, 1255 (D.D.C. 1977) (holding that an agency was precluded from rejecting an alternative action based on previous actions it illegally took without conducting NEPA review).

The Corps' current position is particularly untenable in light of the success the agency enjoyed in the prior litigation over the 1993 draft manual, in persuading the court that that

Alabama's and Alabama Power's NEPA claims were due to be dismissed because the draft was not "final agency action." *See supra* at pp. 15-16. Having convinced that court that Alabama's and Alabama Power's claims were not ripe, the Corps cannot now claim that the 1993 draft manual can become part of the baseline on the theory that the "time has passed to challenge" it. *Cf. Custer Cnty. Action Assoc. v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) (rejecting challenge to inclusion of operations in baseline when "time ha[d] passed to challenge" them). Courts have held that "judicial estoppel" may prevent agencies from "indefinitely shield[ing]" certain components of final agency action "from NEPA review" by first proposing and analyzing them in non-final, unreviewable form and then later "incorporat[ing]" the previous analyses "by reference" into a final EIS. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002) (quoting *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 670 (9th Cir. 1998)) (both addressing an agency's inability to "tier" discussion of impacts to non-final program documents). Similar estoppel principles apply here. Supreme Court jurisprudence holds that an agency action is not "final" when it does not mark the "consummation of the agency's decision making process," or when no "legal consequences will flow" from it. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted). The Corps cited that test in seeking the dismissal of the previous NEPA lawsuit, and the court relied on it when issuing that dismissal. *See* D-00049326; D-00049315. The Corps cannot now prevent NEPA review of the draft manual's change in operations by claiming that their provisional implementation had the "legal consequence" of making those operations a part of the established "No Action" baseline.

It is no response to say, as the Corps did during the comment process, that the guidance accompanying NEPA's implementing regulations calls for the no-action alternative to reflect "'the present course of action'" and thus, in the Corps' estimation, "current reservoir operations"

no matter how unlawfully implemented (and non-NEPA-reviewed) they might be. D-00046584

(quoting Council on Environmental Quality, *Forty Most Asked Questions Concerning CEQ's*

*NEPA Regulations*, 46 Fed. Reg. 18026, 18027 (1981)). In reasoning that the NEPA baseline for

proposals to modify ongoing programs generally will incorporate "the present course of action,"

that memo presupposes that the program at issue will have been implemented under "existing

legislation and regulations." *Id.* Nothing in that guidance (or in jurisprudence referring to the

"No Action" Alternative as generally the "status quo," *see, e.g.*, *Powder River Basin Res.*

*Council v. U.S. Bureau of Land Mgmt.*, 37 F. Supp. 3d 59, 88-89 (D.D.C. 2014)) suggests that

the agency should peg the baseline to a "present course of action" that is unlawful and non-

NEPA-reviewed and thus not, as a legal matter, "under existing legislation and regulations." *Id.*

A procedural ruse that would allow an agency to avoid disclosing the impact of its operations

would "circumvent[] the purpose of NEPA." *Kern*, 284 F.3d at 1073. EPA's own guidance

suggests that agencies not use the "current condition" as the baseline when it does "not

adequately represent how actions have impacted resources in the past and present" and "limit[s]

assessment to the proposed action and future actions." EPA Office of Federal Activities,

*Consideration of Cumulative Impacts in EPA Review of NEPA Documents* ¶ 4.4 (1999),

*available at* https://www.epa.gov/sites/production/files/2014-08/documents/cumulative.pdf. That

logic precludes the Corps from incorporating the 1993 draft manual into the baseline here.

**B.    The FEIS Fails to Disclose the Impacts Associated with New Operations in the Proposed Action Alternative.**

The Corps committed independent legal error by failing to measure the impact of its

Proposed Action Alternative in an accurate way. The public comments catalogued numerous

flaws in the Corps' analysis on this front, *see supra* at p. 21, and two of these errors make it

particularly incumbent upon the Corps to provide a new EIS now.

1.    **The FEIS fails to disclose the impact of the Corps' discretion not to generate hydropower.**

*First*, the Corps' modeling of the Proposed Action Alternative failed to disclose the impact of one of the new Manual's most fundamental changes—the Corps' discretion not to make *any* hydropower releases in any of the action zones at Lake Allatoona. *See supra* at pp. 20-21. The Corps' modeling of the Proposed Action Alternative assumed that the Corps would generate the maximum amount of hydropower at the top two zones during nine months of the year, and would generate 50% of the maximum for those zones in the other three months. D-00043433. But the Manual does not require the Corps to take those steps, *see supra* at pp. 18-19, and the assumption that it will do so is not realistic in light of the Corps' operational history. The Manual's stated goal of maintaining Allatoona's elevation at the highest level possible belies the FEIS's insistence that the Corps nonetheless will generate maximum hydropower for nine months of the year. Even when the Corps operated the Allatoona Project under the 1993 draft manual—which did not give the Corps the absolute discretion to wholly withhold hydropower releases provided by the new Manual—the Corps generated less than 100% of the authorized hydropower amount during the nine-month period of the year and less than 50% of the authorized hydropower amount during the other three months. D-00043434.

To adequately disclose the potential effects of the new action zones, the Corps should have modeled realistic circumstances in which the Corps generated less hydropower and even no hydropower. Alabama offered its own modeling to the Corps showing that in those circumstances, flows would dramatically decrease. D-00043412–43413; D-00043433–43437; D-44870-76; D-00049351–49354. Likewise, Alabama Power demonstrated that these reduced flows resulted in lower lake levels at Weiss and other projects. D-00049516–49520, D-00049596–49629.

>    2.    *The FEIS fails to disclose the impact of CCMWA's water-supply withdrawals.*

*Second*, the Corps also masked the Proposed Action Alternative's impact when it adopted inconsistent assumptions about Georgia entities' water-supply withdrawals from Lake Allatoona. The Cobb County-Marietta Water Authority has historically withdrawn far more water from Lake Allatoona than its contract allows. *See supra* at p. 9. The Corps, while acknowledging these contractual violations, has repeatedly not been enforcing the contract's limits. SUPPAR012736. Acknowledging this reality, the Corps modeled the No Action Alternative using CCMWA's actual withdrawals, rather than the substantially lower contractual limits. *See* D-00046585. But the Corps modeled the Proposed Action Alternative on the inconsistent assumption that CCMWA would abide by its contractual limits in the future. *See* D-00044225–44226.

There was no basis for the Corps to make that inconsistent assumption, and the practical consequence is to understate the environmental impact of the Corps' Proposed Action Alternative. The FEIS represents a baseline condition under which CCMWA is making repeated withdrawals above their contractual limits, yet represents that under the Manual, those withdrawals will decrease to a lower level, consistent with the contract limits. The Corps has admitted that the difference between CCMWA's actual historical withdrawals and its contractual limits is "substantial[]," and this issue has long been a point of contention between Alabama and Georgia. D-00064570; D-000064577. So the FEIS is representing that far more water will be available to improve downstream conditions than is realistic. The Corps had no rational basis for simply assuming that this problem would disappear in the future.

These considerations mean that the Corps has neither taken the "hard look" at the Manual's consequences nor made the public disclosures that NEPA demands. *Young*, 99 F. Supp. 2d at 67. "When relevant information 'is not available during the [impact statement]

process and is not available to the public for comment[,] . . . the [impact statement] process cannot serve its larger informational role, and the public is deprived of [its] opportunity to play a role in the decision-making process.'" *N.C. Wildlife Fed.*, 677 F.3d at 603 (quoting *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083 (9th Cir. 2011)). The Court therefore should "set aside" the Manual. *Humane Soc.*, 520 F. Supp. 2d at 37. If the Corps wishes to proceed with another revision, it should do so in a way that adequately analyzes and discloses the new Manual's impact.

### C. NEPA Required the FEIS to Consider Alternatives Requiring the Corps to Generate Hydropower.

The Corps' failure to model the effects of its newfound discretion to eliminate hydropower generation also highlights an independent NEPA violation in the FEIS. *See supra* at 47. NEPA required the Corps to consider an appropriately broad range of "alternatives to the proposed action." before adopting a master Manual for its ACT operations. 42 U.S.C. § 4332(C)(iii). By "unreasonably excluding other alternatives from consideration," an agency "violate[s] its NEPA obligations." *Pub. Employees for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.*, 177 F. Supp. 3d 146, 154 (D.D.C. 2016). That is what happened here. Not even one of FEIS's proposed alternatives, other than the No Action Alternative, required the Corps to generate minimum levels of hydropower. D-00044229. By failing to consider an alternative that would serve Allatoona's hydropower purpose in that way, the Corps failed to consider an adequate range of alternatives for its NEPA analysis. *See Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 835 (D.C. Cir. 1972) ("When the proposed action is an integral part of a coordinated plan to deal with a broad problem, the range of alternatives that must be evaluated is broadened."); *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997) ("One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender

as to define competing 'reasonable alternatives' out of consideration (and even out of existence).").

*   *   *

Although each of the Alabama Parties' claims raises distinct legal issues, the root problem is the same. Congress authorized the Corps to use Allatoona and the other ACT projects to provide the basin with flood control, hydropower, and navigation support. The Corps now is compromising those goals for the sake of lake recreation. In so doing it is running afoul of Congress's original statutory authorization for Allatoona. It is diminishing water quality in contravention of the Clean Water Act. It is continuing its practice of effectuating changes in this basin without providing the public an accurate statement of the environmental transformation the changes would cause. For each of these reasons, the Corps is exceeding the limits Congress has placed on its discretion, and for each of these reasons the APA calls for this Court to set the Corps' actions aside.

## CONCLUSION AND REQUEST FOR RELIEF

The Court should grant summary judgment in favor of the Alabama Plaintiffs, vacating the Manual and remanding the matter to the Corps to revise the Manual and FEIS in a manner consistent with the Court's opinion, and ordering the Corps to operate its projects in the ACT Basin also in a manner consistent with the Court's opinion.

Respectfully submitted,

s/ John C. Neiman, Jr.
John C. Neiman, Jr.
John A. Earnhardt
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue N, Suite 2400
Birmingham AL 35203
jneiman@maynardcooper.com
jearnhardt@maynardcooper.com

Andrew L. Brasher, Solicitor General
(*Appearing Under LCvR 83.2(f)*)
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery AL 36104
abrasher@ago.state.al.us

*Attorneys for Plaintiff*
*State of Alabama*

s/ James A. Byram, Jr.
James A. Byram, Jr.
Thomas L. Casey, III (*Admitted Pro Hac Vice*)
Balch & Bingham LLP
105 Tallapoosa Street, Suite 200
Montgomery AL 36104
jbyram@balch.com
tcasey@balch.com

C. Fredrick Beckner III
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
rbeckner@sidley.com

*Attorneys for Plaintiff*
*Alabama Power Company*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will perfect service on all registered CM/ECF users on this 30th day of May, 2017.

*s/* John C. Neiman, Jr.
OF COUNSEL