# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF ALABAMA,<br><br>    Plaintiff,<br><br>    v.<br><br>THE UNITED STATES ARMY CORPS OF ENGINEERS, et al.,<br><br>    Defendants. | Civil Action No.<br>1:15-CV-00696-LLA |

**REPLY OF THE ATLANTA REGIONAL COMMISSION AND COBB COUNTY-MARIETTA WATER AUTHORITY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION .......................................................................................................................... 1

    I.    *Geren* Does Not Control This Case ................................................................................... 1

        A.    *Geren* Did Not Establish a Nationwide Bright-Line Definition for "Major Operational Change" ............................................................................................. 1

        B.    *Geren* Is Not Controlling Because the Reallocation at Allatoona Lake is "Below the Line" for All Three of the Metrics Cited in That Case ...................... 3

        C.    Alabama's Arguments Are Foreclosed by Issue Preclusion Because the Exception for "Unmixed Questions of Law" Does Not Apply ............................. 7

        D.    *Geren* Suggests Up to 13.4% of Conservation Storage Can Be Reallocated Without Congressional Approval ...................................................................... 11

    II.    Alabama has Conceded Any Challenge Regarding the Corps' "Storage Accounting" and Decision to Grant Credit for "Made Inflows" .................................. 12

CONCLUSION ............................................................................................................................ 13

CERTIFICATE OF SERVICE .................................................................................................... 14

# TABLE OF AUTHORITIES

**Supreme Court Opinions**                                                              **Page(s)**

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024) ................................................................................................ 2

*United States v. Stauffer Chem. Co.*,
    464 U.S. 165 (1984) ............................................................................................... 8-9

*Webster v. Fall*,
    266 U.S. 507 (1925) ................................................................................................ 10

**D.C. Circuit Opinions**

*Alabama v. U.S. Army Corps of Eng'rs*,
    704 F. Supp. 3d 20 (D.D.C. 2023) ......................................................................... 9

*Arrington v. District of Columbia*,
    597 F. Supp. 2d 52, 58 (D.D.C. 2009) ................................................................ 12

*Bancoult v. McNamara,*
    227 F. Supp. 2d 144 (D.D.C. 2002) ...................................................................... 13

*Ponte v. FDIC*,
    2024 WL 4730602, 2024 U.S. Dist. LEXIS 205591 (D.D.C. Oct. 11, 2024) .......... 8

*Southeastern Federal Power Customers v. Geren*,
    514 F.3d 1316 (D.C. Cir. 2008) .................................................... 4, 1, 5, 2, 3, 4, 5, 11

*Wannall v. Honeywell, Inc.*,
    775 F.3d 425 (D.C. Cir. 2014) ............................................................................... 12

**Federal Court Opinions**

*Gruver v. La. Bd. of Supervisors for the La. State Univ. Agric. & Mech. Coll.*,
    959 F.3d 178 (5th Cir. 2020) ................................................................................. 9

*In re ACF Basin Water Litig.*,
    467 F. Supp. 1323 (N.D. Ga. 2020) ....................................................................... 8

*In re ACF Basin Water Litig.*,
    554 F. Supp. 3d 1282 (N.D. Ga. 2021) .................................................................. 8

*In re MDL-1824 Tri-State Water Rights Litig.*,
    644 F.3d 1160 (11th Cir. 2011) ............................................................................. 10

*United Food & Commercial Workers Union, Local 1564 of New Mexico v. Albertson's, Inc.*,
    207 F.3d 1193 (10th Cir. 2000) ............................................................................. 10

**State Cases**

*Johns v. League, Duvall & Powell, Inc.*,
 202 Ga. 868 (1947) ................................................................................................... 4

**Other**

Local Civil Rule (LCvR) 7(b) ........................................................................................ 12

18 Moore's Federal Practice - Civil § 134.04 ............................................................... 10

# INTRODUCTION

Alabama has staked its entire case on its theory that *Southeastern Federal Power Customers v. Geren*, 514 F.3d 1316 (D.C. Cir. 2008), establishes a national rule prohibiting all water supply reallocations that "involve[] a cumulative reallocation of more than 9% of a reservoir's conservation pool." (ECF 164 at 2.) Alabama's argument fails, and judgment should be entered against it, because *Geren* does not establish any bright-line rule; and even if it did, the reallocation at issue in this case is below any line that can be drawn from that case.

The remainder of Alabama's arguments are easily dismissed. By failing to respond to the arguments in our opening brief on this issue, Alabama has abandoned any challenge to the Corps' decision correcting its storage accounting at Allatoona Lake to grant credit for "made inflows." (*See* ECF 161 at 33–35.) Alabama also expressly abandoned its argument that the record does not sufficiently explain the reallocation under the framework established by the 2012 Stockdale Memo, calling that argument "moot." (*See* ECF 164 at 15.) And, as the State of Georgia explains, the record fully supports the Corps' conclusion that the Allatoona reallocation is within its authority under *Geren*. (*See* ECF 167 at 13–15.)[1]

I.  ***Geren* Does Not Control This Case**

   A.  ***Geren* Did Not Establish a Nationwide Bright-Line Definition for "Major Operational Change"**

Alabama's interpretation of *Geren* requires crediting its assertion that a panel of the D.C. Circuit Court of Appeals reached far beyond the case before it to establish a bright-line, nationwide definition of the term "major operational change" for all reallocations at all reservoirs. It also

---

[1] The Water Supply Providers adopt the State of Georgia's arguments on this point. They further adopt the Federal Defendants' arguments in full (ECF 166) and write separately to make the additional points below.

1

requires believing the *Geren* panel issued such a consequential decision without benefit of a final agency action to review, an administrative record or technical analysis of any kind, or any information about reservoir operations and water supply reallocations other than the one proposed in the settlement agreement before it. This interpretation should be rejected because it ignores the text and context of *Geren*, and the inherently contextual nature of the statutory test, while assuming the worst of that distinguished panel.

Rather than grappling with the actual meaning of *Geren*, Alabama hangs its hat on *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), as if that case eliminated any need to understand and correctly apply the "precedent" upon which Alabama relies. (ECF 164 at 1–2.) But *Loper Bright* changes nothing, because no party disputes that *Geren* is precedential or asserts that the Corps "has legal authority to disregard precedential decisions." (ECF 164 at 1.) The question is not whether *Geren* is precedential, but what it means and how it relates to the specific facts presented here. Alabama claims the Federal Defendants and Intervenors "denigrate" *Geren* (ECF 164 at 2), but it does not "denigrate" a decision to read it in context. Nothing in *Geren* suggests that panel intended to establish an arbitrary bright-line limit on all reallocations nationwide.

*Geren* was a fact-specific holding in which the D.C. Circuit assessed the legality of a settlement agreement at Lake Lanier, Georgia, which proposed for the Corps to implement the largest water supply reallocation in the history of the Corps' water supply program. *See Geren*, 514 F.3d at 1324. Based on the unprecedented scale of the proposed reallocation, the court concluded it exceeded the "major operational change" threshold "on its face." 514 F.3d at 1316. Given this, the court expressly did not attempt to establish a test that could be used to adjudicate other cases — like this one — where "the difference between a minor and a major operational change might be an ambiguous matter of degree." *Id.* at 1325.

2

As we explained in our motion for summary judgment, Alabama previously acknowledged exactly this point, conceding that the Water Supply Act does not impose "some 'one-size-fits-all approach' or specific 'percentage limitation' for every federal reservoir." (ECF 161 at 24 (quoting Alabama summary judgment brief to the district court in Georgia).) Alabama's response is tellingly silent about that prior concession, offering no explanation for reversing itself here.

### B. *Geren* Is Not Controlling Because the Reallocation at Allatoona Lake is "Below the Line" for All Three of the Metrics Cited in That Case

Even if Alabama could show that *Geren* established a bright-line definition of "major operational change" for all reservoirs, Alabama would still need to show the Allatoona reallocation exceeds whatever test *Geren* purportedly establishes. Alabama should lose the first point for reasons discussed above; it cannot win the second, either, because the reallocation at Allatoona Lake is below any bright line that could be derived from that case.

For any bright line to have the force of precedent, it would have to be stated in *Geren* itself. Any rule derived from any other metric would be an extension, and not a direct application, of controlling precedent. There are three candidates corresponding to three measures stated in *Geren*: the court stated the reallocation before it involved (1) 241,000 acre-feet of storage space in Lake Lanier, (2) 22% of Lake Lanier's "total storage space," and (3) an additional 9% of "total storage space," or 95,000 acre-feet, over and above the *status quo* at that reservoir. *Geren*, 514 F.3d at 1320, 1324. The reallocation at Allatoona Lake is smaller in every respect: (1) even with all prior reallocations taken into account,[2] the total amount of storage reallocated to water supply is less than 33,000 acre feet, as compared to 241,000 acre-feet in *Geren*; (2) it amounts to just 5.9% of

---

[2] The 2021 Record of Decision approved a reallocation of 14,159 acre-feet of storage to water supply. AR000001. Together with all prior reallocations, a total of 32,698 acre-feet of storage is allocated to water supply. AR000002–03.

3

Allatoona's total storage, as compared to 22% in *Geren*; and (3), the current reallocation increases the percentage of Lanier's "total storage" devoted to water supply by only 2.5%, as compared to 9% (95,000 acre-feet) in *Geren*.[3] Given these comparisons, the Allatoona reallocation does not exceed any line that could be derived from *Geren*, even if *Geren*'s facts could be construed as bright-line limits applicable to all reallocations nationwide.

Recognizing that it cannot prevail based on any "bright line" drawn from *Geren* based on the court's actual words, Alabama proposes to modify the court's words to produce a more stringent limit consistent with Alabama's theory of the case. Specifically, Alabama proposes to substitute "conservation storage" for "total storage" whenever *Geren* used that term. (*Compare* ECF 164 at 2, *with Geren*, 514 F.3d at 1324.) While the proposed substitution would correct a troublesome error,[4] the result would be to produce a new limit much more stringent than any rule consistent with the facts as *Geren* understood them, as confirmed by the opinion itself.

To try to tie its proposed new limit to *Geren* — as necessary to claim it as precedent, rather than an advocate's outcome-oriented interpretation — Alabama asserts *Geren* used the terms "conservation storage" and "total storage" interchangeably, notwithstanding that the former is a

---

[3] AR000002–03 (noting amount of storage incrementally reallocated "would comprise 2.53% of total usable storage" which, when combined with previous reallocations to water supply, amounts to "approximately 5.85% of total usable storage."). Also note that, unlike the situation at Lake Lanier, the prior reallocations at Allatoona Lake are documented by contracts executed in the 1960s, which are now fully paid.

[4] The *Geren* panel understood Lake Lanier's total storage to be 1,049,400 acre-feet, and the stated percentages are based on this understanding. 514 F.3d at 1319. The volume of "total storage" in Lake Lanier is in fact 2,554,000 acre-feet as a matter of record. (*E.g.,* D-00066718 (discussing the erroneous use of terminology in *Geren* and noting that "[i]n fact, the 'total storage' of Lake Lanier, including flood control, conservation, and inactive storage, is 2,554,000 acre-feet, of which the 240,858 acre-feet at issue in *Geren* comprises 12.6 percent, not 22 or 22.9 percent.").) *Cf. Johns v. League, Duvall & Powell, Inc.*, 202 Ga. 868, 873 (1947) ("[A] decision is to be treated as a precedent, not on what might have been the true facts in the case, but rather on the facts as the court construed or assumed them to be for the purpose of decision.").

4

fraction (often a very small fraction) of the latter. Alabama claims the court intentionally conflated these terms, without discussion, because it secretly "determined" that "flood storage is not within the 'total' storage available for water-supply reallocations." (ECF 164 at 9.) It is unclear why, how, or when Alabama believes the *Geren* panel determined flood storage cannot be reallocated to water supply, however, as these questions were not raised as issues in that case or discussed in the opinion.

The fact that it is necessary for Alabama to speculate about the meaning and significance of the percentages quoted in *Geren* speaks volumes about that court's focus, which obviously was not on those details. Having concluded the reallocation was too big "on its face," 514 F.3d at 1316, there was no need to do so. This does not detract from *Geren*'s correctness or force as applied to its holding that the proposed reallocation at Lake Lanier was too big; but it does show the court was not focused on or motivated by the details it misstated. Even if details stated in the opinion were not clearly erroneous, as they indisputably are, it would be dangerous to extract and isolate them from that decision to be used as a bright-line definition of "major operational change" for every reallocation at every reservoir nationwide. Doing so would compound the original error, with significant adverse consequences *Geren* obviously did not intend.

*First*, contrary to Alabama's understanding, water-supply reallocations frequently include storage from the flood pool. According to one recent analysis, more than one-third — 35% — of all prior water-supply reallocations did so.[5] This common practice explains in part why the Corps

---

[5] U.S. Army Corps of Engineers, Institute for Water Resources, 2014 Municipal, Industrial, and Irrigation Water Supply Database Report 2015-R-02, p. 10 (Aug. 2015) ("Reallocations come from various pools within the reservoir, and sometimes from storage specifically allocated to another purpose…. Hydropower storage has been the most affected by reallocations followed by the flood pool."), *available at* https://bit.ly/IWR-Database; *id.* at Table 10 (identifying 50 different flood pool reallocations completed by the Corps).

5

has always included "total usable storage" in the denominator when using percentages to determine the level of approval required for a proposed reallocation. (*E.g.*, ECF 161 at 11–12; AR003921; AR015881.[6]) The Corps evaluates flood storage options in every case to determine what is socially, economically, and environmentally preferred. (*E.g.*, AR014052 (responding to comment about flood pool reallocation at Allatoona Lake, explaining that "USACE is required to evaluate a full array of alternatives to meet water supply needs, including looking at a variety of pool levels").) The evaluation is highly dependent on the facts of each reservoir, as it involves determining how much flood storage is needed, how much can be spared, whether any increase in flood risk caused by such a reallocation can be mitigated by other measures, and whether the benefits to water supply and other purposes outweigh disbenefits when all factors are balanced. (*E.g.*, SUPPAR025817–20; SUPPAR025462–67 (describing water supply reallocations and Corps' "evaluation framework"); SUPPAR025818 (discussing financial credits "when hydropower is adversely impacted by reallocation of the flood pool to satisfy additional water supply needs"); SUPP025817–18 (discussing requirements for "mitigation storage" when "reallocations of storage from the flood control pool would impact existing water supply and hydropower users").) A new rule arbitrarily prohibiting flood storage reallocations would thus have significant adverse effects on the Corps' entire water supply program by taking an alternative

---

[6] Note that, while the Corps has used the percentage of "total storage" involved in a reallocation to identify reallocations that must be approved by the Assistant Secretary of the Army, rather than lower officials within the Corps, it has never used percentages to identify "major operational change" requiring Congressional approval. D-00066737 at n.164 (discussing the Assistant Secretary of the Army's delegation of authority to approve water supply reallocations and stating: "Although Corps guidance at one time indicated that reallocations of less than 50,000 acre-feet or 15 percent of storage 'are considered insignificant' and do not require Congressional authorization, no Army policy has ever indicated that reallocations exceeding those thresholds necessarily require Congressional authorization").

off the table that is often determined to be the best available. Nothing suggests *Geren* intended such a result or had any awareness of these issues.

*Second*, because the flood storage issue was not presented, the record before the court in *Geren* did not include any facts or information relevant to this subject. While providing a page's worth of speculation as to why *Geren* might have agreed with Alabama's position if the issue had come up (ECF 164 at 9), Alabama does not claim that it did. The record in *Geren* did not include any information about the possibility of reallocating storage from the flood pool at Lake Lanier or any other reservoir. This was not discussed in the briefs, at argument, or in the opinion itself. It did not come up because it was not relevant to any issue before the court in *Geren*. On that record, it strains credulity to assert *Geren* intended to prohibit or say anything about the possibility of reallocating storage from the flood pool at Lake Lanier or any other reservoir.

Rather than assuming *Geren* formed unstated opinions about a practice that had nothing to do with the case before it, a "far more plausible" (*cf.* ECF 164 at 9) reading is that the court erred in its use of percentages to describe the size the reallocation it had already concluded was "too big" on its face. The error was harmless if those details are construed as merely supporting *Geren*'s main holding. It becomes material, however, if the error is misconstrued as the *ratio decedendi* for the court's determination — especially if the erroneous details are then isolated and extracted from their context, *modified* to refer to 9% of *conservation* storage, and *extended* to serve as a bright-line rule applicable to all reservoirs. The doctrine of *stare decisis* obviously does not require this result.

### C.  Alabama's Arguments Are Foreclosed by Issue Preclusion Because the Exception for "Unmixed Questions of Law" Does Not Apply

In 2021, the Northern District of Georgia issued final judgment rejecting similar claims by Alabama that a bright-line, size-based limit should be used to assess whether a proposed

7

reallocation at Lake Lanier was a "major operational change." *In re ACF Basin Water Litig.*, 554 F. Supp. 3d 1282, 1300 (N.D. Ga. 2021). This judgment was issued in Alabama's challenge to the Corps' final action at Lake Lanier following *Geren*. Among other issues, Alabama challenged the Corps' determination on remand from the Eleventh Circuit that "the size of a reallocation" is not "an appropriate measure of operational change under the Water Supply Act." *Id.* In a binding final judgment, the Northern District of Georgia court ultimately agreed with the Corps "that measures of the size of a reallocation are not useful measures of 'operational change.'" Alabama is bound by this judgment and should be collaterally estopped from taking a contrary position here. (ECF 161 at 28.) All of the elements for collateral estoppel are satisfied.

Alabama asserts collateral estoppel should not apply because Judge Sullivan determined in Phase 1 of this litigation that a different order (*In re ACF Basin Water Litig.*, 467 F. Supp. 1323 (N.D. Ga. 2020)) about a different question (whether "water quality standards" established under the Clean Water Act are "self-enforcing requirements" with which the Corps is required to comply) was subject to an exception for "unmixed questions of law." (ECF 164 at 13–14.) Alabama asserts without explanation that analysis of "major operational change" is a "pure question of law," but fails to show the prerequisites for this exception are satisfied here. (ECF 164 at 14.)[7]

In cases involving mutual estoppel, the unmixed question of law exception has been "narrowly limited" to circumstances in which "facts of the [current and previous] cases are substantially unrelated," *Ponte v. FDIC*, No. 24-cv-2379 (APM), 2024 WL 4730602, 2024 U.S. Dist. LEXIS 205591, at *14 n.2 (D.D.C. Oct. 11, 2024), *i.e.,* where factual differences between the cases are of "legal significance . . . in resolving the issue presented," *United States v. Stauffer*

---

[7] Alabama also asserts that the Water Supply Providers waived any opportunity to address this issue by not pre-rebutting Alabama's argument based on the exception. There is no requirement to pre-rebut arguments before they are asserted, however.

8

*Chem. Co.*, 464 U.S. 165, 172 (1984). Judge Sullivan determined that differences in state water quality standards governing the ACF basin (which includes Lake Lanier) and the ACT basin (which includes Allatoona Lake) were of legal significance in resolving the Clean Water Act issues raised in Phase 1 of this litigation. *Alabama v. U.S. Army Corps of Eng'rs*, 704 F. Supp. 3d 20, 75–76 & n.19 (D.D.C. 2023) (noting, for example, Alabama's identification of "[o]ne specific and critical factual difference is that in this case, the Corps' operations under the ACT Manual will contribute to violations of water-quality standards that were incorporated in a 'Total Maximum Daily Load,' or 'TMDL,' at Weiss Lake in Alabama"). Alabama has not identified any material factual differences between the *ACF* case and this one that are of legal significance to the Water Supply Act issue raised in this phase of the litigation.

To the contrary, Alabama's entire theory of this case is that *Geren's* decision about the reallocation at Lake Lanier controls the outcome here. If the facts at Lake Lanier and Allatoona Lake are similar enough for *stare decisis* potentially to apply, depending on the meaning and effect of *Geren*, it follows that the two cases are sufficiently related for the Northern District's holding *that size alone is not an appropriate metric to identify a "major operational change"* to have preclusive effect. Conversely, if the two cases are so "substantially unrelated" that collateral estoppel does not bind Alabama to the result in the *ACF* case, the "more flexible doctrine"[8] of *stare decisis* also should not require this Court to agree that Alabama's interpretation of *Geren* is correct or that it applies in this case.

Additionally, Alabama is mistaken about the reasons the Northern District of Georgia "refused to apply" *Geren*. (ECF 164 at 14.) It was not because the court is not subject to D.C.

---

[8] *See Gruver v. La. Bd. of Supervisors for the La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 182 n.3 (5th Cir. 2020) (quoting Restatement (Second) of Judgments § 29(7) & cmt. i (Am. Law. Inst. 1982)).

Circuit precedent. It was because the Eleventh Circuit respectfully considered *Geren* when the underlying case reached it on remand, after it was transferred to the Middle District of Florida, and engaged in a thorough analysis of *Geren* to identify the aspects that were actually litigated, and thus preclusive, and those that were not. Based on an examination of the briefs and argument in *Geren*, the Eleventh Circuit found — without questioning *Geren*'s holding that the proposed settlement agreement exceeded the Corps' authority — that "the question of whether percent reallocation of storage is the correct or sole measure of operational change was not actually litigated." *In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d 1160, 1203 (11th Cir. 2011). The Eleventh Circuit determined that the relevance of percentages to assessing operational change was simply assumed. *Id.* The Eleventh Circuit thus instructed the Corps that *Geren* did not prevent it from considering these questions on remand. This instruction was not premised on *Brand X,* as Alabama claims, or any disrespect for *Geren* or the D.C. Circuit; instead, it was premised on the Eleventh Circuit's considered interpretation of *Geren* and its intended holding.

Finally, whether or not collateral estoppel applies as a matter of doctrine,[9] the fact that the use of percentages as a measure of "operational change" was not "actually litigated" in *Geren* is highly relevant to determining the rule of decision to be applied as precedent in other cases. The lack of discussion about the percentages quoted in that opinion — and the fact they are misstated — cuts strongly against Alabama's argument that percentages supplied the motivation for the holding. As discussed above, the more plausible interpretation is that *Geren* was not overly

---

[9] Like collateral estoppel, the more flexible doctrine of *stare decisis* applies only to matters actually decided the first court. *See United Food & Commercial Workers Union, Local 1564 of New Mexico v. Albertson's, Inc.,* 207 F.3d 1193, 1199–1200 (10th Cir. 2000) (holding a previous decision that did not explicitly address an issue implicit in the earlier case was not entitled to stare decisis effect on that issue); 18 Moore's Federal Practice - Civil § 134.04 (stating "issues that merely lurk in the record are not stare decisis," citing *Webster v. Fall,* 266 U.S. 507 (1925)).

concerned about any specific detail because it immediately concluded the reallocation was too big "on its face." It follows that the individual details cited in that opinion should not be construed as establishing a bright-line definition of "major operational change" based on size for all reallocations at all reservoirs, including those where *Geren* itself explicitly states the question is a matter of degree. 514 F.3d at 1325.

### D. *Geren* Suggests Up to 13.4% of Conservation Storage Can Be Reallocated Without Congressional Approval

As the Water Supply Providers noted in their opening brief (ECF 161 at 27), *Geren* cited and relied upon a Corps memorandum addressing the scope of the Corps' authority to implement two alternative reallocations at Lake Lanier, one larger and one smaller. The memorandum concluded the larger alternative required major operational change and would require congressional authorization, but the smaller reallocation (145,460 acre-feet, or about 13.4% of conservation storage) would not. *Geren* cited this Corps memorandum as a basis for its decision. 514 F. 3d at 1325. If this Court wishes to follow *Geren*, it can do so by citing the same analysis and concluding that a reallocation smaller than the one the Corps previously determined was acceptable is *also* acceptable. Alabama contends this suggestion is "unsupportable" (ECF 164 at 12), but it is closer to *Geren*'s actual mode of analysis than Alabama's bright-line interpretation.

More importantly, it is significant that *Geren* approvingly cited a Corps memorandum concluding a reallocation *exceeding* the bright line Alabama claims *Geren* intended to establish. Given that *Geren* admonished the Corps for not explaining its own departure from that same, prior analysis, it is highly unlikely the court would cite it approvingly while failing to note it disagreed that a reallocation involving 13.4% of conservation storage could be approved without Congressional authorization. Its silence on this point suggests *Geren* had no intention to adopt a bright-line rule, let alone to adopt one that conflicts with the analysis it cited and relied upon.

11

**II.     Alabama has Conceded Any Challenge Regarding the Corps' "Storage Accounting" and Decision to Grant Credit for "Made Inflows"**

The Corps' 2021 Record of Decision addresses two separate and distinct issues. One is whether to reallocate storage under the Water Supply Act to meet water needs of the City of Cartersville and Bartow County. The second is whether to correct the "storage accounting" used at Allatoona Lake and to grant credit for "made inflows" generated by the Cobb County-Marietta Water Authority. (*E.g.*, AR000002–03.)

In our motion for summary judgment, the Water Supply Providers explained that this second decision regarding storage accounting and made inflows had nothing to do with the question of "major operational change" under the Water Supply Act. (ECF 161 at 32–33.) Further, we explained that the Corps' decision regarding its storage accounting policies was not just supported by the record, but legally required to correct prior storage accounting policies that were flatly illegal and directly conflicted with the Corps' own ACT Water Control Manual. (ECF 161 at 33–35.) Thus, the Water Supply Providers explained, it would have been both contrary to law and arbitrary and capricious for the Assistant Secretary to decline to correct them here.

Alabama offers no response to any of these arguments. That being so, Alabama has conceded these unaddressed arguments and the Corps' decision on these points must be affirmed. *See, e.g.*, LCvR 7(b); *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) (under LCvR 7(b), "if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded."); *Arrington v. District of Columbia*, 597 F. Supp. 2d 52, 58 (D.D.C. 2009) ("If the party opposing a motion for summary judgment files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal

12

of the entire case.") (cleaned up) (quoting *Bancoult v. McNamara*, 227 F. Supp. 2d 144, 149 (D.D.C. 2002)).

## CONCLUSION

For the foregoing reasons, judgment should be entered in favor of the Federal Defendants on Alabama's claims, and the Assistant Secretary of the Army's August 2021 decision reallocating storage to water supply at Allatoona Lake; correcting the Corps' storage accounting; and granting credit for made inflows should be affirmed.

Respectfully submitted this 11th day of December, 2024,

> */s/ Lewis B. Jones*
> LEWIS B. JONES
>
> */s/ John L. Fortuna*
> JOHN L. FORTUNA
>
> JONES FORTUNA LP
> 111 New Street, Suite A
> Decatur, GA 30030
> Phone: 404-282-4725
> Email: ljones@jonesfortua.com
>             jfortuna@jonesfortuna.com
>
> *Counsel for Defendant-Intervenors Atlanta Regional Commission and Cobb County-Marietta Water Authority*

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will perfect service on all registered CM/ECF users.

*/s/ John L. Fortuna*

*Counsel for Defendant-Intervenors Atlanta Regional Commission and Cobb County-Marietta Water Authority*
