## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF ALABAMA,<br><br>          *Plaintiff*,<br><br>     v.<br><br>UNITED STATES ARMY CORPS OF<br>ENGINEERS, *et al.*,<br><br>          *Defendants*,<br><br>     and<br><br>STATE OF GEORGIA, *et al.*,<br><br>          *Intervenor-Defendants*. | Civil Action No. 15 - 696 (LLA) |

## <u>MEMORANDUM OPINION</u>

This case concerns the operation of a dam and attached reservoir at Allatoona Lake, near Cartersville, Georgia. The project plays a key role in controlling water supplies for the Alabama-Coosa-Tallapoosa River Basin ("ACT Basin") and is managed pursuant to operational manuals created by the U.S. Army Corps of Engineers (the "Corps"). In 2015, the State of Alabama sued, arguing that the Corps' newly issued 2015 operating manual for the ACT Basin was unlawful. ECF No. 1. In 2023, after several years of litigation, the court (Sullivan, J.) issued a memorandum opinion granting summary judgment in favor of the Corps. ECF No. 150. In the interim, however, the Corps had updated its operational manual in 2021 to grant the State of Georgia's request for additional water supplies, prompting Alabama to file a supplemental complaint. ECF No. 143. While related to the original complaint, the supplemental complaint raises distinct legal issues and challenges the Corps' authority to grant Georgia's request under the Water Supply Act ("WSA"),

43 U.S.C. § 390b. ECF No. 143. The parties, including several intervenor-defendants, now move for summary judgment on the supplemental complaint. ECF Nos. 156, 158, 159, 161. For the reasons explained below, the court will deny Alabama's motion and grant the Corps' and Intervenor-Defendants' cross-motions.

## I.    BACKGROUND

### A.    Statutory Background

In 1958, Congress passed the Water Supply Act, 43 U.S.C. § 390b, instructing the Corps to "participate and cooperate with States and local interests" to develop water supply mechanisms. 43 U.S.C. § 390b(a). To do so, Congress gave the Corps the authority to include water storage "in any [Corps] reservoir project" and to "impound water for present or anticipated future demand or need for municipal or industrial water." *Id.* § 390b(b).

Congress did, however, impose certain restrictions on the Corps' authority. Most relevant here, the Corps must seek Congressional approval for any "[m]odifications of a reservoir project" authorized to include water-supply storage if those modifications would (1) "seriously affect the purposes for which the project was authorized," or (2) "involve major structural or operational changes." *Id.* § 390b(e). Congress did not define either phrase.

### B.    History of the Allatoona Project

The Alabama, Coosa, and Tallapoosa Rivers, along with their tributaries and drainage areas, form the water system known as the ACT Basin. *Alabama v. U.S. Army Corps of Eng'rs*, 704 F. Supp. 3d 20, 50 (D.D.C. 2023). The ACT Basin comprises a total of 22,739 square miles across both Alabama and Georgia. *Id.* Many of its rivers and tributaries flow from Georgia, through Alabama, and into the Gulf of Mexico. *Id.*

This case concerns the Allatoona Project, which is located on the Etowah River in Georgia and part of the ACT Basin. *Id.* at 51. The Etowah River flows southwesterly from northern Georgia until it joins the Coosa River near Rome, Georgia. *Id.* at 51, 54. The Coosa River eventually feeds into the Tallapoosa River near Montgomery, Alabama to form the Alabama River. *Id.* The Allatoona Project consists of the Allatoona Dam and the reservoir it forms, known as the Allatoona Lake. *Id.* at 51. It sits roughly at the midpoint of the Etowah River, about thirty miles north of Atlanta. Administrative Record ("AR") 5306. Allatoona Lake's watershed (all the land that drains toward a body of water) is 1,122 square miles, or just under five percent of the ACT Basin. *Alabama*, 704 F. Supp. 3d at 51. Because the downstream water demand in the ACT Basin tends to exceed supply during the summer, the Corps "store[s] water when there is an abundance of rain" and releases it "when there is less rain, ensuring that all water needs can be met throughout the year." *Id.* at 52.

The Allatoona Dam was originally built to control floods, regulate stream flow for navigation, and develop hydroelectric power. *Id.*; Flood Control Act of 1941 ("FCA"), Pub. L. No. 77-228, 55 Stat. 638, 638-41 (1941). The Corps completed the dam in 1949 and began operating it around June 1950. *Alabama*, 704 F. Supp. 3d at 53. Since then, Congress has assigned additional objectives for the project. *Id.* "Today, the Allatoona Project operates pursuant to its seven authorized project purposes: hydropower, flood risk management, navigation, recreation, water quality, fish and wildlife conservation, and water supply." *Id.* (internal quotation marks omitted).

The Corps sets forth management plans for each water system under its control (like the ACT Basin) in what is called a "master manual," while individual "water control manuals" govern specific projects (like the Allatoona Project). *Id.* at 51. Together, these manuals establish how the Corps should operate water systems and projects to "balance conflicting purposes" and ensure

"proper management of reservoirs during times of high water, low water, and normal conditions." *Id.* The original master manual for the ACT Basin was promulgated in 1951, and the individual water control manuals for each project within the ACT Basin were "completed as [the various] projects came on line." *Id.* In 2015, the Corps revised the ACT Basin master manual for the first time in more than half a century, prompting Alabama to sue and initiating the first phase of this lengthy litigation. *Id.* at 44; *see infra*, Part II.A.[1]

### C.    Pre-2018 Operations at the Allatoona Project

At multipurpose storage reservoirs like the Allatoona Project, the Corps divides the reservoir into separate storage pools. AR 5293. At the base of the reservoir is "inactive storage," which is used to account for sediment accumulations over time. AR 5293-94. The Corps typically does not use or access inactive storage. AR 5293-94. At the Allatoona Project, the inactive storage has a volume of 68,006 acre-feet. AR 5269.

Above the inactive pool is "conservation storage," which is the primary source of usable water at a reservoir. AR 5293. It can be directed towards hydropower generation, recreation,

---

[1] Due to the ACT Basin's size and the competing interests of its numerous stakeholders, it has been the subject of significant litigation. In 1990, Alabama sued to block the implementation of a storage reallocation plan for the Allatoona Project that would have granted additional water supply to the Cobb County-Marietta Water Authority ("CCMWA"). *See* Compl., *Alabama v. U.S. Army Corps of Eng'rs*, No. 90-CV-1331 (N.D. Ala. June 28, 1990). The Corps never finalized that reallocation. AR 5272. In November 2014, Georgia sued the Corps to compel it to act on Georgia's then-pending water supply request for the Allatoona Project. *See* Compl., *Georgia v. U.S. Army Corps of Eng'rs*, No. 14-CV-3593 (N.D. Ga. Nov. 7, 2014). The court sided with Georgia and ordered the Corps to take final action with respect to Georgia's request. J. & Order, *Georgia*, No. 14-CV-3593 (N.D. Ga. Jan. 9, 2018). In February 2017, the CCMWA filed its own lawsuit against the Corps challenging the storage accounting system it used to determine how much water the CCMWA was entitled to at the Allatoona Project. *See* Compl., *Cobb Cnty.-Marietta Water Auth. v. U.S. Army Corps of Eng'rs*, No. 17-CV-400 (N.D. Ga. Feb. 1, 2017). The parties eventually voluntarily dismissed the case in September 2021. *See* Order, *Cobb Cnty.-Marietta Water Auth.*, No. 17-CV-400 (N.D. Ga. Sept. 14, 2021).

water supply, or a variety of other purposes.  AR 5293.  In times of drought, the Corps may release water from conservation storage to benefit downstream users.  AR 5293.  The Allatoona Project's conservation storage has a capacity of 270,247 acre-feet.  AR 5267.

On top of the conservation pool is "flood storage," which is the (usually empty) storage space above the reservoir's normal elevation that can be used to hold excess water.  AR 5294.  This allows the Corps to impound water as necessary to prevent downstream flooding.  AR 5294.  The Allatoona Project's flood storage capacity is 288,606 acre-feet.  AR 5267.  The combination of conservation storage and flood storage makes up a reservoir's "usable storage" (sometimes confusingly referred to as "*total* usable storage")—in this case, 558,853 acre-feet.  AR 5464.  The overall "total storage" (including the inactive pool) is 626,859 acre-feet:

| The Allatoona Project's Storage Capacities, 2018 | |
|---|---|
| Flood storage (F) | 288,606 acre-feet |
| Conservation storage (C) | 270,247 acre-feet |
| Inactive storage (I) | 68,006 acre-feet |
| Usable storage (F+C) | 558,853 acre-feet |
| Total storage (F+C+I) | 626,859 acre-feet |

### D.    Georgia's 2018 Water-Supply Request

Beginning in the 1960s, the Corps began contracting with the Cobb County-Marietta Water Authority ("CCMWA") and the City of Cartersville to reallocate 18,539 acre-feet, or roughly 6.9%, of the Allatoona Project's conservation storage for water-supply withdrawals (represented by the vertical blue bar in the diagram below).  AR 5211, 5861.



AR 5269.  In 2018, Georgia requested an increase in water supply allocations for the CCMWA and the City of Cartersville to meet future demands.  AR 5226.  Due to population growth, both entities had exceeded existing storage agreements at the Allatoona Project in the years leading up to the request.  AR 5247.  Georgia's request consisted of two components.  First, Georgia asked the Corps to allocate more reservoir storage from the conservation pool to water supply, increasing the daily withdrawal from 37.1 million gallons to 94 million gallons through 2050 (an increase of 56.9 million gallons per day).  AR 5260, 5276, 24022.  Second, it asked to change the Corps' water accounting methodology—i.e., how the Corps calculated water flowing *into* the Allatoona Project— so that the CCMWA would receive full credit for any water it returned to the reservoir.  AR 24023, AR 5277.  Those returns would primarily come from two sources: the CCMWA's upstream Hickory Log Creek Reservoir and its water treatment facilities near Allatoona Lake.  *See* AR 1.[2]

---

[2] CCMWA designed and built the Hickory Log Creek Reservoir to "hold[] water in reserve for the sole purpose of filling [the] CCMWA's storage in Allatoona Lake when water is needed." AR 4930-31.  Combined with releases from the CCMWA's water treatment facilities, these two sources increase the CCMWA's inflows into Allatoona Lake by more than 30 million gallons per day.  AR 1047.

Water inflows are divided into two broad categories: "natural inflows" and "made inflows." Natural inflows are ones that are not attributable to human behavior, while made inflows are human driven. *See* AR 5277. Under the Corps' pre-2018 accounting methodology, users only received partial credit for made inflows. AR 5441. Georgia's request would give the CCMWA full credit for its made inflows, thus incentivizing it to release more water from the Hickory Log Creek Reservoir to offset withdrawals from the Allatoona Project. AR 5334. In practical terms, this would enable the Corps to meet more water-supply needs without needing to pull as much from existing storage space.

The Corps chose to consider Georgia's proposal and issued public notice. AR 5436. The Corps identified twenty-two possible action plans to respond to the request, plus a "no action" alternative. AR 3. The no action alternative would maintain the status quo, including the preexisting water-supply allocation of 18,539 acre-feet, or 6.9%, of the Allatoona Project's conservation storage, to Georgia. *See* AR 3. The Corps then issued a draft Feasibility Report and Integrated Supplemental Environmental Impact Statement ("FR/SEIS") in November 2019, AR 16447-730, and a final FR/SEIS in November 2020, AR 5224-6045. Both reports recommended adopting a plan called "Alternative 11," which would meet Georgia's full request of 94 million gallons per day through 2050. AR 5260, 6471, 16582-83, 16585, 16601, 16659. Alternative 11 did *not*, however, adopt Georgia's accounting methodology. AR 4.

To supply the additional 56.9 million gallons per day, Alternative 11 would reallocate an additional 33,872 acre-feet of storage: 11,670 acre-feet would come from flood storage (requiring the Corps to raise the conservation pool by one foot in the summer and one-and-a-half feet in the winter, thereby cutting into flood storage), and 22,202 acre-feet would come from existing conservation storage. AR 16659; 5441. Combined with the preexisting allocation to water supply

(18,539 acre-feet, or 6.9%, of conservation), the total water-supply storage would rise to 52,411 acre-feet, or approximately 18.6% of conservation storage (or 9.4% of usable storage). AR 16659; 5441.

Various stakeholders submitted a total of 583 inquiries or comments. AR 5438. Alabama submitted four public comments. AR 8583-89 (draft FR/SEIS); AR 426-431 (final FR/SEIS). First, it argued that the proposed reallocation would require Congressional approval under the WSA because it exceeded the 9% "major operational change" threshold enunciated by the D.C. Circuit in *Southeastern Federal Power Customers, Inc. v. Geren*, 514 F.3d 1316 (D.C. Cir. 2008), *cert. denied sub nom.*, *Georgia v. Florida*, 555 U.S. 1097 (2009). AR 8585. The Corps responded by saying that the WSA does not set a limit for what constitutes a major operational change. AR 8585.

Second, Alabama asserted that, *Geren* aside, the FR/SEIS had failed to conduct any of "the required legal analysis." AR 428, 8583. In a similar vein, Georgia submitted a comment requesting "that the Final SEIS include an additional and specific discussion of the Corps' Water Supply Act legal authority." AR 8572. When the final FR/SEIS did not contain that analysis, Georgia commented that it would be "absolutely appropriate for the Corps to include a fulsome analysis of its legal authority to proceed with the reallocation either in the [Record of Decision ("ROD")] or separately prior to the ROD." AR 423. The Corps acknowledged when it published the final FR/SEIS that it had yet to complete the legal analysis but intended to do so "prior to adopting any alternative" and would "document in the ROD, as appropriate, any relevant conclusions." AR 8583. At the same time, the Corps maintained that the draft FR/SEIS had extensively documented the operational changes and determined that the effects would "be no more than negligible or slightly adverse (or beneficial)" in "virtually all relevant categories." AR 8583.

Third, Alabama argued that the Corps' statutory analysis would need to account for the Corps' preexisting contractual allocations to Georgia (18,539 acre-feet, or 6.9%, of conservation). AR 8585.  The Corps "concur[red] that the baseline for evaluating the effects of a proposed reallocation of storage" under the WSA "[was] the congressional authorization for the project, not necessarily current conditions."  AR 8585.  The Corps "also concur[red] that this evaluation should consider the cumulative total of all storage reallocated at the project under the discretionary authority of the WSA."  AR 8585.

Fourth and finally, Alabama urged the Corps to reject Georgia's proposed storage-accounting methodology because the current methodology gave the Corps "the flexibility it need[ed] to operate the reservoir for all project purposes."  AR 8587.  The Corps acknowledged that if it were to adopt Georgia's methodology, a document similar to a water control manual would be needed for the Hickory Log Creek Reservoir so that it could be operated effectively alongside the Allatoona Project.  AR 8587.

### E.    The Corps' 2021 Record of Decision

In August 2021, the Corps issued a ROD granting Georgia's water-supply request.  AR 1-7. Instead of adopting Alternative 11, however, the Corps selected Alternative 12 as the final plan. AR 1-7.  Alternative 12 still granted Georgia's full request for 94 million daily gallons of water supply, AR 2-3, but—unlike Alternative 11—it *also* implemented Georgia's proposed accounting methodology, AR 1.  One hundred percent of all return flows from the CCMWA's water treatment facilities near Allatoona Lake and all releases from the Hickory Log Creek Reservoir would be credited toward Georgia's water-supply storage account.  AR 1.

Because of the offsetting inflows from these two sources, Alternative 12 only required an additional water-supply reallocation of 14,159 acre-feet (not 33,872 acre-feet).  AR 2.  Combined

with the preexisting allocation, the total amount of storage space dedicated to water supply would be 32,698 acre-feet (not 52,411 acre-feet), as depicted below.  AR 3.

| Reallocation | Alternative 11 (rejected) | Alternative 12 (adopted) |
|---|---|---|
| Total water supply (*acre-feet*) | 52,411 acre-feet | 32,698 acre-feet |
| Total water supply (*% of conservation storage*) | 18.6% | 12.1% |
| (*% of usable storage*) | 9.4% | 5.9% |
| (*% of total storage*) | 8.4% | 5.2% |
| Additional water supply (*acre-feet*) | 33,872 acre-feet | 14,159 acre-feet |
| Additional water supply (*% of conservation*) | 11.7% | 5.2% |
| (*% of usable storage*) | 6.1% | 2.5% |
| (*% of total storage*) | 5.4% | 2.3% |

The Corps explained that Alternative 12 was preferable because Alternative 11 would have required "reallocation from flood storage" and "any potential increase in flood risk is unacceptable." AR 2.  It also opined that it was "reasonable to defer to the determination of the State on the best way to meet [its] water supply users' needs, especially where doing so [would] not interfere with federal purposes, policies, or law."  AR 4.  With respect to its legal authority under the WSA, the Corps wrote only the following:

> The recommended reallocation of 14,159 ac[re]-f[ee]t from Lake
> Allatoona falls within the authority of the 1958 Water Supply Act.
> As explained above and in the FR/SEIS, the reallocation of storage
> under the Selected Plan would not entail any major changes to the
> Corps' operation of Allatoona Lake or the ACT system projects for
> their authorized purposes, and there would be no significant impacts
> to any authorized project purpose.  Therefore, no major operational
> change or serious effects occur as a result of the recommended storage

reallocation, and the reallocation can be fully accommodated under
the Water Supply Act.

AR 6.

## II.    PROCEDURAL HISTORY

### A.    Phase One: Challenge to the 2015 Master Manual

After the Corps revised its ACT Basin master manual in 2015, Alabama sued to block its
implementation.  ECF No. 1.  Alabama argued that the manual's directives with respect to the
Allatoona Project violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, the
National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Clean Water Act
("CWA"), 33 U.S.C. § 1251 *et seq.*  In 2016, the court consolidated the case with a related lawsuit
that had been filed by the Alabama Power Company.  Minute Order, *Ala. Power Co. v. U.S. Army
Corps of Eng'rs*, No. 15-CV-699 (D.D.C. July 25, 2016).  Over the course of several years, numerous
interested parties—including Intervenor-Defendants Georgia, the Atlanta Regional Commission
("ARC"), and the CCMWA—successfully joined the litigation.  Mar. 31, 2017 Minute Order.

The parties filed motions for summary judgment and completed briefing in late 2017.  *See*
Docket, No. 15-CV-696.  While the motions were pending, however, the U.S. District Court for
the Northern District of Georgia issued an opinion that had significant implications for the case.
*See In re ACF Basin Water Litig.*, 554 F. Supp. 3d 1282 (N.D. Ga. 2021).  The parties jointly
agreed to set a new briefing schedule, which the court granted.  Jan. 19, 2022 Minute Order.  The
second round of summary-judgment briefing completed in early 2022.  *See* Docket, No. 15-CV-696.

In November 2023, the court granted summary judgment in the Corps' favor and held the
2015 master manual to be lawful under the APA, the NEPA, and the CWA.  *Alabama*, 704 F. Supp.
3d at 161.  One month later, the case was reassigned to the undersigned.  *See* Dec. 14, 2023 Docket
Entry.

11

### B.    Phase Two: Challenge to the 2021 Record of Decision

While the parties were busy litigating the 2015 master manual, Alabama sought permission to file a supplemental complaint raising distinct legal issues regarding the 2021 ROD.  ECF No. 128.  Specifically, Alabama argued that the Corps' reallocation of storage at the Allatoona Project to accommodate Georgia's water-supply request violated the WSA as interpreted by the D.C. Circuit in *Geren*.  *Id.*

The court granted Alabama's motion, Nov. 18, 2022 Minute Order, and Alabama docketed its supplemental complaint in November 2022.  ECF No. 143.  In June 2024, Alabama filed a motion for summary judgment.  ECF No. 156.  The Corps opposed and cross-moved for summary judgment in August 2024.  ECF Nos. 157, 158.  Intervenor-Defendants Georgia, the ARC, and the CCMWA did the same in September 2024.  ECF Nos. 159, 160, 161, 162.  The matter is now fully briefed.  ECF Nos. 164 to 168.

### III.    LEGAL STANDARDS

Under the APA, a court shall "set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  To pass muster, an agency's action must be "reasonable and reasonably explained."  *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The court must ensure that the agency "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made."  *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.*, 709 F.3d 1, 8 (D.C. Cir. 2013) (quoting *Keating v. Fed. Energy Reg. Comm'n*, 569 F.3d 427, 433 (D.C. Cir. 2009)).  An agency acts arbitrarily and capriciously if it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs

12

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997-98 (D.C. Cir. 2008)).

In cases proceeding under the APA, the usual summary judgment standard under Federal Rule of Civil Procedure 56 does not apply "because of the court's limited role in reviewing the administrative record." *Albino v. United States*, 78 F. Supp. 3d 148, 163 (D.D.C. 2015). The court may only review the record "that was before the [agency] at the time [it] made [its] decision." *Am. Wildlands*, 530 F.3d at 1002 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Albino*, 78 F. Supp. 3d at 163 (quoting *Occidental Eng'g Co. v. Immigr. & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985)). "Summary judgment thus serves as the mechanism for deciding . . . whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*

## IV.    DISCUSSION

The legal challenges in this case can be broken into three main issues.[3] First, the court considers whether the D.C. Circuit's decision in *Geren* conclusively establishes that the 2021 ROD

---

[3] Alabama asserts, and the Corps does not contest, that Alabama has standing to challenge the 2021 ROD. Alabama's Opening Br., ECF No. 156, at 17-18. The court agrees. The Corps' adoption and implementation of the 2021 ROD threatens to decrease the water available to downstream users, which is sufficient to show injury in fact. Additionally, that harm is fairly traceable to the ROD and a ruling in Alabama's favor would block it from going into effect. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (explaining that standing requires (1) a concrete and particularized injury that is actual or imminent; (2) a causal connection between the injury and the challenged conduct; and (3) a non-speculative likelihood that the injury will be redressed by a favorable court decision).

violated the WSA.  Next, the court analyzes the language and context of the WSA to determine whether the 2021 ROD exceeded the Corps' statutory authority.  Finally, the court considers whether the Corps' issuance of the 2021 ROD was otherwise arbitrary and capricious in violation of the APA.

### A.    *Geren* Does Not Conclusively Dictate the Outcome of This Case

Ordinarily, when a party challenges agency action as exceeding statutory authority under the APA, the court examines the statute's provisions, interprets its language, and decides whether the agency has acted within the bounds of the law.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).  According to Alabama, however, *Geren* provides a simple shortcut for this analysis.  It argues that the D.C. Circuit has already done the court's work by setting a clear, "major operational change" threshold that the 2021 ROD "unambiguously" crosses.  ECF No. 156, at 21 (quoting *Geren*, 514 F.3d at 1325).  The court disagrees.

As an initial matter, it is axiomatic that all opinions issued by the D.C. Circuit are binding on this court.  To the extent that any D.C. Circuit opinion squarely applies to a case before the district court, the district court is compelled to follow that opinion.  *Lieu v. Fed. Election Comm'n*, 370 F. Supp. 3d 175, 186 (D.D.C. 2019), *aff'd*, No. 19-5072, 2019 WL 5394632 (D.C. Cir. Oct. 3, 2019) (per curiam).  None of the parties dispute this general principle.  *See* Corps' Opening Br., ECF No. 158, at 26.  Instead, the Corps and Intervenor-Defendants debate whether *Geren* controls the outcome in this *particular* case.  The question is not whether *Geren* is relevant, informative, or helpful; the question is "what *Geren* [actually] held," Corps' Reply Br., ECF No. 166, at 5 (emphasis omitted), and whether that holding has determinative authority here, *see Cactus Canyon Quarries v. Fed. Mine Safety & Health Rev. Comm'n*, 820 F.3d 12, 18 (D.C. Cir. 2016) (explaining that the "precedential value of a decision is defined by the context of the case from which it arose,"

meaning that "the holding of [an] earlier case cannot control [a later case]" if they are "materially or meaningfully different" (quoting *UC Health v. Nat'l Lab. Rels. Bd.*, 803 F.3d 669, 683 (D.C. Cir. 2015) (Edwards, J., concurring))).

### 1.    *Geren* and Subsequent, Related Developments

To paint the fullest possible picture, the court discusses *Geren* and two key subsequent developments: *In re MDL-1824 Tri-State Water Rights Litigation*, 644 F.3d 1160 (11th Cir. 2011) (per curiam) ("*Tri-State*"), and the 2012 Stockdale Memorandum.

### a.    *Southeastern Federal Power Customers, Inc. v. Geren*, 514 F.3d 1316 (D.C. Cir. 2008)

*Geren* concerned a proposed settlement agreement between the Corps, the State of Georgia, a group of Georgian water supply providers, and Southeastern Federal Power Customers, Inc.—a non-profit consortium of rural electric systems deriving significant power from Corps-managed dams. *See* 514 F.3d at 1318; *Se. Fed. Power Customers, Inc. v. Geren*, 301 F. Supp. 2d 26, 30 (D.D.C. 2004), *rev'd*, 514 F.3d 1316 (D.C. Cir. 2008).[4]   The case centered on Lake Lanier, a Corps-operated reservoir in the Apalachicola-Chattahoochee-Flint River Basin ("ACF Basin"), in Georgia. *Geren*, 514 F.3d at 1318.

In 2000, Southeastern Federal sued the Corps to try and stop it from diverting Lake Lanier's water from hydropower generation to water supply. *Geren*, 514 F.3d at 1318.  The district court referred the parties to mediation where, later joined by Georgia and the water suppliers, everyone

---

[4] The unique settlement-agreement posture of *Geren* meant that the D.C. Circuit did not have the benefit of an extensive administrative record, significant evidence of reasoned agency judgment, or even the Corps' interpretation of the operative WSA statute. *See* 514 F.3d at 1327 (Silberman, J., concurring in the judgment) ("Typically we would defer to an agency's interpretation of [an] ambiguous term, but we cannot do so here because we are not reviewing an agency rulemaking or adjudication, but only a settlement agreement (which does not even purport to interpret the crucial language).").

agreed that the Corps would allocate up to 240,858 acre-feet (out of 1,049,400 acre-feet)—or 22%—of Lake Lanier's "total storage space" to water-supply purposes for a period of ten years. *Id.* at 1319. At the time the agreement was signed, the Corps had already been allocating 145,460 acre-feet of the reservoir to water supply. *Id.* at 1328 (Silberman, J., concurring in the judgment). The agreement thus called for an additional, or "incremental," 95,398 acre-feet—or 9%—of "total storage space" to be added to the existing water-supply volume. *Id.*[5]

After the parties signed the settlement agreement in early 2003, the States of Alabama and Florida intervened to block it, arguing that the reallocation exceeded the Corps' statutory authority under several statutes, including the WSA. *Id.* at 1320 (majority opinion). The district court rejected Alabama's and Florida's arguments. *Id.* On appeal, Alabama and Florida reasserted their argument that the allocation of nearly 241,000 acre-feet of storage space constituted a "major operational change" for which Congressional approval was required under the WSA. *Id.* at 1322.[6] The D.C. Circuit agreed (Judge Rogers and then-Judge Kavanaugh formed the majority, while Judge Silberman concurred in the judgment). *Id.* at 1318.

In reaching its conclusion, the majority relied on two analytical documents that the Corps had previously prepared. The first, a 1989 Post-Authorization Change Report, opined that reallocating 207,000 acre-feet—or 20%—of Lake Lanier's "total current storage" might require Congressional approval under the WSA. *Id.* at 1323. The second, a 2002 Memorandum, observed that a reallocation request of 370,930 acre-feet—or 35%—of Lake Lanier's "total storage" would

---

[5] The precise mathematical figures in *Geren* were 22.9% (cumulative) and 9.1% (additional) of conservation storage, respectively. Because the *Geren* Court and the parties here shorten these figures to 22% and 9%, this court will do the same.

[6] At the time, the "major structural or operational change" provision of the WSA was codified at 43 U.S.C. § 390b(d). Congress has since relocated it to subsection 390b(e). *See* Water Resources Reform and Development Act of 2014, Pub. L. 113-121, § 1046(d), 128 Stat. 1198 (2014).

"involve substantial effects on project purposes and major operational changes" necessitating Congressional approval under the WSA. *Id.* Based on these two documents, the majority concluded that, "[o]n its face, . . . reallocating more than twenty-two percent (22%, approximately 241,000 acre feet) of Lake Lanier's storage capacity to local consumption uses . . . constitutes the type of major operational change referenced by the WSA." *Id.* at 1324.

While the Corps had asked the D.C. Circuit to focus on the 9% change from the status quo, the majority explained that "the appropriate baseline for measuring the impact of the Agreement's reallocation of water storage [was] zero, which [had been] the amount allocated to storage space for water supply when the lake began operation." *Id.* In other words, the majority appeared to focus on the *cumulative* allocation for water supply (22%), rather than the incremental reallocation (9%). That said, the majority went on to explain that "[e]ven a nine percent (9%, approximately 95,000 acre feet) increase over 2002 levels for twenty years [was] significant," because that change "would be the largest acre-foot reallocation ever undertaken by the Corps without prior Congressional approval." *Id.* And while the majority acknowledged that "[i]n other circumstances it is conceivable that the difference between a minor and a major operational change might be an ambiguous matter of degree," it held that the reallocation in the proposed settlement unambiguously qualified as a major operational change for which Congressional approval was required under the WSA. *Id.* at 1325 (citation omitted).[7]

---

[7] Because the Court's opinion focused entirely on the "major structural or operational" language of the WSA, it did not consider whether the reallocation would "seriously affect" Lake Lanier's original purposes. *See Geren*, 514 F.3d at 1322 n.2 ("The court . . . has no occasion to consider whether Alabama and Florida would have standing to challenge the Agreement as 'seriously affect[ing]' the original Congressionally authorized purposes of Lake Lanier." (second alteration in original)).

Judge Silberman concurred in the judgment but disagreed with how the majority defined the appropriate "baseline" for measuring operational change. He "fundamental[ly] disagree[d]" with a baseline "storage of zero," and instead evaluated the magnitude of reallocation "compared to the [preexisting] allocation." *Id.* at 1327-28 (Silberman, J., concurring in the judgment). In his view, reallocating "approximately 9% more of Lake Lanier's total capacity" was enough "to constitute a 'major operational change,'" even without considering the cumulative 22% figure. *Id.*

> b.    *In re MDL-1824 Tri-State Water Rights Litigation*,
> 644 F.3d 1160 (11th Cir. 2011) (per curiam)

After the D.C. Circuit remanded *Geren* to the district court, the United States Judicial Panel on Multidistrict Litigation transferred the case to the U.S. District Court for the Middle District of Florida. *See* Letter, *Se. Fed. Power Customers, Inc. v. Caldera*, No. 00-CV-2975 (D.D.C. Aug. 11, 2008), ECF No. 223. Once there, the case was consolidated with other cases that would eventually be appealed as *In re MDL-1824 Tri-State Water Rights Litigation*, 644 F.3d 1160 (11th Cir. 2011) (per curiam).

In *Tri-State*, the Eleventh Circuit offered its own reading of *Geren*—albeit in the context of collateral estoppel. *Id.* at 1201-05. Despite the *Geren* Court's focus on percent reallocation as a metric for major operational change, the Eleventh Circuit observed that "the question of whether percent reallocation of storage is the correct or sole measure of operational change *was not actually litigated*" in *Geren*. *Id.* at 1203 (emphasis added). The parties had simply assumed that the relevant metric was percent allocation, and "the *Geren* court made the same assumption in its opinion[s] without any discussion of the issue." *Id.* The Eleventh Circuit thus held that it was not "bound by collateral estoppel to hold that percent reallocation of storage is the only appropriate measure of operational change," and it concluded that the Corps was free to "determin[e] the appropriate

measure of operational change on the basis of its own expertise," without needing to examine percent allocation in isolation.  *Id.*

*c.*     2012 Stockdale Memorandum

The Eleventh Circuit ultimately remanded *Tri-State* to the Middle District of Florida.  644 F.3d at 1205.  Following the remand, the Corps' Chief Counsel, Earl H. Stockdale, drafted a legal memorandum analyzing the Corps' authority to reallocate portions of Lake Lanier to water supply. AR 4694-741.  Informed by *Geren*, *Tri-State*, and other relevant cases, Mr. Stockdale undertook both a general assessment of the WSA and the particular characteristics of Lake Lanier.  He began by observing that "Congress intended for the Corps to . . . assume an active role" in managing municipal and industrial water supplies.  AR 4727.  He then considered the meaning of the terms "seriously" and "major" in 43 U.S.C. § 390b(e) and concluded that they referred to modifications "that fundamentally depart from Congressional intent for a project, as expressed through the authorizing legislation relevant to that project."  AR 4728.

In deciding whether any given water supply request would require Congressional approval, Stockdale wrote that the request would need to be "evaluate[d] . . . in its totality."  AR 4729.  As a result, "the amount or percent of storage contracted for . . . [would not be] determinative of whether a proposed action w[ould] result in major structural or operational change or seriously affect authorized purposes."  AR 4730; AR 4730 n.163 (observing that "Congress chose not to specify any number in connection with [the] limits" on the Corps' unilateral authority).  The proper

19

measure, he explained, would be "the actual operational changes and impacts to project purposes that would result from accommodating the projected withdrawals and returns."  AR 4731.[8]

## 2.   Whether *Geren* is Dispositive

After carefully reviewing *Geren*, the court agrees with the Corps and Intervenor-Defendants that it does not impose an across-the-board numerical threshold for what constitutes a "major structural or operational change" in every conceivable circumstance under the WSA. While Alabama asks this court to read "22%" and "9%" and call it a day, Alabama's Opening Br., ECF No. 156, at 18-19, such a simplistic approach contradicts the way the WSA was drafted, is in tension with the logic of *Geren*, and fails to reckon with subsequent persuasive authorities.

Begin with the WSA.  If Congress had wanted the WSA to impose strict, numerical thresholds for detecting a "major operational change," it "easily could have drafted language to that effect." *Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420, 429 (2022) (quoting *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014)).  This rationale is reinforced by the fact that Congress *did* set percent limits in another part of the same statutory provision: the WSA caps the expenditures "allocated to anticipated future demands" for water supply to "30 per centum of the total estimated cost of any project."  43 U.S.C. § 390b(b); *see* Pub. L. No. 116-260, § 402(d), 134 Stat. 2615, 2742 (2020) (establishing, as a "special rule" for the Willamette Valley Project, that the Corps "may reallocate not more than 10 percent of overall storage in the joint conservation pool . . . without further congressional action").  The court generally does not assume that Congress omitted requirements that it meant to impose, especially "when Congress has shown elsewhere in

---

[8] Seemingly in direct reference to *Geren*, Mr. Stockdale went on to criticize courts and litigants that had "focused too narrowly upon the amount of acre-feet or the percentage of storage proposed for 'reallocation' under the Water Supply Act."  AR 4731.

the same statute that it knows how to make such a requirement manifest." *Jama v. Immgr. & Customs Enf't*, 543 U.S. 335, 341 (2005). Congress's decision to leave Section 390b(e) open-ended implies that it recognized the nuances of reservoir management, the unique attributes of different systems, and the impracticality (and imprudence) of a one-size-fits-all approach. This court will not mathematically ossify all future assessments of "major operational changes" when Congress itself chose not to.

The same is true of *Geren*. Throughout the opinion, the *Geren* Court was careful to limit its analysis to Lake Lanier—an entirely different reservoir in a different river basin. *See* 514 F.3d at 1324 ("twenty-two percent . . . of Lake Lanier's storage capacity"); *id.* at 1325 ("twenty-two percent (22%) of Lake Lanier's storage space" and "nine percent (9%) of Lake Lanier's storage space"). At no point did the Court suggest that it was setting forth a numerical definition for the phrase "major . . . operational change" in the WSA, or that its decision applied with equal force to the countless nationwide projects not directly at issue in that case. Instead, the Court recognized that the Corps had previously determined that a 20% reallocation of Lake Lanier's total storage would constitute a major operational change under the WSA, and then it held the Corps to that determination. *Id.* at 1323-24. In doing so, the Court acknowledged that "[i]n other circumstances it is conceivable that the difference between a minor and a major operational change might be an ambiguous matter of degree." *Id.* at 1325.

If the WSA and *Geren* were not enough, consider that courts interpreting *Geren* have refused to read it so rigidly. As the Eleventh Circuit explained in *Tri-State*, the question "whether percent reallocation of storage is the correct or sole measure of operational change was not actually litigated [in *Geren*]." 644 F.3d at 1203. For that reason, it declined to hold that percent allocation was the sole criterion for determining whether an operational change was "major" under the WSA.

*Id.* at 1203-04; *see In re ACF Basin Water Litig.*, 554 F. Supp. 3d 1282, 1300 (N.D. Ga. 2021) ("The Court agrees with the Defendants that Alabama does not sufficiently show why the size of a storage reallocation in isolation gives any useful information about the operational changes of the reallocation."); *see also In re ACF Basin Water Litig.*, 554 F. Supp. 3d at 1300 (concluding that "[n]othing [in *Geren*] precluded the Corps from later determining the appropriate measure of operational change based on its own expertise").

Managing water systems requires a careful "balance [of] conflicting purposes" and "competing interests." *Alabama*, 704 F. Supp. 3d at 51, 94. Each reservoir, dam, and river basin is unique and requires a tailored approach. Congress could have easily reduced Section 390b(e) to numerical metrics, but it did not. Congress also could have instructed the Corps to consider just one criterion in the major-operational-change analysis, but it did not do that either. While percent allocations may be a useful proxy for major operational change in certain circumstances, focusing on percentages alone does not do justice to the complexity of the Corps' tasks or the language of the WSA. And fixating on that one metric at a *different* reservoir than the one in this case would be misguided. For these reasons, the court declines to turn the D.C. Circuit's holding about Lake Lanier into a stiff, categorical rule. Accordingly, *Geren* does not provide Alabama with a shortcut to victory.

### 3.    Whether *Geren* is Persuasive

When a case is not binding, it may nonetheless be persuasive. But even if the court were to apply *Geren*'s percentages, Alabama still would not prevail. Properly contextualized, the percentage allocations in *Geren* were, in fact, larger than the percentages here. To understand why this is so requires a deeper dive into the numbers. Each time the *Geren* Court mentioned its numerical holdings, it spoke in terms of Lake Lanier's "total" storage. At various points, the Court alternated

between "total storage space," "total capacity," "storage space," and "storage capacity." *See Geren*, 514 F.3d at 1319 ("Lake Lanier's storage space is 1,049,400 acre-feet"); *id.* at 1320 ("twenty-two percent (22%) of the total storage space"; "approximately nine percent (9%) more of the total storage space"); *id.* at 1324 ("twenty-two percent . . . of Lake Lanier's storage capacity"; "twenty-two (22%) of total storage"); *id.* at 1328 (Silberman, J., concurring in the judgment) ("9% more of Lake Lanier's total capacity"). The Court never defined any of these terms. As explained above, *supra* Part I.C, the Corps separates reservoirs into various pools, all of which comprise different portions of storage. The three main pools are the flood pool, the conservation pool, and the inactive pool. *See* AR 5293-94. "Total storage" normally refers to the "combined storage in all three pools," *see* AR 5266, while "usable storage" refers to the combination of the flood and the conservation pools, AR 5464.

As the Corps points out, as Alabama admits, and as the record demonstrates, the *Geren* Court's references to "total storage" actually referred to total *conservation* storage. *See* AR 4731 n.164 ("[T]he D.C. Circuit determined that a reallocation of 22 percent of 'total storage' at Lake Lanier—which was actually a reallocation of 22 or 22.9 percent of *conservation* storage, 14.3 percent of *usable* storage, and 12.6 percent of *total* storage—amounted to 'major operational change[.]'" (citation omitted)); Alabama's Opening Br., ECF No. 156, at 19 n.1. The true volume of total storage at Lake Lanier was 2,554,000 acre-feet, not the 1,049,400 acre-feet identified in *Geren*. *Compare* AR 4712 n.72 ("In fact, the 'total storage' of Lake Lanier, including flood control, conservation, and inactive storage, is 2,554,000 acre-feet, of which the 240,858 acre-feet at issue in *Geren* comprises 12.6 percent, not 22 or 22.9 percent."), *with Geren*, 514 F.3d at 1319 ("Lake Lanier's storage space is 1,049,400 acre-feet."), *and* 514 F.3d at 1328 (Silberman, J., concurring in the judgment) ("The total storage capacity of Lake Lanier is 1,049,400 acre-feet.").

It is unclear whether the D.C. Circuit was aware of this distinction because it did not mention or distinguish between flood, conservation, or inactive storage. *See generally Geren*, 514 F.3d 1316. There are two possible ways to interpret this uncertainty. The first is that the *Geren* Court understood "total storage" in the ordinary sense of the term: that it included some combination of the flood, conservation, and inactive pools (rather than just the conservation pool). In other words, the Court erroneously *thought* it was discussing total storage when it was *in fact* discussing conservation storage. The Corps' opposition to Georgia's petition for certiorari suggests as much:

> The [D.C. Circuit] appears to have confused the conservation storage in Lake Lanier with the total storage in the reservoir. As a result, the court incorrectly stated that the proposed reallocation constituted either 22% or 9%, depending on the baseline, of Lake Lanier's "water storage," "storage capacity," or "total storage." In fact, the 22% and 9% figures refer to percentages of "conservation storage" (1,049,400 acre-feet), which is a subset of the "usable storage" (1,686,400 acre-feet), which in turn is a subset of the total water volume contained in the reservoir. . . . The court of appeals therefore erred in calculating the percentage of storage in Lake Lanier that would be devoted to water supply storage under the settlement agreement.

Brief for Federal Respondents in Opposition, *Georgia v. Florida*, 555 U.S. 1097 (2009) (No. 08-199), 2008 WL 4918013, at *5-6. If that were the case, then the *Geren* Court believed that the proposed reallocation was much larger than it actually was. Twenty-two percent of conservation storage (1,049,400 acre-feet) versus twenty-two percent of *total* storage (2,554,000 acre-feet) yields two massively different results. If the Court thought that the Corps intended to reallocate roughly a quarter of Lake Lanier's *entire* volume, that may have played a significant role in its major-operational-change analysis. Had the Court known that—in truth—the reallocation only comprised 14.3% of usable storage and 12.6% of true total storage, the outcome may not have been so "unambiguous[]." *Id.* at 1325.

Revisionist conjecture aside, if the *Geren* Court had understood the proposed allocation to be 22% of all storage, then the proposed allocation at the Allatoona Project pales in comparison. Here, the 2021 ROD reallocates 32,698 acre-feet within Allatoona Lake, AR 3, which only translates to 5.9% of usable storage and 5.2% of total storage, *see* AR 5794 (listing the Allatoona Project's "total storage capacity" at 626,860 acre-feet). Those are mere fractions of the "major operational change" threshold of 22% identified in *Geren*, and still lower than the incremental 9% threshold.[9] Under this first assumption, Alabama would almost certainly lose by relying strictly on *Geren*'s numbers.

The second, less-likely possibility is that the D.C. Circuit *knew* it was only analyzing conservation storage but did not label it accordingly. But even under this scenario, the Allatoona Project reallocation is still much smaller than the one in *Geren*. The 32,698 acre-feet figure only represents 12.1% of the project's conservation pool, or just over half the proportional reallocation in *Geren* (22%). *See* AR 3. The only way for Alabama to convincingly make its point is by resorting to *Geren*'s alternative 9% threshold.

The parties vigorously debate how to read the 9% figure. The Corps and Intervenor-Defendants argue that it only refers to incremental reallocation, not cumulative reallocation. Corps' Opening Br., ECF No. 158, at 25; Georgia's Opening Br., ECF No. 159, at 11-14; ACR/CCMWA's

---

[9] While the Corps does not advocate for a "major operational change" test that relies solely on absolute numbers, it observes that the reallocation in *Geren* (240,858 acre-feet) dwarfed the reallocation here (32,698 acre-feet). Corps' Opening Br., ECF No. 158, at 37-38. In fact, the *Geren* reallocation almost equals the entire conservation pool at the Allatoona Project (281,917 acre-feet). AR 342. Both the *Geren* majority and concurrence noted that the proposed change "would be the largest acre-foot reallocation ever undertaken by the Corps without prior Congressional approval." 514 F.3d at 1324; *id.* at 1328 (Silberman, J., concurring in the judgment). This court, however, hesitates to place too much weight on these numbers because doing so would encounter the same pitfalls as a strict percentage-based approach. But the stark difference in absolute volume between *Geren* and this case illustrates why applying bright-line rules to different systems makes little sense. *See supra*, Part IV.A.2.

Opening Br., ECF No. 161, at 20-21. Alabama argues the opposite, claiming that a 9% *cumulative* reallocation would constitute a major operational change under *Geren*. Alabama's Opening Br., ECF No. 156, at 20-21. If the Corps and Intervenor-Defendants are correct, then the Allatoona Project reallocation undercuts every single numerical metric from *Geren* (because the *incremental* percent allocation at the Allatoona Project is only 5.2%). If Alabama is correct, the *cumulative* 12.1% reallocation at the Allatoona Project would exceed *Geren*'s 9% threshold.

The answer depends on the proper baseline for measuring major operational change, which was the main source of disagreement between the *Geren* majority and concurrence. *See Geren*, 514 F.3d at 1327 (Silberman, J., concurring in the judgment). The majority held that "the appropriate baseline for measuring the impact of the Agreement's reallocation of water storage is zero, which was the amount allocated to . . . water supply when the lake began operation." *Id.* at 1324 (majority opinion). In other words, if the initial Congressional authorization for a project contained no dedicated water-supply, then every allocation above that initial level of zero must factor into the major-operational-change analysis. Judge Silberman, however, "fundamental[ly] disagree[d]" because the majority's view implied that earlier water-supply allocations were potentially illegal. *Id.* at 1327 (Silberman, J., concurring in the judgment). It was against this backdrop that Judge Silberman wrote that reallocating "9% *more* of Lake Lanier's total capacity"—above and beyond what had already been allocated—was a "major operational change." *Id.* at 1327-28 (emphasis added). Judge Silberman did not appear to have any issue with the preexisting 13% of water-supply allocation.

In three of the four references to "9%" in the *Geren* majority, the Court contextualized the 9% threshold as an incremental increase. *See id.* at 1319-20 ("nine percent (9%) more of the total storage space than was being allocated . . . in 2002"); *id.* at 1324 ("nine percent . . . increase over

2002 levels"); *id.* at 1324 ("taking the status quo as the consumption level in 2002, the reallocation of approximately nine percent . . . is still significant"). The majority omitted the context just once, stating that "a reallocation of approximately nine percent (9%) of Lake Lanier's storage space" constituted a major operational change and "present[ed] no ambiguity." *Id.* at 1325. While this final articulation—in a vacuum—would support Alabama's broader reading, the court concludes that the Corps and Intervenor-Defendants have the better of the argument. The majority's repeated qualifiers on the 9% threshold and engagement with Judge Silberman's concurrence suggest that "9%" referred to incremental reallocations, not cumulative ones. Reading the two percentage figures together, then, the *Geren* Court held that a 22% *cumulative* allocation or a 9% *incremental* reallocation would constitute a major operational change.[10] In either case, the Allatoona Project reallocation falls well short of those thresholds (12.1% cumulative and 5.2% incremental), as shown below:

| Reallocation metric | *Geren* | The Allatoona Project |
|---|---|---|
| Cumulative acre-feet | 240,898 acre-feet | 32,698 acre-feet |
| Percent of conservation | 22.0% | 12.1% |
| Percent of usable storage | 14.3% | 5.9% |
| Percent of total storage | 12.6% | 5.2% |
| Incremental acre-feet | 95,398 acre-feet | 14,159 acre-feet |
| Incremental increase as percentage of conservation | 9.0% | 5.2% |

---

[10] Even if the court were to side with Alabama on its reading of the 9% figure, this would only be one data point in Alabama's favor. And, as explained above, *supra* Part IV.A.2, reducing the major-operational-change analysis to nothing more than a comparison of percentages would contravene the WSA.

If anything, a comparison between this case and *Geren* suggests that the Allatoona Project reallocation was *not* a major operational change. *Geren*'s use of numerical holdings thus serves the Corps, not Alabama.

**B.    Whether the Corps Exceeded Its Statutory Authority Under the WSA**

Having concluded that *Geren* does not militate a decision in Alabama's favor, the court next considers whether the Corps' approximate 33,000 acre-feet allocation exceeded its authority under the WSA. Because Alabama largely hinged its case on the applicability of *Geren*, it has virtually nothing to say here.[11] The court concludes that the Corps did not exceed its statutory authority here.

The WSA requires Congressional approval for reservoir project modifications that "would seriously affect the purposes for which the project was authorized" or "would involve major structural or operational changes." 43 U.S.C. § 390b(e). Congress did not define these phrases, so the court must employ "the traditional tools of statutory construction." *Loper Bright*, 603 U.S. at 403.

The court begins by giving the statutory text its "ordinary meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (alteration in original) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). This analysis must be done by reading the words together, "not in isolation." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022). The ordinary meaning of "major" when the WSA was enacted was "[o]f a greater value, length,

---

[11] Alabama's opening brief relies almost exclusively on *Geren* and only reckons with the WSA's text when criticizing Mr. Stockdale's 2012 Memorandum. *See* Alabama's Opening Br., ECF No. 156, at 18-31 (briefly discussing, on pages 29-30, the definitions of key terms in the WSA). And its reply brief entirely omits any such discussion. *See generally* Alabama's Reply Br., ECF No. 165; *see also* Corps' Opening Br., ECF No. 158, at 23 ("At bottom, Alabama offers no alternative affirmative reading of the statutory text."); Corps' Reply Br., ECF No. 166 (similar).

age, or the like, than another or others of the same type."  Major, *Webster's New Int'l Dictionary* (2d ed. 1958).  "Serious" meant "grave," "solemn," or "important."  Serious, *Webster's New Int'l Dictionary* (2d ed. 1958).  And "modification" meant "[a] change; an alteration which introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject-matter intact."  Modification, *Black's Law Dictionary* (4th ed. 1951).  Taken together, these terms suggest that Congressional approval is only required when the Corps' contemplated action is substantial and significant.[12]

The degree of that significance is less clear, but the court may "[r]esort to context" to determine the answer.  *Dubin v. United States*, 599 U.S. 110, 119 (2023); *see United States v. Hansen*, 599 U.S. 762, 775 (2023) ("When words have several plausible definitions, context differentiates among them.").  "It is a fundamental canon of statutory construction" that the court analyzes the statute's words "with a view to their place in the overall statutory scheme."  *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).  To fulfill its objectives, the WSA permits the Corps "to impound water for present or anticipated future demand or need for municipal or industrial water" by providing storage "in any reservoir project" it manages.  43 U.S.C. § 390b(b).  Because Congress paired this authorization with the Corps' responsibility to maintain "Federal navigation, flood control, irrigation, [and other] multiple purpose projects," *id.* § 390b(a), the statute grants the Corps relatively

---

[12] Alabama, relying on the Supreme Court's decision in *MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218 (1994), argues that "modify" implies "moderate change."  Alabama's Opening Br., ECF No. 156, at 29-30 (citing *MCI Telecomms. Corp.*, 512 U.S. at 228-29).  That may be true when reading the term in isolation, but Alabama's argument quickly disintegrates when "modification" is itself modified by "seriously" and "major."  The court does not construe words "in a vacuum," *Gundy v. United States*, 588 U.S. 128, 141 (2019) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)), and it would make no sense to say that a "moderate" change could "seriously affect" project purposes or result in "major structural or operational changes."

broad discretion to balance competing interests.  *See In re ACF Basin Water Litig.*, 554 F. Supp. 3d at 1302 ("The Corps has significant discretion to balance the often competing purposes at its multi-purpose reservoirs.").  That discretion necessarily requires careful tailoring to accommodate assorted stakeholders and harmonize different goals.  It would not make sense for Congress to instruct the Corps to undertake these various tasks but simultaneously hamstring the Corps' ability to carry out any of those functions without prior approval.  Reading "seriously affect" and "major structural or operational changes" to convey their mildest possible meanings would put them in tension with the WSA's other directives.

Additionally, as discussed in detail above, *supra* Part IV.A.2, the lack of any manifest limits on the Corps' authority in Section 390b(e) indicates that Congress wanted to give the Corps managerial flexibility.  Congress easily could have imposed strict limits on what the Corps could do absent approval but elected not to.  And because Congress did exactly that in *other* parts of the WSA, its failure to implement similar constraints in Section 390b(e) supports broader discretion with respect to interpreting "serious[] [e]ffect[s]" and "major structural or operational changes." At the very least, it appears that Congress intended for this language to trigger a qualitative, rather than a quantitative, test.

Finally, while the Supreme Court has lessened its weight in recent years, a law's purpose still plays a role in statutory construction.  The court may not "pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal," but it can consider purpose when it "is readily apparent from the [statute]'s text."  *Sw. Airlines Co.*, 596 U.S. at 463 (first quoting *New Prime Inc. v. Oliveira*, 586 U.S. 105, 120 (2019), then quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011)).  Here, Congress expressly "declared [its] policy" that "the Federal Government should participate and cooperate with States and local interests in developing . . .

water supplies in connection with the construction, maintenance, and operation of Federal navigation, flood control, irrigation, or multiple purpose projects." 43 U.S.C. § 390b(a). Instructing the Corps to work hand-in-hand with dozens of states and hundreds of localities to meet water needs necessarily requires significant leeway.[13]

As the Supreme Court has recently affirmed, "Congress has often enacted such [discretion-conferring] statutes." *Loper Bright*, 603 U.S. at 394; *id.* ("In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion."). For example, some statutes "empower an agency . . . to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility.'" *Id.* (quoting *Michigan v. Env't Prot. Agency*, 576 U.S. 743, 752 (2015)). But while this discretion may be broad, it is not limitless.[14] And even for discretionary statutes, the reviewing court must still "independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 395.

Now that *Chevron* has been overruled, a court may no longer defer to an agency's interpretation of ambiguous statutory language.[15] *See Loper Bright*, 603 U.S. at 412-13. That said, the court can still "properly resort" to an agency's "body of experience and informed judgment"

---

[13] While the Supreme Court has all but sidelined legislative history as an interpretive tool, it too supports wide latitude for the Corps' management of water systems. *See* S. Rep. No. 85-1710, at 133 (1958) (considering the WSA "one of the most important parts of the bill because of the increasingly acute water shortages" across the country and entrusting the Corps "to develop the best overall use of water resources in river basins in the service of water supply and other needs"); H. Rep. No. 85-1894, at 134-35 (1958) (same).

[14] Alabama asserts that, under the Corps' interpretation, "it is difficult to conceive of any realistic scenario in which the WSA would require the Corps to seek the approval of Congress." Alabama Opening's Br., ECF No. 156, at 31. But the Corps readily admits that anything impeding "prudent reservoir management" would trigger the requirement. AR 4733.

[15] The Corps wisely did not hinge its arguments on *Chevron* deference and disclaims any reliance on it here. Corps' Opening Br., ECF No. 158, at 17 n.4. Instead, the Corps presents the agency's conclusions as informative, rather than authoritative. *Id.* at 29 n.9.

when "determining the meaning of statutory provisions." *Id.* at 394. This is especially so when those judgments "rest[] on factual premises within [the agency's] expertise." *Id.* at 402 (second alteration in original) (quoting *Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 98 n.8 (1983)). The 2012 Stockdale Memorandum, although not binding on this court by any means, *see Loper Bright*, 603 U.S. at 398-99, reflects the Corps' carefully considered understanding of its authority under the WSA. AR 4694-741. In it, Mr. Stockdale concluded that the terms "seriously" and "major" referred to "changes and impacts that fundamentally depart from Congressional intent for a project." AR 4728. He grounded his analysis in the Corps' "decades of managing hundreds of federal multi-purpose reservoir projects with varying operations, size[s], and authorized purposes." Corps' Opening Br., ECF No. 158, at 16. This assessment aligns with and supports the court's aforementioned statutory analysis. And it makes good sense: Congress, having already conferred discretion on the Corps to fulfill the WSA's objectives, would logically require approval when the Corps' modifications might disrupt those objectives.

Here, the Corps determined that allocating a cumulative 12.1% (or an incremental 5.2%) of the Allatoona Project's conservation storage would not interfere with the project's operations and thus would not require Congressional approval. AR 6. To reach this conclusion, the Corps examined the particular characteristics of the Allatoona Project and how increasing water supply would affect its primary functions, like flood risk management and hydropower generation. *See* AR 1-3. Unlike an agency's assessment of statutory language, these expertise-driven factual findings receive an "extreme degree of deference." *Huntsman Petrochemical LLC v. Env't Prot. Agency*, 114 F.4th 727, 735 (D.C. Cir. 2024) (quoting *Miss. Comm'n on Env't Quality v. Env't Prot. Agency*, 790 F.3d 138, 150 (D.C. Cir. 2015) (per curiam)).

Because Alabama hitched its wagon to *Geren*, it does little to fight the statute's text on its own terms. The plain language of Section 390b(e), informed by its surrounding context and the rest of the WSA, indicate that Congress gave the Corps flexibility to manage its reservoirs. Congress did not enact a rigid, formulaic approach to the "seriously affect" or "major . . . operational change[]" inquiries, and the court will not impose one. Therefore, Alabama cannot demonstrate that the Corps overstepped its legal authority under the WSA in reallocating 12.1% of the Allatoona Project's conservation pool to meet water supply needs.

### C.    Whether the Corps' Allocation Was Otherwise Arbitrary and Capricious

Alabama next argues that the Corps failed to adequately explain its decision to proceed without Congressional approval on the 2021 ROD. It attacks the Corps' judgment from two angles. First, Alabama claims that the Corps did not consider the full, cumulative allocation at the Allatoona Project in making its assessments. Second, it says that the Corps' legal analysis was woefully deficient even under the 2012 Stockdale Memorandum's framework.

It is well established that judicial review under the arbitrary-and-capricious standard "is deferential, and a court may not substitute its own policy judgment for that of the agency." *Inteliquent, Inc. v. Fed. Commc'ns Comm'n*, 35 F.4th 797, 802 (D.C. Cir. 2022) (quoting *Prometheus Radio Project*, 592 U.S. at 423). A court must "simply ensure[] that the agency has acted within a zone of reasonableness" by "consider[ing] the relevant issues and reasonably explain[ing] the decision." *Prometheus Radio Project*, 592 U.S. at 423. And even when the agency's decision is "of less than ideal clarity," the court will still uphold it if "the agency's path may reasonably be discerned." *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 924 (D.C. Cir. 2017) (quoting *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006)).

1.      **Whether the Corps adequately analyzed the cumulative reallocation amount**

Alabama begins by arguing that "neither the ROD nor the FR/SEIS assessed the impact of the cumulative water-supply storage reallocations at Allatoona." Alabama's Opening Br., ECF No. 156, at 32. If this were true, it would likely pose a problem under the APA. But the record does not bear out Alabama's concern.

Alabama asserts that the Corps only looked at the effects of the *incremental* allocation at the Allatoona Project while disregarding the fuller picture. This would be especially problematic because even the Corps itself acknowledged—during the notice-and-comment process—that "the baseline for evaluating the effects of a proposed reallocation of storage is the congressional authorization for the project, not necessarily current conditions." AR 8585. As evidence, Alabama cites to the fact that the "no action alternative" incorporated the preexisting storage contracts, which accounted for 6.9% of the Allatoona Project's conservation pool. Alabama's Opening Br., ECF No. 156, at 33. Because the "no action alternative" would maintain the status quo, the incorporation suggested that the Corps was only evaluating the impact of reallocations *beyond* that amount. *Id.* at 32-33.

The record, however, shows that the Corps understood the proper baseline to be Congress's original authorization. In issuing the 2021 ROD, the Corps "kept in mind the project's original authorization, which [only] authorized the plan for flood control . . . , hydropower, and navigation." AR 2. The Corps thus recognized that the project's initial purposes did *not* include water supply, resulting in a baseline of zero. The ROD was also clear in defining the full scope of the water-supply allocation, noting that, "[c]ombined with existing storage in Allatoona Lake already allocated to water supply, the total storage allocated to water supply would be 32,698 [acre-feet], or approximately 5.85 percent of total usable storage in Allatoona Lake, and 12.1 percent of the conservation storage pool." AR 3.

Besides the ROD, other documents in the record support the conclusion that the Corps was considering the cumulative allocation.  For example, the Army Director of Civil Works (at the Corps' headquarters) wrote a memorandum opining that the cumulative 52,411 acre-feet reallocation contemplated in the later-scrapped Alternative 11 plan would not have "involve[d] a fundamental departure from authorized project operations" or "seriously affect[ed] the congressionally authorized project purposes for the Allatoona Lake Project."  AR 226.  Implicitly, then, a much smaller 32,698 acre-feet reallocation would have had even fewer measurable effects.  The Corps also directly responded to comments raising the cumulative-assessment concern by reassuring stakeholders that the "Final FR/SEIS extensively analyzed and documented operational changes, impacts to authorized purposes, and other effects of each alternative *including cumulative effects*, in keeping with applicable laws and regulations."  AR 428-29, 431, 441 (emphasis added).  And the 2012 Stockdale Memorandum—which specifically addresses Lake Lanier but also guides the Corps' approach to handling reallocation requests more generally—requires the Corps to "first determine the Congressional understanding of the purposes and operation of that project *at the time of authorization*."  AR 4712-13 (emphasis added).

Even so, the court acknowledges that the Corps could have done a better job of clearly explaining that it used the correct baseline.  For example, the ROD could have expressly said that it was separately analyzing the 32,698 acre-feet reallocation as a cumulative change.  But the full extent of an agency's decision need not be "crystal clear."  *Casino Airlines*, 439 F.3d at 717 (quoting *Chritton v. Nat'l Transp. Safety Bd.*, 888 F.2d 854, 862 (D.C. Cir. 1989)).  And because the court can discern from the record as a whole that the Corps *did* evaluate the reallocation request

from the appropriate baseline, Alabama has not carried its burden on arbitrary-and-capricious review.  *See Epsilon Elecs., Inc.*, 857 F.3d at 924 (quoting *Casino Airlines*, 439 F.3d at 717).[16]

### 2.    Whether the Corps adequately explained the legal basis for its decision

Finally, Alabama laments that the Corps did not conduct a lengthy, independent legal analysis (like the 2012 Stockdale Memorandum) for Georgia's water-supply request.  Alabama's Opening Br., ECF No. 156, at 33-35.  Putting aside the fact that neither the APA nor the WSA requires legal analysis anywhere close to the scale of the 2012 Stockdale Memorandum, the legal basis for the Corps' conclusion is well-supported by the administrative record.

Backed by thorough analysis, factfinding, and experience, the Corps determined that granting Georgia's water-supply request would have little, if any, effect on the Allatoona Project's operations.  It also concluded that Georgia's needs "could be met using either storage accounting method, without requiring any significant changes to the operation of the Allatoona Project and without significantly affecting [any] authorized purposes."  AR 4.

These assessments are patently clear from the record, which is replete with evidence showing negligible or non-significant impacts on the Allatoona Project.  The ROD included a comprehensive table assessing the reallocation's effect on criteria ranging from "aesthetics" and "aquatic resources" to "navigation," "soils," and "water quality."  AR 5.  For each category, the

---

[16] Alabama seems to separately challenge the Corps' adoption of Georgia's storage-accounting methodology.  Alabama's Opening Br., ECF No. 156, at 21-22.  But Alabama does not explain how that adoption would have any structural or operational impact for the Allatoona Project.  And the Corps concluded that "[t]he operation of Allatoona Lake and the federal ACT system would not change in any significant way if the storage accounting method were changed."  AR 367-68.  The new methodology enabled the Corps to meet Georgia's water-supply request without devoting additional storage to that purpose.  *See* AR 1 n.1.  If anything, the methodology—which corrected prior accounting errors and more accurately credited the CCMWA for its inflows into Allatoona Lake—actually *minimized* the operational impact of granting Georgia's request.

impact was either insignificant or nonexistent.  *Id.*  The ROD also incorporated the FR/SEIS, which considered myriad possible environmental effects in exhaustive detail and concluded that none produced more-than-negligible effects.  AR 5366-435.  The Corps also identified twenty-three courses of action, intensively surveyed fourteen of them, and presented those fourteen for public comment.  AR 3; AR 16562-85.  It then received 583 comments from various stakeholders and considered them all.  AR 5438; AR 5.

In sum, the Corps conducted a comprehensive analysis of Georgia's request and determined that it would have no "appreciable effect" on the project's overall operation.  AR 5366.  These findings are precisely the type of fact-bound, expertise-laden agency conclusions that are entitled to "extreme" deference under the APA.  *Huntsman Petrochemical*, 114 F.4th at 735 (quoting *Miss. Comm'n on Env't Quality*, 790 F.3d at 150); *see Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 193 (1983) (explaining that "a reviewing court must generally be at its most deferential" when examining "predictions [that an agency makes] within its area of special expertise").  And the findings undergirded the Corps' ultimate legal assessment that the reallocation "would not entail any major changes to the Corps' operation of Allatoona Lake or the ACT system projects for their authorized purposes, and [that] there would be no significant impacts to any authorized project purpose."  AR 6.

Alabama largely fails to dispute this.  *See generally* Alabama's Opening Br., ECF No. 156; Corps' Reply Br., ECF No. 166, at 19 ("Alabama does not dispute that the Corps' substantive factual determination—that it could grant Georgia's water supply request without effecting a 'major operational change' at the Allatoona project—is entitled to deference.").  Alabama quibbles with the ROD's depth of analysis, but the analysis it seeks is omnipresent throughout the administrative record.

*    *    *

In conclusion, Alabama over-relies on an overreading of *Geren*. It cannot persuasively demonstrate that the D.C. Circuit's decision established a categorical, bright-line rule that dispositively resolves this case in its favor. Such a reading would rigidly expand the Circuit's holding about a single reservoir into a one-size-fits-all approach that contradicts the WSA and defies common sense.

With no path to victory through *Geren*, Alabama is forced to fight the WSA on its own terms, but it comes up short there, too. Under the text of the statute, and in light of the Corps' expert analysis, Alabama cannot show that the Corps' reallocation of water storage at the Allatoona Project required Congressional approval, or that its exhaustive analysis was arbitrary and capricious.

## V.    CONCLUSION

For the foregoing reasons, the court will deny Alabama's motion for summary judgment, ECF No. 156, grant the Corps' cross-motion for summary judgment, ECF No. 158, grant Georgia's cross-motion for summary judgment, ECF No. 159, and grant the ACR's and the CCMWA's cross-motion for summary judgment, ECF No. 161. A contemporaneous order will issue.

_____
LOREN L. ALIKHAN
United States District Judge

Date:   March 31, 2025